No. 21-2030

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

_____

KESHA T. WILLIAMS

*Plaintiff – Appellant*

v.

STACEY A. KINCAID, et al.

*Defendants-Appellees.*

_____

**On Appeal from the United States District Court
for the Eastern District of Virginia
(Case No. 1:20-01397, Hon. Claude Hilton)**

_____

### BRIEF OF APPELLANT

Joshua Erlich (VSB No. 81298)
Davia Craumer (VSB No. 87426)
Katherine L. Herrmann (VSB No. 83203)
THE ERLICH LAW OFFICE, PLLC
2111 Wilson Blvd. Suite 700
Arlington, VA 22201
Tel: (703) 791-9087
Fax: (703) 722-8114
Email: jerlich@erlichlawoffice.com
       dcraumer@erlichlawoffice.com
       kherrmann@erlichlawoffice.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-2030      Caption: Kesha T. Williams v. Stacey A. Kincaid, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kesha T. Williams
(name of party/amicus)

who is _____ appellant _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?   ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
   If yes, identify all such owners:

12/01/2019 SCC                          - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Katherine L. Herrmann                    Date: _____10/04/2021_____

Counsel for: Kesha T. Williams, Plaintiff-Appellant

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION........................................................4

STATEMENT OF THE ISSUES...........................................................5

STATEMENT OF THE CASE...............................................................6

    I.    Factual Background.....................................................6

    II.   Procedural History......................................................11

SUMMARY OF ARGUMENT ............................................................12

STANDARD OF REVIEW .................................................................15

ARGUMENT ....................................................................................16

    I.    THE DISTRICT COURT ERRED IN FINDING MS.
        WILLIAMS' AMENDED COMPLAINT DID NOT
        RELATE BACK FOR STATUTE OF LIMITATIONS
        PURPOSES .......................................................................16

        A.   Extension of the Service Period Under Rule 4(m)
            Applies for the Purpose of Rule 15 and Relation Back ...........18

        B.   Ms. Williams Met the Requirements for Relation Back
            Set Forth in Federal Rule of Procedure 15(c)(1) within
            the 90-Day Period Provided by Rule 4(m) .............................19

            1.   Deputy Garcia and NP Wang Had Notice of the
                Claims Against Them Within the 90-Day
                Service Period................................................................20

            2.   Deputy Garcia and NP Wang Knew or Should
                Have Known They Were the Parties Ms.
                Williams Intended to Name in Her Complaint...............22

    II.   THE DISTRICT COURT ERRED IN FINDING MS.
        WILLIAMS DID NOT SUFFICIENTLY STATE A CLAIM

OF AN EQUAL PROTECTION VIOLATION AGAINST
DEPUTY GARCIA ............................................................................23

III.   THE DISTRICT COURT ERRED IN FINDING MS.
       WILLIAMS DID NOT SUFFICIENTLY STATE A CLAIM
       OF DELIBERATE INDIFFERENCE AGAINST NP WANG ..........27

       A.    The District Court Failed to Consider the Entirety of
             Ms. Williams' Allegations Against NP Wang in Her
             Amended Complaint ..................................................................27

       B.    Ms. Williams' Allegations are Sufficient to State a
             Claim of Deliberate Indifference Against NP Wang................29

IV.    THE DISTRICT COURT ERRED IN FINDING MS.
       WILLIAMS' GENDER DYSPHORIA DID NOT ENTITLE
       HER TO THE PROTECTIONS OF THE ADAAA ...........................31

       A.    The Exclusion Found in Section 12111(b)(1) Does Not
             Apply to Gender Dysphoria .......................................................32

             1.    Gender Dysphoria is Substantially Different
                   from the Condition of Gender Identity Disorder
                   that Existed in 1990 .......................................................33

             2.    Gender Dysphoria Has a Known Physical Basis
                   and Is Therefore Not Excluded Under the
                   ADAAA As a Gender Identity Disorder Without
                   a Physical Impairment ....................................................36

       B.    The District Court's Holding Raises a Question as to
             the Constitutionality of the ADA Exclusion Found
             Under 42 U.S.C. § 12211(b)(1) ................................................37

V.     THE DISTRICT COURT ERRED IN FINDING MS.
       WILLIAMS' CLAIMS OF GROSS NEGLIGENCE
       AGAINST DEFENDANTS-APPELLEES FAILED AS A
       MATER OF LAW ..............................................................................40

       A.    Ms. Williams Pled Facts in Her Amended Complaint
             Sufficient to State a Claim Against Deputy Garcia for
             Gross Negligence ......................................................................42

B.    Ms. Williams Pled Facts in her Amended Complaint Sufficient to State a Claim Against NP Wang for Gross Negligence ................................................................44

      1.    Ms. Williams Sufficiently Stated a Claim of Gross Negligence Against NP Wang for her Failure to Continue Ms. Williams' Medically-Necessary Treatment Upon Her Incarceration ..............45

      2.    Ms. Williams Sufficiently Pled a Claim of Gross Negligence Against NP Wang for the Prolonged Lapse in Treatment that Occurred Later in Her Incarceration ................................................................46

C.    Ms. Williams Pled Facts in her Amended Complaint Sufficient to State a Claim Against Kincaid for Gross Negligence ................................................................48

      1.    The Policies Kincaid Enacted Were Not Designed to Promote the Safety of Transgender Inmates................................................................48

      2.    Kincaid Failed to Enforce Those Policies and Procedures Which Do Serve to Protect Transgender Individuals ................................................51

CONCLUSION ........................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adams v. Naphcare, Inc.*,
    246 F. Supp. 3d 1128 (E.D. Va. 2017) ........................................................41

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................16

*Ashwander v. Tenn. Valley Auth.*,
    297 U.S. 288 (1936) ..................................................................................38

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................15

*Blatt v. Cabela's Retail, Inc.*,
    2017 WL 2178123 (E.D. Pa. May 18, 2017) ................................................35

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020) ..............................................................................40

*Commonwealth v. Giddens*,
    816 S.E.2d 290 (Va. 2018) ........................................................................41

*Cowan v. Hospice Support Care, Inc.*,
    603 S.E.2d 916 (Va. 2004) ........................................................................41

*Crowell v. Benson*,
    285 U.S. 22 (1932) ....................................................................................38

*De'Lonta v. Angelone*,
    330 F.3d 630 (4th Cir. 2003) ......................................................................45

*De'lonta v. Johnson*,
    708 F.3d 520 (4th Cir. 2013) ......................................................................30

*DePaola v. Clarke*,
    884 F.3d 481 (4th Cir. 2018) ......................................................................28

*Doe v. Massachusetts Dep't of Correction*,
    2018 WL 2994403 (D. Mass. June 14, 2018) ............................ 35, 36, 37, 39

*Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*,
    213 F.3d 175 (4th Cir. 2000) ......................................................................15

*Edwards v. City of Goldsboro*,
    178 F.3d 231 (4th Cir. 1999) ........................................................15

*Farmer v. Brennan*,
    511 U.S. 825 (1994)......................................................................29

*Fauconier v. Clarke*,
    966 F.3d 265 ......................................................................... 23, 26

*Formica v. Aylor*,
    739 F. App'x 745 (4th Cir. 2018)..................................................29

*Gayton v. McCoy*,
    593 F.3d 610 (7th Cir. 2010) ........................................................29

*Gilstrap v. Huntington Ingalls Inc.*,
    2019 WL 8890001 (E.D. Va. Dec. 9, 2019)........................... 41, 45

*Grimm v. Gloucester County School Board*,
    972 F.3d 586 ................................................................... 30, 33, 40

*Heard v. Sheahan*,
    253 F.3d 316 (7th Cir. 2001) ........................................................28

*Ibarra v. United States*,
    120 F.3d 472 (4th Cir. 1997) ........................................................15

*Iglesias v. True*,
    403 F. Supp. 3d 680 (S.D. Ill. 2019) .............................................35

*Jackson v. Lightsey*,
    775 F.3d 170 (4th Cir. 2014) .................................................. 29, 47

*Jehovah v. Clarke*,
    798 F.3d 169 (2015) .....................................................................45

*Kadel v. North Carolina State Health Plan for Teachers and State Employees*,
    12 F.4th 422 (2021) .....................................................................33

*Krupski v. Costa Crociere, S. p. A.*,
    560 U.S. 538 (2010).....................................................................20

*Martin v. Duffy*,
    858 F.3d 239 (4th Cir. 2017) ........................................................23

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
    682 F.3d 1 (1st Cir. 2012).................................................................39

*Miltier v. Beorn*,
    896 F.2d 848 (4th Cir. 1990) ........................................................47

*Presely v. City of Charlottesville*,
    464 F.3d 480 (4th Cir. 2006) ........................................................15

*Pyler v. Doe*,
    457 U.S. 292 (1982)........................................................................39

*Robinson v. Clipse*,
    602 F.3d 605 (4th Cir. 2010) ............................................ 18, 20, 22

*Romer v. Evans*,
    517 U.S. 620 (1996)........................................................................39

*Rumble v. 2nd Ave. Value Stores*,
    442 F. Supp. 3d 909 (E.D. Va. 2020) ..........................................20

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974)........................................................................16

*Sharpe v. S.C. Dep't of Corr.*,
    621 F. App'x 732 (4th Cir. 2015)..................................................30

*Shorter v. Barr*,
    2020 WL 1942785 (N.D. Fla. Mar. 13, 2020)...............................36

*Tay v. Dennison*,
    2020 WL 2100761 (S.D. Ill. May 1, 2020) ...................................36

*Thomas v. Snow*,
    174 S.E. 837 (Va. 1934) ................................................................41

*Turner v. Safely*,
    482 U.S. 78 (1987)................................................................... 25, 26

*United States v. Dwinells*,
    508 F.3d 63 (1st Cir. 2007)............................................................38

*Veney v. Wyche*,
    293 F.3d 726 (4th Cir. 2002) ........................................................23

*Venson v. Gregson*,
    2021 WL 673371 (S.D. Ill. Feb. 22, 2021)........................ 35, 38, 40

*Weidman v. Exxon Mobil Corp.*,
    776 F.3d 214 (4th Cir. 2015) ........................................................15

*Wilby v. Gostel*,
    578 S.E.2d 796 (Va. 2003) ..........................................................45


**Statutes & Other Authorities:**

U.S. Const., Amend. VIII ............................................... *passim*

U.S. Const., Amend. XIV ...................................................2

28 C.F.R. § 115.15(f) ......................................................43

28 U.S.C. § 1291 ...........................................................4

28 U.S.C. § 1294 ...........................................................4

28 U.S.C. § 1331 ...........................................................4

42 U.S.C. § 1983 ................................................ 4, 16, 28

42 U.S.C. § 12111(b)(1) ............................................ *passim*

42 U.S.C. § 12211(b) .....................................................39

135 Cong. Rec. S11173-78, 1989 WL 183785 (daily ed. Sept. 14, 1989) .............33

Federal Rule of Appellate Procedure 4(a)(1)(A) .......................4

Federal Rule of Civil Procedure 4(m) ............................ *passim*

Federal Rule of Civil Procedure 12(b)(6) ................... 15, 42, 47

Federal Rule of Civil Procedure 15 ......................... 17, 18, 19

Federal Rule of Civil Procedure 15(c) ........................... *passim*

Federal Rule of Civil Procedure 15(c)(1) .............................19

Federal Rule of Civil Procedure 15(c)(1)(B) .........................17

Federal Rule of Civil Procedure 15(c)(1)(C) .........................17

Federal Rule of Civil Procedure 15(c)(1)(C)(i) ......................21

Federal Rule of Civil Procedure 15(c)(1)(C)(ii) .....................22

H.R. Rep. No. 101-485(IV) (May 15, 1990) ........................ 32-33

SOP 606 ....................................................................................50

SOP 606, § II.E ........................................................................49

SOP 606, § II.F ........................................................................49

SOP 606, § IV.B .......................................................................46

SOP 606, § IV.C ................................................................. 46, 49

SOP 606, § IV.D .......................................................................24

American Psychiatric Association, *Diagnostic and Statistical Manuel of Mental Disorders* (5th ed. 2013)........................................... 34, 35

Kevin M. Barry, Jennifer L. Levi, *The Future of Disability Rights Protections for Transgender People*, 35 Touro L. Rev. 25 (2019)..............38

World Professional Association for Transgender Health (WPATH), Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th Version, 2012) ...................................30

# INTRODUCTION

This case arises from the treatment of Kesha T. Williams ("Ms. Williams" or "Plaintiff-Appellant") during her incarceration at the Fairfax County Adult Detention Center ("FCADC") in Fairfax County, Virginia.

Ms. Williams is a transgender woman, an individual whose gender identity (female) is different from the sex assigned to her at birth (male). Long before her incarceration, Ms. Williams completed a legal name change and change in her gender markers in her resident state of Maryland. Her driver's license and other legal documents, such as her birth certificate, bear the designation of "female." In all ways, the law recognizes Ms. Williams as a woman.

Defendant-Appellee Stacey Kincaid ("Kincaid") is the Sheriff of Fairfax County. Kincaid serves as the independent constitutional officer responsible for the operation of FCADC pursuant to Virginia law. Defendant-Appellee Xin Wang ("NP Wang") is a medical professional working for the Fairfax County Sheriff's Office to provide medical treatment to inmates at FCADC, and Defendant-Appellee Deputy Garcia ("Deputy Garcia") is a Fairfax County Sheriff's deputy who, by virtue of his position, bore responsibility for the implementation of policies and procedures at FCADC at all times relevant to Ms. Williams' claims.

Ms. Williams became incarcerated at FCADC on November 16, 2018. Despite legal recognition of Ms. Williams' gender, Defendants-Appellees housed

Ms. Williams with the male population, denied her access to female undergarments, required she shower in the presence of male inmates and Sheriff's deputies, ignored her requests to enter the Workforce Program at FCADC for months, and subjected her to cross-gender searches by a male Sheriff's deputy.

 Defendants-Appellees halted Ms. Williams' medically-necessary hormone therapy treatment upon her incarceration for nearly a month and allowed for a several-week-long lapse in her treatment to occur later in Ms. Williams' incarceration. Defendants-Appellees knew Ms. Williams' medical history and diagnosis of gender dysphoria, as well as the serious risk of harm that might result from a failure to provide treatment, and still denied and delayed her treatment.

Ms. Williams' Amended Complaint asserted a claim against Kincaid for discrimination under the ADAAA; against Deputy Garcia for violation of the Equal Protection clause based on her sex under the Fourteenth Amendment; and against NP Wang for deliberate indifference in violation of the Eighth Amendment. In addition, Ms. Williams' Amended Complaint stated a claim against all Defendants-Appellees for gross negligence in violation of Virginia law.

Defendants-Appellees each filed motions to dismiss. The district court granted Kincaid's motion to dismiss the Amended Complaint on June 7, 2021 and granted NP Wang and Deputy Garcia's motions to dismiss the Amended

Complaint on August 18, 2021. Ms. Williams now appeals the dismissal of her

Amended Complaint.

## <u>STATEMENT OF JURISDICTION</u>

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because the action asserted violations of federal statutory rights under the Americans with Disabilities Act Amendments Act of 2008 and/or Section 504 of the Rehabilitation Act and under 42 U.S.C. § 1983 ("Section 1983"). The district court entered final judgment on August 18, 2021.

Under Federal Rule of Appellate Procedure 4(a)(1)(A), Plaintiff-Appellant timely filed a Notice of Appeal on September 16, 2021, within 30 days after final judgment was entered. This Court has jurisdiction to consider Plaintiff-Appellant's appeal from the district court's final judgment under 28 U.S.C. §1291 and 28 U.S.C. §1294.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in finding that, to state a claim of discrimination under the Americans with Disabilities Act Amendments Act and/or Rehabilitation Act, an individual with gender dysphoria must allege their condition resulted from a physical impairment to show they are a qualified individual with a disability.

2.    Whether the district court erred in finding that a Sheriff who enacts and maintains any policy intended to ensure the safety of inmates at a facility has exercised some degree of care for all inmates such that a claim of gross negligence against the Sheriff must fail as a matter of law.

3.    Whether the district court erred in finding that a medical practitioner at a jail who provides any medical treatment to an inmate has exercised some degree of care such that a claim of gross negligence against the medical practitioner must fail as a matter of law.

4.    Whether the district court erred in finding that a Sheriff's deputy who is performing a duty he is authorized to perform cannot be deemed grossly negligent in violation of Virginia common law, even where he performs the action in a manner that suggests a conscious disregard for the well-being of an inmate and results in physical injury to that inmate.

5.     Whether the district court erred in finding that relation back for statute of limitations purposes does not apply when an Amended Complaint is served beyond the ninety (90) day period provided in Federal Rule of Civil Procedure 4(m) but within an extension of the service period granted by the Court for a showing of good cause.

6.     Whether the district court erred in finding that relation back for statute of limitations purposes did not apply to Ms. Williams' Amended Complaint where Defendants-Appellees received notice of the claims against them within the ninety (90) day period provided in Federal Rule of Civil Procedure 4(m), and all requirements for relation back provided in Federal Rule of Civil Procedure 15(c) were otherwise met.

## STATEMENT OF THE CASE

### I.     Factual Background

Ms. Williams became incarcerated at FCADC on November 16, 2018. J.A. 014 at ¶ 31. A female Sheriff's deputy at FCADC performed the initial search of Ms. Williams' person and escorted her to the female side of the facility. J.A. 014 at ¶ 33. FCADC provided Ms. Williams with the standard prison uniform provided to all female inmates, including 3 bras and 3 sets of female underwear. J.A. 014 at ¶ 32.

Later that same day, Ms. Williams underwent an initial medical evaluation during which she informed her medical provider, NP Wang, that she is transgender, that she lives full-time as a woman, and that she identifies as a woman. J.A. 014 at ¶ 35. Ms. Williams informed NP Wang that she had been on hormone treatment for the past fifteen (15) years and that her current hormone medication regiment consisted of a daily pill and bi-weekly injection. J.A. 014 at ¶ 35. Despite Ms. Williams raising concerns over a lapse in her hormone therapy treatment, NP Wang did not promptly prescribe Ms. Williams medication or permit Ms. Williams to retrieve the hormone medication she had brought with her to the facility. J.A. 016 at ¶ 49. Instead, NP Wang instructed Ms. Williams to fill out a medical records release form and indicated she would follow up with Ms. Williams once FCADC received her medical records. J.A. 017 at ¶¶ 51, 52.

Upon learning that Ms. Williams had not yet undergone transfeminine bottom surgery, NP Wang changed Ms. Williams' records to label her as "male" for purposes of housing classification. J.A. 015 at ¶ 39. Based solely on this determination, Sheriff's deputies at FCADC would later place Ms. Williams in male housing without performing an assessment to determine her vulnerability in the general male jail population or taking any additional steps for the purpose of ensuring Ms. Williams' safety and security. J.A. 015 at ¶¶ 41-42. Such an

assessment is required under FCADC policy governing the housing of transgender inmates at the facility. J.A. 015 at ¶ 42.

FCADC also required Ms. Williams to return the female clothing she had been issued and instead issued her the standard uniform for a male inmate. J.A. 015 at ¶ 43. Ms. Williams has breasts and requested she be provided with a bra. NP Wang instructed Ms. Williams to purchase a bra from the commissary rather than assist her with requesting a bra as an accommodation. J.A. 016 at ¶ 45.

Due to the sudden cessation in her hormone therapy treatment, Ms. Williams experienced symptoms, including depression and significant discomfort. J.A. 017 at ¶¶ 55-57. She requested a "sick call visit" on December 1, 2018, to follow up on the status of her medically-necessary treatment and seek access to mental health treatment and counseling. J.A. 017 at ¶¶ 55, 57. A different medical provider instructed Ms. Williams to fill out a medical records release form a second time so that NP Wang could order the medication she required. J.A. 017 at ¶ 56.

NP Wang received and reviewed Ms. Williams' medical records on or about December 4, 2018 but waited until December 10, 2018 to log their receipt into FCADC's system and order Ms. Williams' medically-necessary daily mediation. J.A. 017-18 at ¶¶ 58-65. The medical records confirmed Ms. Williams' long-term diagnosis of gender dysphoria and outlined the hormone therapy that is a necessary part of her treatment. J.A. 018 at ¶ 60.

After her initial medical evaluation, Ms. Williams attempted to purchase a bra from the commissary, per NP Wang's instruction, but FCADC denied her request on the grounds that female commissary items were not made available to individuals housed with the male population. J.A. 018-19 at ¶¶ 67, 68. On November 28, 2021, Ms. Williams made a written request to FCADC's ADA Compliance Officer seeking a bra as a reasonable accommodation, and the ADA Compliance Officer referred Ms. Williams to NP Wang to determine the medical necessity of her request. J.A. 019 at ¶¶ 60-61. NP Wang granted Ms. Williams a medical authorization to receive a bra on or about December 10, 2018, nearly a month after Ms. Williams had informed NP Wang of her need for the item. J.A. 019 at ¶ 72.

FCADC provided Ms. Williams with a size XL bra which she was unable to wear as it did not fit her. J.A. 019 at ¶ 073. FCADC provided individuals housed with the general female population with bras of an appropriate size but the Sheriff's deputies at FCADC told Ms. Williams they did not have a larger size bra available for her at the facility. J.A. 019 at ¶¶ 73-74. FCADC did not provide Ms. Williams with a bra that fit at any point during her incarceration at FCADC. J.A. 019 at ¶ 75.

FCADC denied Ms. Williams' request for women's underwear as a formal accommodation in its entirety. As with the bra, Ms. Williams made her request to

FCADC's ADA Compliance Officer, and the ADA Compliance Officer referred Ms. Williams to NP Wang to evaluate the medical necessity of her request. NP Wang, despite Ms. Williams' history of gender dysphoria, declined to provide medical authorization for the request. J.A. 019-20 at ¶¶ 77-80.

Throughout her incarceration, Fairfax County Sheriff's deputies subjected Ms. Williams to a host of other indignities based on her sex, sex-based stereotypes, and gender identity. J.A. 020 at ¶ 81. This included purposefully misgendering her and referring to her as "sir" or "mister." Deputies also denied her access to a private shower despite Ms. Williams' stated concerns for her safety showering with the general male population. J.A. 020-21 at ¶¶ 82, 86.

FCADC subjected Ms. Williams to other forms of discrimination as well. The facility delayed Ms. Williams' entrance into the Workforce Program, a form of work release, despite her being qualified for the program and making repeated requests. J.A. 022 at ¶¶ 95-106. Ms. Williams watched individuals who were not transgender – and who had been incarcerated after her – be transferred into the Workforce Program while her own requests went unanswered and ignored for months on end. *Id*.

In January 2019, during a "shakedown" search of Ms. Williams' housing unit, Ms. Williams requested that her person be searched by a female deputy. J.A. 021 at ¶ 90. Deputy Garcia, a male deputy, proceeded to search Ms. Williams

despite her request. J.A. 021 at ¶ 91. Deputy Garcia told Ms. Williams, "Sir, you are a male and I need to search you," before performing an unreasonably aggressive search of Ms. Williams' person. J.A. 021 at ¶ 92. During the search, Deputy Garcia groped Ms. Williams' right breast with such force that she bruised. J.A. 022 at ¶ 93. After the search, he mocked her request to be searched by a female deputy to other Sheriff's deputies who were present during the search. J.A. 022 at ¶ 94.

In April and May of 2019, Ms. Williams suffered another prolonged lapse in her hormone treatment because of NP Wang's failure to provide consistent medical care. J.A. 024 at ¶¶ 111-13. During that time, NP Wang failed to provide Ms. Williams with her bi-weekly hormone injection on two consecutive dates, resulting in more than a one-month lapse in Ms. Williams' hormone treated prior to her release. J.A. 024 at ¶¶ 111-13.

## II.   Procedural History

Ms. Williams filed her Complaint in the United States District Court for the Eastern District of Virginia on November 16, 2020. (Dkt. 1). Ms. Williams named Kincaid and two individual "Does" as Defendants in her Complaint before engaging in limited early discovery to determine the proper identity of the Doe defendants. Ms. Williams' counsel worked amicably with Defendants-Appellees' counsel to identify the Doe Defendants. Once Ms. Williams identified the Doe

Defendants, she filed her Amended Complaint naming Kincaid, NP Wang, and Deputy Garcia on February 12, 2021. J.A. 008.

On the same date she filed her Amended Complaint, February 12, 2021, Ms. Williams moved for an extension of time to serve her Amended Complaint, citing her diligent efforts to identify the Doe Defendants as good cause. J.A. 036. The district court granted Ms. Williams' motion for good cause and extended her time to serve the Amended Complaint on Defendants until March 18, 2021. J.A. 039. Ms. Williams served both NP Wang and Deputy Garcia on March 12, 2021. (Dkt. 45, 46).

Kincaid filed a motion to dismiss Ms. Williams' Amended Complaint on February 26, 2021 that was granted by the district court on June 7, 2021 without a hearing. J.A. 040 and 046. NP Wang and Deputy Garcia both filed motions to dismiss Ms. Williams' Amended Complaint on April 2, 2021 which were granted by the district court on August 18, 2021 without a hearing. J.A. 042, 044, and 053. Ms. Williams appeals these final orders and the resulting dismissal of her Amended Complaint in its entirety. J.A. 061.

## SUMMARY OF ARGUMENT

In granting Defendants-Appellees' motions to dismiss, the district court applied a flawed reading of the law in several respects, including a failure to apply relation back for statute of limitations purposes, an improperly narrow reading of

the Americans with Disabilities Amendments Act, and an inaccurate application of state law.

First, the district court erred in finding allegations in Ms. Williams' Amended Complaint against Deputy Garcia and NP Wang did not relate back to the date of her original Complaint even though the district court found good cause to grant an extension for service of the Amended Complaint on Deputy Garcia and NP Wang pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. A proper reading of the rules requires the extension apply for the purpose of relation back under Rule 15(c). Furthermore, the requirements for relation back were otherwise met – even absent the extension – as NP Wang and Deputy Garcia were on notice of the claims within 90 days of the filing of Ms. Williams' original Complaint.

The district court also erred in finding that Ms. Williams failed to plead sufficient facts to allege her constitutional claims against Deputy Garcia and NP Wang, again including a finding that facts more than two years preceding the filing of Ms. Williams' Amended Complaint could not be considered in evaluating Ms. Williams' claims.

The district court's finding that gender dysphoria is excluded from coverage under the Americans with Disabilities Act as a gender identity disorder absent allegations it arose from a physical impairment is also in error. In doing so, the lower court embraced an outdated understanding of what gender dysphoria entails,

its causes, and the medical treatment available to transgender individuals who suffer from the condition.

The district court's dismissal of Ms. Williams' claim of gross negligence against Defendants-Appellees was also in error. The court found it could not consider the facts relevant to Ms. Williams' gross negligence claim against Deputy Garcia, it nevertheless held the allegations evidenced some degree of care by Deputy Garcia such that her allegations were insufficient to state a claim against him as a matter of law. The district court's finding that Deputy Garcia exercised any degree of care during his search of Ms. Williams' person is in error.

With respect to the gross negligence claim against NP Wang, the district court erred in two separate regards. First, it failed to apply relation back, considering only those allegations that occurred within two years of the filing of the Amended Complaint. Second, it held that the exercise of any degree of care by NP Wang precluded Ms. Williams' claim of gross negligence against her as a matter of law.

The district court's holding that Ms. Williams failed to state a claim of gross negligence claim against Kincaid is similarly in error. Contrary to the district court's findings, the policies Kincaid implemented were not designed to prevent the specific harm alleged by Ms. Williams or to protect the safety of transgender inmates. Further, Ms. Williams alleges that Kincaid failed to ensure Sheriff's

deputies' compliance with the policies that were in place, and the policies' mere existence does not evidence the exercise of any care by Kincaid toward Ms. Williams or any other transgender inmates at FCADC.

## **STANDARD OF REVIEW**

A district court's grant of a motion to dismiss for failure to state a claim is reviewed *de novo*. *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015). Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) "does not resolve contests surrounding the facts, the merits of the claims, or the applicability of defenses." *Presely v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Instead, upon a motion to dismiss, a court assumes the truth of all facts alleged in the complaint and must construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *See Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

A complaint must contain factual information sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To achieve facial plausibility, a complaint should contain sufficient

factual allegations to support a reasonable inference that a defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A complaint can withstand a motion to dismiss "even if it appears 'that a recovery is very remote and unlikely.'" *Id*. (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

## <u>ARGUMENT</u>

The district court erred in three areas by: (1) failing to apply relation back for statute of limitations purposes to Ms. Williams' Amended Complaint, (2) failing to recognize Ms. Williams as a qualified individual with a disability under the ADAA, and (3) failing to analyze her state law claims consistent with applicable state law. With due consideration given to the entirety of the facts pled in her Amended Complaint, Ms. Williams pled plausible constitutional claims, plausibly pled her claim under the ADAAA, and plausibly pled her claims of gross negligence.

## I.     THE DISTRICT COURT ERRED IN FINDING MS. WILLIAMS' AMENDED COMPLAINT DID NOT RELATE BACK FOR STATUTE OF LIMITATIONS PURPOSES.

Ms. Williams filed her original Complaint on November 16, 2020, within the two-year statute of limitations period applicable to her claims arising under 42 U.S.C. § 1983 in Virginia. The district court erred in finding the relation back doctrine did not apply to Ms. Williams' Amended Complaint and improperly dismissed Ms. Williams' claims against Deputy Garcia and NP Wang based on

16

consideration of only those allegations arising during the two-year period preceding the filing date of Ms. Williams' Amended Complaint rather than the two-year period preceding the filing of Ms. Williams' original Complaint.

For an amended claim to relate back to the date of the original complaint under Rule 15(c), "the amendment [must] assert a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). In addition, where "the amendment changes the party or the naming of the party against whom a claim is asserted," Rule 15(c) provides the following two additional requirements:

> [Within] the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> (i)      Received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii)      Knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1)(C).

This Court has previously held that an extension of the 90-day service period provided by Rule 4(m) also applies for purposes of meeting the Rule 15 requirements set forth above. The district court granted Ms. Williams' request for an extension to serve her Amended Complaint for good cause, and this extension allowed for her claims to relate back to the date of her original Complaint.

17

Furthermore, the requirements for relation back under Rule 15(c) speak only to notice, rather than formal service. Defendants-Appellees had notice of the claims against them within the 90-day service period provided by Rule 4(m), and such notice is sufficient to meet the requirements for relation back. The district court erred in holding otherwise.

### A. Extension of the Service Period Under Rule 4(m) Applies for the Purpose of Rule 15 and Relation Back.

Within the 90-day period provided for service of process under Federal Rule of Civil Procedure 4(m), Ms. Williams moved the district court for an extension of time to serve her Amended Complaint. J.A. 008. Rule 4(m) requires the district court to "extend the time for service to an appropriate period" if there is "good cause" for not serving a defendant "within 90 days after the complaint is filed." Fed. R. Civ. P. 4(m). The district court granted Ms. Williams' motion to extend the time for service for good cause shown. J.A. 039.

In *Robinson v. Clipse*, this Court held that Rule 15(c)'s notice period incorporates any extension of the 90-day period under Rule 4(m). 602 F. 3d 605, 608 (4th Cir. 2010). In so holding, the Court looked to the 1991 Advisory Committee Notes to Rule 15, which provides "This rule allows not only the [90] days specified in [Rule 4(m)], but also any additional time resulting from any

extension ordered by the court pursuant to that rule." Fed. R. Civ. P. 15, Advisory

Comm. Notes (1991 Amendment).[1]

Ms. Williams formally served Deputy Garcia and NP Wang within the

extended time for service granted by the district court for good cause. As such, the

allegations in her Amended Complaint properly relate back for statute of

limitations purposes.

### B. Ms. Williams Met the Requirements for Relation Back Set Forth in Federal Rule of Procedure 15(c)(1) within the 90-Day Period Provided by Rule 4(m).

Even if, *arguendo*, the extension of time granted for service of the Amended

Complaint under 4(m) did not apply for the purposes of Rule 15(c), Ms. Williams

still met the notice and prejudice requirements for relation back within the standard

90-day service period provided in the Rule. Rule 15(c)(1)(C)(i) requires only that

Defendants-Appellees have notice of the claims against them within the service

period, and formal service is only one method by which such notice can be proven.

"[W]here an original timely Complaint's Rule 4(m) service period has not

expired before a prospective defendant (i) receives notice of the action and (ii)

knows or should know that the action would have been brought against the

---

[1] At the time of this Advisory Committee Note, Rule 4(m) provided for a service period of 120 days. In 2015, amendments to Rule 4(m) resulted in a change of this service period from 120 days to 90 days. Fed. R. Civ. P. 4(m) Advisory Comm. Notes (2015 Amendment).

prospective defendant, an amendment to add the prospective defendant relates back to the original timely Complaint's filing date." *Rumble v. 2nd Ave. Value Stores*, 442 F.Supp.3d 909, 915 (E.D. Va. 2020) (citing *Robinson*, 602 F.3d at 605).

1.  *Deputy Garcia and NP Wang Had Notice of the Claims Against Them Within the 90-Day Service Period*.

Deputy Garcia and NP Wang had constructive notice of Ms. Williams' Amended Complaint within the 90 days provided under Rule 4(m), and such notice is sufficient for her Amended Complaint to relate back. *See, e.g.*, *Krupski v. Costa Crociere*, *S. p. A.*, 560 U.S. 538, 554-55 (2010) (finding relation back proper where an unnamed defendant should have known they were the party the plaintiff intended to sue within the 90-day period provided by 4(m), even when the plaintiff filed the amended complaint naming the defendant after the 90-day period had run).

The 90-day period that began with the filing of Ms. Williams' original complaint on November 16, 2020 ended on February 14, 2021. During this time, Ms. Williams' counsel worked with counsel for Defendants-Appellees to determine the proper identity of the Doe defendants described in Ms. Williams' original complaint. Through these communications, and before Ms. Williams filed her Amended Complaint on February 12, 2021, counsel for Ms. Williams informed counsel for NP Wang and Deputy Garcia that both individuals would be named in the amended pleading in place of the Doe defendants. Within the 90-day period,

Plaintiff's counsel informed counsel for Defendants-Appellees of its intent to seek
an extension from the district court for service of the Amended Complaint on
Deputy Garcia and NP Wang. Counsel for Deputy Garcia and NP Wang did not
object to this motion, and counsel for both parties discussed whether counsel for
Defendants-Appellees would accept service on behalf of Deputy Garcia and NP
Wang before the 90-day period expired.

In addition, before the expiration of the 90-day service period, counsel for
NP Wang and Deputy Garcia received, through the district court's electronic filing
system, a copy of the Amended Complaint naming NP Wang and Deputy Garcia as
defendants on February 12, 2021. Counsel for NP Wang and Deputy Garcia also
received notification via the district court's electronic filing system that Ms.
Williams had filed a motion seeking an extension of time to serve them with the
Amended Complaint as well as proposed summonses for service of her Amended
Complaint on NP Wang and Deputy Garcia on February 12, 2021.

Per the requirement provided in Rule 15(c)(1)(C)(ii), both Deputy Garcia
and NP Wang had notice of Ms. Williams' Amended Complaint within the 90-day
Rule 4(m) period such that they would not be prejudiced in defending the claims
against them on the merits. Had Deputy Garcia and NP Wang been named in the
original complaint, they would be in the same position as they are in now. *See, e.g.,*

*Robinson*, 602 F.3d at 609 (finding defendant not prejudiced on the merits where notice received within the 4(m) limitation period).

2. *Deputy Garcia and NP Wang Knew or Should Have Known They Were the Parties Ms. Williams Intended to Name in Her Complaint.*

Ms. Williams identified NP Wang as a "Health Care Doe" in her original Complaint, whom she described as an individual engaged to provide medical services to Ms. Williams for gender dysphoria during all times relevant to the Complaint, and as the individual who completed Ms. Williams' initial medical evaluation on November 16, 2018. Compl. ¶¶ 19, 34. Ms. Williams identified Deputy Garcia as a "Custody Doe" in her original Complaint, whom she described as a Sheriff's deputy who refused her request to be searched by a female deputy and proceeded to search her person himself during a "shakedown" search that occurred in January 2019. Compl. ¶¶ 61-67.

Despite not knowing their names, Ms. Williams described Deputy Garcia and NP Wang with sufficient particularity such that they could be identified by counsel, and both individuals knew or should have known, Ms. Williams intended the action to be brought against them. As such, Ms. Williams has met the second requirement for relation back provided in Rule 15(c)(ii).

The district court erred in finding Ms. Williams Amended Complaint did not relate back for statute of limitations purposes, and this Court should reverse this

portion of the judgment and remand to the district court for an examination of Ms.

Williams' allegations on the merits.

## II.    THE DISTRICT COURT ERRED IN FINDING MS. WILLIAMS DID NOT SUFFICIENTLY STATE A CLAIM OF AN EQUAL PROTECTION VIOLATION AGAINST DEPUTY GARCIA.

The district court dismissed Ms. Williams' claim of an Equal Protection

violation against Deputy Garcia by excluding from consideration those allegations

which arose prior to between November 16, 2018 and February 12, 2019 through

its failure to properly apply the relation back doctrine. For the reasons described in

Section I, *supra*, Ms. Williams' Amended Complaint properly relates back to the

date of her original Complaint for statute of limitations purposes, and the district

court's failure to consider all of Ms. Williams' allegations against Deputy Garcia

was in error.

To state a claim for a violation of the Equal Protection Clause, a plaintiff

must plausibly allege first "that he has been treated differently from others with

whom he is similarly situated and that the unequal treatment was the result of

intentional or purposeful discrimination." *Martin v. Duffy*, 858 F.3d 239, 252 (4th

Cir. 2017). In deference to prison authorities, a prisoner must allege that "the

disparate treatment [was not] reasonably related to any legitimate penological

interests." *Fauconier v. Clarke*, 966 F.3d 265 (citing *Veney v. Wyche*, 293 F.3d

726, 732 (4th Cir. 2002)).

Ms. Williams alleges in her Amended Complaint that Deputy Garcia knew her to be a woman, heard her request to be searched by a female deputy, and proceeded with a cross-gender search of her despite a female deputy being present and available to conduct the search. J.A. 021 at ¶ 90; J.A. 028 at ¶ 138. Deputy Garcia refused to acknowledge Ms. Williams' gender identity and searched her under circumstances that did not warrant a cross-gender, contrary to FCADC policy. Deputy Garcia engaged in this behavior because Ms. Williams is transgender and based on the discriminatory belief that one's gender identity must align with the sex assigned to that individual at birth.

FCADC policy prohibits cross-gender searches of inmates absent the existence of a clear danger to the security and safety of personnel. J.A. 027-28 at ¶¶ 134, 144 (citing PREA regulations prohibiting cross-gender pat-down searches absent an emergency, and FCADC's general adherence to these regulations). However, FCADC policy pertaining specifically to transgender inmates also permits a male deputy to search any inmate housed within the male population "if there is uncertainty by a deputy as to a classified inmate's gender." J.A. 021 at ¶ 89 (quoting SOP 606, Section IV.D).

The allegations in Ms. Williams' Amended Complaint demonstrate that no clear danger to the security and safety of personnel existed at the time Deputy Garcia searched her. J.A. 091. Ms. Williams' allegations also make clear that there

was no uncertainty regarding her gender. From providing FCADC with legal

identification documents clearly stating Ms. Williams' gender as female to directly

informing Deputy Garcia that she identifies as female, Ms. Williams' gender was

not in question. Deputy Garcia had no grounds to perform a cross-gender search

under FCADC policy.

Deputy Garcia's conduct surrounding his search of Ms. Williams evidences

the discriminatory animus with which he acted. Deputy Garcia deliberately

misgendered Ms. Williams prior to the search, saying "Sir, you are a male and I

need to search you." J.A. 021 at ¶ 91. These statements evidence Deputy Garcia's

refusal to accept Ms. Williams' stated gender identity where he had reason to

believe her gender identity differed from the sex assigned to her at birth. His

disdain for Ms. Williams' because she is transgender is demonstrated by the highly

aggressive manner in which he performed the search of Ms. Williams, physically

injuring her and leaving her with bruising on her right breast. J.A. 021 at ¶ 92.

There is no penological interest which Deputy Garcia can argue justified his

treatment of Ms. Williams. Whether a plaintiff has alleged facts sufficient to

demonstrate the disparate treatment alleged is not reasonably related to any

legitimate penological interest is guided by the factors set forth in *Turner v. Safely*:

> First, there must be a 'valid, rational, legitimate
> governmental interest put forward to justify it. Second, a
> court must consider 'the impact accommodation of the
> asserted constitutional right will have on guards and other

inmates and on the allocation of prison resources, generally.' Third, 'the absence of ready alternatives is evidence of reasonableness of a prison regulation.'

*Fauconier*, 966 F.3d at 277-78 (citing *Turner v. Safely*, 482 U.S. 78, 89-91 (1987)).

Deputy Garcia's actions violated FCADC's policy limiting the circumstances under which a Sheriff's deputy may perform a cross-gender search of an inmate. Such actions – contrary to the guidance of established safety regulations at the facility – cannot be deemed as furthering the health and welfare of individuals in FCADC custody or as serving the interests of security at the facility.

Further, Ms. Williams' allegations demonstrate that a readily available alternative to her search by Deputy Garcia existed and would not have required FCADC to allocate any additional resources. J.A. 021 at ¶ 90 ("A female deputy was present during this search, but Ms. Williams' request [to be searched by a female deputy] was not honored.").

For these reasons, and with proper consideration of all allegations in the Amended Complaint, Ms. Williams has sufficiently pled facts to state a claim for an Equal Protection violation against Deputy Garcia.

### III. THE DISTRICT COURT ERRED IN FINDING MS. WILLIAMS DID NOT SUFFICIENTLY STATE A CLAIM OF DELIBERATE INDIFFERENCE AGAINST NP WANG.

The district court erred in its analysis of Ms. Williams' deliberate indifference claim against NP Wang in two regards. First, the district court evaluated this claim based only on the allegations against NP Wang that arose after February 12, 2019, or within two years of the filing date of Ms. Williams' Amended Complaint. Even if, *arguendo*, Ms. Williams' Amended Complaint did not relate back, Ms. Williams alleges a continuing violation of her constitutional rights by NP Wang that permitted the district court to look beyond the two-year statute of limitation period applicable to her claim.

Second, the district court erred in its finding on the substance of Ms. Williams' allegations against NP Wang. Ms. Williams' Amended Complaint contains allegations against NP Wang sufficient to plausibly state a claim against her for deliberate indifference in violation of the Eighth Amendment, and the district court erred in holding otherwise.

### A. The District Court Failed to Consider the Entirety of Ms. Williams' Allegations Against NP Wang in Her Amended Complaint.

Ms. Williams' Amended Complaint properly relates back to the date of her original filing, as described in Section I, *supra*. Even if relation back did not apply, Ms. Williams alleged a series of acts or omissions by NP Wang that amount to a continuing violation of her constitutional rights throughout the period of her

incarceration and that demonstrate deliberate indifference for Ms. Williams'

medical needs related to her gender dysphoria.[2]

The continuing violation doctrine applies to claims under Section 1983.

*DePaola v. Clarke*, 884 F.3d 481, 487 (4th Cir. 2018). To assert a Section 1983

claim of deliberate indifference under the continuing violation doctrine, a plaintiff

must "(1) identify a series of acts or omissions that demonstrate deliberate

indifference to his serious medical need(s); and (2) place one or more of these acts

or omissions within the applicable statute of limitations." *Id*. Further, "a plaintiff's

claim of a continuing violation may extend back to the time at which the prison

officials first learned of the serious medical need and unreasonably failed to act."

*Id*. (citing *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001).

As such, this Court should give full consideration to Ms. Williams'

allegations dating back to the time when NP Wang first learned of her serious

medical need and failed to act. Whether by reason of relation back or because of

the continuing nature of the violation alleged, proper evaluation of Ms. Williams'

claim against NP Wang for deliberate indifference requires an examination of all

relevant allegations in her Amended Complaint.

---

[2] These facts are further examined in Section III.B, *infra*.

**B. Ms. Williams' Allegations are Sufficient to State a Claim of Deliberate Indifference Against NP Wang.**

With due consideration given to all allegations in her Amended Complaint, Ms. Williams has sufficiently stated a claim against NP Wang for deliberate indifference in violation of the Eighth Amendment.

Assessment of a claim of deliberate indifference has two aspects: an objective inquiry and a subjective inquiry. *Formica v. Aylor*, 739 F. App'x 745, 754 (4th Cir. 2018) (citing *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A medical condition is shown as objectively serious when it 'would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id*. at 744 (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). To satisfy the subjective element, a plaintiff must show an individual "knows of and disregards an excessive risk to inmate safety or health." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Ms. Williams' Amended Complaint states facts sufficient to demonstrate the objective seriousness of her gender dysphoria. NP Wang learned of Ms. Williams' ongoing hormone treatment for gender dysphoria on November 16, 2017. J.A. 014 at ¶ 35. Established standards of care for gender dysphoria, recognized by this Court, speak to the seriousness of the condition.[3]

---

[3] Ms. Williams cites to the standard of care provided by the World Professional Association for Transgender Health (WPATH), Standards of Care for the Health of

NP Wang acted, or failed to act, with knowledge of Ms. Williams' gender dysphoria and in contravention of established standards of care applicable to gender dysphoria. NP Wang knew of and disregarded an excessive risk to Ms. Williams' health when she discontinued Ms. Williams' hormone treatment upon incarceration, took nearly a month to follow-up with Ms. Williams to initiate treatment, and failed to consistently provide the treatment NP Wang herself deemed necessary. These facts are sufficient to plausibly state the subjective element of Ms. Williams' claim.

"A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015). NP Wang discontinued Ms. Williams' ongoing hormone treatment in November 2018 and took nearly a month to restart Ms. Williams' treatment. J.A. 016-18 at ¶¶ 46-66. NP Wang did not provide alternate treatment or counseling to Ms. Williams during this delay. Ms. Williams suffered an exacerbation of her symptoms because of NP Wang's complete failure to act. J.A. 017-18 at ¶¶ 54-57, 65.

---

Transsexual, Transgender, and Gender Nonconforming People (7th Version 2012). J.A. 013-14 ¶¶ 27-30. This Court recognized the WPATH standards as the authoritative standard of care for gender dysphoria. *See, e.g.*, *Grimm v. Gloucester County School Board*, 972 F.3d 586, 595-96 (citing *De'lonta v. Johnson*, 708 F.3d 520, 522-23 (4th Cir. 2013).

NP Wang eventually ordered Ms. Williams' hormone treatment and evaluated her medical need for a bra. J.A. 018-19 at ¶¶ 64, 71. Despite finding both Ms. Williams' hormone treatment and the provision of a bra to be medically necessary, NP Wang permitted extended lapses in Ms. Williams' treatment and failed to obtain a bra of appropriate size for Ms. Williams at any point during her incarceration. J.A. 019 at ¶ 75; J.A. 024 at ¶¶ 111-114.

Ms. Williams pled facts in her Amended Complaint sufficient to plausibly allege that she suffered from a serious medical condition of which NP Wang was aware but for which she failed to provide treatment, despite knowledge of an excessive risk to Ms. Williams' safety and health. This Court should reverse the district court's dismissal of Ms. Williams' claim against NP Wang for deliberate indifference in violation of the Eighth Amendment.

## IV. THE DISTRICT COURT ERRED IN FINDING MS. WILLIAMS' GENDER DYSPHORIA DID NOT ENTITLE HER TO THE PROTECTIONS OF THE ADAAA.

Ms. Williams pled facts in her Amended Complaint sufficient to demonstrate she is a qualified individual with a disability within the scope of the ADAAA. Although this Court has yet to address the issue, the exclusions to coverage set forth in 42 U.S.C. § 12111(b)(1) do not apply to gender dysphoria. This is supported by an examination of the legislative history behind the exclusion, the expansion of what constitutes a disability under the ADAAA, and the growth in

medical understanding about gender dysphoria that has occurred in the decades since the exclusion became law. To find otherwise raises a serious question about the constitutionality of the exclusion and its disparate treatment of transgender individuals in violation of Equal Protection.

The district court granted Defendants' motion to dismiss Ms. Williams' ADAAA claim based exclusively on a finding that Ms. Williams had not sufficiently pled her gender dysphoria resulted from physical impairment. Gender dysphoria is not a gender identity disorder and therefore does not require a showing that it arose from a physical impairment to avoid the exclusion set forth in 42 U.S.C. § 12211(b)(1). Even if, *arguendo*, gender dysphoria required such a showing, a physical basis exists for the condition that places it outside the scope of the exclusion.

Ms. Williams' Amended Complaint sets forth allegations sufficient to demonstrate she is a qualified individual with a disability under the ADAAA and to plausibly state a claim of disability discrimination against Kincaid.

### A. The Exclusion Found in Section 12111(b)(1) Does Not Apply to Gender Dysphoria.

The legislative history of the ADA reflects the DSM-III-R as the source of the gender identity disorder exclusion. H.R. Rep. No. 101-485(IV), at 81 (May 15, 1990) (dissenting views of Rep. William E. Dannemeyer, Rep. Joe Barton, and

Rep. Don Ritter) (referencing DSM-III-R); *accord* 135 Cong. Rec. S11173-78,

1989 WL 183785 (daily ed. Sept. 14, 1989) (statement of Sen. Armstrong).[4]

In 1990, Congress chose to expressly exclude from its definition of

"disability" in Americans with Disabilities Act "gender identity disorders not

resulting from physical impairments, or other sexual behavior disorders." 42

U.S.C. § 12111(b)(1). Pursuant to the language of the statute, the exclusion does

not apply to all gender identity disorders, but only those that do not result from

physical impairments. *Id*.

1. *Gender Dysphoria is Substantially Different from the Condition of Gender Identity Disorder that Existed in 1990.*

Being transgender is not itself a psychiatric condition, but for many years

"mental health practitioners attempted to convert transgender people's gender

identity to conform with their sex assigned at birth, which did not alleviate

dysphoria, but rather caused shame and psychological pain." *Grimm v. Gloucester

School County Board*, 972 F.3d 586, 594-95 (2020); *see also Kadel v. North

Carolina State Health Plan for Teachers and State Employees*, 12 F.4th 422, 427

(2021) (providing that being transgender, like being cisgender, is a natural

variation in human development and implies no "impairment in judgment,

stability, reliability, or general social or vocational capabilities.").

---

[4] The DSM-III-R was the version of the DSM in effect at the time the ADA was debated in Congress.

In 2013, advances in medical understanding resulted in the diagnosis of "gender identity disorder" being removed in its entirety from the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), and the separate condition of "gender dysphoria" being added. American Psychiatric Association, Diagnostic and Statistical Manuel of Mental Disorders 451 (5th ed. 2013) (hereinafter "DSM-5").

Where gender identity disorder defined gender nonconformity itself as a medical condition, gender dysphoria is a clinical diagnosis that recognizes being transgender is not a medical condition–rather, the medical condition is the distress caused by having a gender identity that differs from one's birth sex. Gender dysphoria is characterized by: (1) a marked incongruence between one's birth-assigned sex, which is often accompanied by a strong desire to be rid of one's primary and secondary sex characteristics and/or to acquire primary/secondary sex characteristics of another gender; and (2) intense emotional pain and suffering resulting from this incongruence. *Id*.

Notably, the diagnosis of gender dysphoria in DSM-V requires attendant disabling symptoms or manifestations of clinically significant emotional distress. *Id*. at 452 ("The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning"); *id*. at 453 (stating that, in addition to marked incongruence, "[t]here must also be

34

evidence of distress about this incongruence"). If left medically untreated, gender dysphoria can result in debilitating depression, anxiety and, for some people, suicidal ideation, and suicide. *Id*. at 455-56.

Gender dysphoria, by its definition, is necessarily understood as a disabling condition that results in clinically significant impairment of major life activities. It is substantially different from the outdated diagnosis of gender identity disorder that existed at the time the exclusion in 42 U.S.C. § 12211(b)(1) was drafted.

Several district courts that have examined the applicability of the exclusion to the condition of gender dysphoria have reached the same conclusion. *See, e.g.*, *Blatt v. Cabela's Retail, Inc.*, 2017 WL 2178123 (E.D. Pa. May 18, 2017); *Doe v. Massachusetts Dep't of Correction*, 2018 WL 2994403 (D. Mass. June 14, 2018) (holding that the ADA's "transgender exclusion" did not apply to gender dysphoria); *Iglesias v. True*, 403 F. Supp. 3d 680, 688 (S.D. Ill. 2019) (denying motion to dismiss based on ADA's transgender exclusion, noting disagreement between courts as to whether the ADA's transgender exclusion applied to gender dysphoria); *Venson v. Gregson*, 2021 WL 673371 (S.D. Ill. Feb. 22, 2021) (denying motion to dismiss and rejecting defendant's conclusory argument that gender dysphoria is, for all practical purposes, the equivalent to "gender identity disorder").

2.  *Gender Dysphoria Has a Known Physical Basis and Is Therefore Not Excluded Under the ADAAA As a Gender Identity Disorder Without a Physical Impairment.*

The DSM-5 explicitly explores the physiological aspects of gender dysphoria and the existence of genetic and possibly hormonal contributions to the condition. DSM-5 at 457. The physical etiology of gender dysphoria demonstrates it does *not* fall within the exclusion of "gender identity disorders that do not result from physical impairments" that is outlined in § 12111(b)(1), as the condition has a known physical basis. The district court erred in finding that Ms. Williams was required to plead additional facts demonstrating physical impairment where, as here, such impairment is inherently a part of the condition.

Several courts have recognized substantial evidence that a physical etiology may underly gender dysphoria, and that this fact places the condition outside the exclusion of "gender identity disorders without a physical impairment" found in 42 U.S.C. §12211(b)(1). *See, e.g.*, *Doe v. Dep't of Corr.*, 2018 WL 2994403, at *6 (D. Mass. June 14, 2018); *Tay v. Dennison*, 2020 WL 2100761, at *3 (S.D. Ill. May 1, 2020) (allowing ADA claim to proceed because the "court cannot categorically say that gender dysphoria falls within the ADA's exclusionary language"); *Shorter v. Barr*, 2020 WL 1942785, at *9 (N.D. Fla. Mar. 13, 2020).

The court in *Doe v. Massachusetts* found "the continuing re-evaluation of [gender dysphoria] underway in the relevant sectors of the medical community is

36

sufficient, for present purposes, to raise a dispute of fact as to whether [plaintiff]'s [gender dysphoria] falls outside the ADA's exclusion of gender identity-based disorders as they were understood by Congress twenty-eight years ago." 2018 WL 2994403, at *7 (D. Mass. June 14, 2018).

For all of these reasons, the district court's erred in finding a requirement to plead an additional physical impairment beyond the diagnosis of gender dysphoria for Ms. Williams' condition to qualify as a disability subject to the protections of the ADAAA. Ms. Williams' condition is not a gender identity disorder, and she is not required to meet this additional burden to avoid the exclusion. Even if this Court were to equate gender dysphoria with gender identity disorder, the physical basis for gender dysphoria places it outside the category of "gender identity disorders not resulting from physical impairments" excluded from ADAAA protection under the language of 42 U.S.C. §12211(b)(1).

### B. The District Court's Holding Raises a Question as to the Constitutionality of the ADA Exclusion Found Under 42 U.S.C. § 12211(b)(1).

The district court's holding that 42 U.S.C. §12211(b)(1) excludes individuals with gender dysphoria from the protections of the ADAAA raises a serious question of constitutionality. The district court erred in failing to consider a plausible construction of the statute that is not constitutionally suspect. The lower

court's reading of the transgender exclusion in a manner that bars Ms. Williams' claim raises an equal protection issue that could otherwise be avoided.

The lower court bore a duty to "first ascertain whether a construction of the statute is fairly possible by which [a constitutional] question may be avoided." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288 (1936) (Brandeis, J., concurring) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). "Congress is presumed to legislate in accordance with the Constitution and . . . therefore, as between two plausible constructions of a statute, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative." *United States v. Dwinells*, 508 F.3d 63, 70 (1st Cir. 2007).

There is evidence that "gender identity disorders not resulting from physical impairments" were explicitly made a part of the 30-year-old exclusion "based on the moral opprobrium of several senior senators." *See Venson v. Gregson*, 2021 WL 673371, at *2 (S.D. Ill Feb. 22, 2021) (citing Kevin M. Barry, Jennifer L. Levi, *The Future of Disability Rights Protections for Transgender People*, 35 Touro L. Rev. 25 (2019)). The effect of these exclusions has been to prevent transgender litigants from challenging disability discrimination under federal law. 35 Tour L. Rev. 25 at 42.

A reading of the exclusion that interprets "gender identity disorder" not as a medical condition distinct from gender dysphoria, but instead as a category of

transgender-related health conditions, would render the classification facially

discriminatory. As the district court in *Doe v. Massachusetts Department of*

*Corrections* noted:

> It has long been recognized that where the government
> draws a distinction "against a historically disadvantaged
> group and [where that distinction] has no other basis,
> Supreme Court precedent marks this as a reason
> undermining rather than bolstering the distinction."
> *Massachusetts. v. U.S. Dep't of Health & Human Servs.*,
> 682 F.3d 1, 14 (1st Cir. 2012) (citing *Pyler v. Doe*, 457 U.S.
> 292, 227 (1982), and *Romer v. Evans*, 517 U.S. 620, 635
> (1996)).
>
> . . . .
>
> Consider the company that "gender identity disorders not
> resulting from physical impairments" keeps within the
> same subsection of the statute: pedophilia, exhibitionism,
> and voyeurism. The pairing of gender identity disorders
> with conduct that is criminal or viewed by society as
> immoral or lewd raises a serious question as to the light in
> which the drafters of this exclusion viewed transgender
> persons.

*Id*. at *7. It is also telling that the remaining subsections of §12211(b) include

exclusions for "(2) compulsive gambling, kleptomania, or pyromania," and "(3)

psychoactive substance use disorders resulting from current illegal use of drugs,"

or additional activities that are "illegal, dangerous to society, or the result of

harmful vices." *Id*. at *8.

No federal court of appeals or the Supreme Court has interpreted the

constitutionality of the ADAAA's transgender exclusion to date. *Venson*, 2021

673371, at *2. However, the Supreme Court's recent decision in *Bostock v. Clayton County* recognized that discrimination against a person for being transgender is discrimination "on the basis of sex." 140 S. Ct. 1731, 1741 (2020); *see also Grimm*, 972 F.3d at 611 (finding transgender persons are a quasi-suspect class to whom a standard of heightened scrutiny applies).

This Court should find that the district court erred in finding the exclusion applicable to gender dysphoria as a matter of statutory interpretation. In the alternative, this Court should find the exclusion itself to be unconstitutional.

## V. THE DISTRICT COURT ERRED IN FINDING MS. WILLIAMS' CLAIMS OF GROSS NEGLIGENCE AGAINST DEFENDANTS-APPELLEES FAILED AS A MATER OF LAW.

Virginia recognizes three levels of negligence:

> The first level, simple negligence, involves the failure to use the degree of care that an ordinarily prudent person would exercise under similar circumstances to avoid injury to another.

> The second level, gross negligence, is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person. This requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness.

> The third level of negligent conduct is willful and wanton negligence. This conduct is defined as acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the

> defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.

*Gilstrap v. Huntington Ingalls Inc.*, 2019 WL 8890001, at *5 (E.D. Va. Dec. 9, 2019) (citing *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918-19 (Va. 2004).

In Virginia, a claim of gross negligence requires "something more than ordinary negligence," but "something less than willfulness." *Commonwealth v. Giddens*, 816 S.E.2d 290, 294 (Va. 2018). "While gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence[,] it is something less than willful, wanton, and reckless conduct." *Giddens*, 816 S.E.2d at 294 (quoting *Thomas v. Snow*, 174 S.E. 837, 839 (Va. 1934). "[T]he standard for gross negligence in Virginia is one of indifference." *Id*.

The inquiry on a motion to dismiss is one of plausibility and Ms. Williams has satisfied that burden with respect to Sheriff Kincaid, NP Wang, and Deputy Garcia. Ms. Williams has not had the opportunity to develop a full record upon which the facts of the matter can be assessed. *See, e.g., Adams v. Naphcare, Inc.*, 246 F. Supp. 3d 1128 (E.D. Va. 2017) ("At this stage of the proceeding, before discovery has even begun, reasonable minds can differ over whether [defendant]'s conduct amount to an utter disregard of prudence."). However, with the facts

alleged in her Amended Complaint construed in the light most favorable to Ms. Williams, as required at the 12(b)(6) stage of the proceedings, she has sufficiently stated a plausible claim of gross negligence against all three Defendants-Appellees.

### A. Ms. Williams Pled Facts in Her Amended Complaint Sufficient to State a Claim Against Deputy Garcia for Gross Negligence.

Although the district court found Ms. Williams' claim against Deputy Garcia in her Amended Complaint did not relate back for statute of limitations purposes, it went on to find the allegations relevant to that claim were insufficient to state a claim of gross negligence as a matter of law. The district court erred in finding that the mere existence of a standard which permitted Deputy Garcia to search Ms. Williams' person under certain circumstances demonstrated he exercised care in conducting the search, particularly where such circumstances were not present. The lower court should not have dismissed Ms. Williams' claim of gross negligence against Deputy Garcia on these grounds.

The lower court failed to consider Ms. Williams' allegations concerning the manner in which Deputy Garcia performed the search of Ms. Williams' person. Although FCADC policy permits male deputies to search any inmate housed in the male population, they are only permitted to do so if they are uncertain as to the gender of the person they intend to search. J.A. 021 at ¶ 89. In addition, there are separate policies that dictate the manner a deputy is to perform a search of an inmate, of which Deputy Garcia clearly ran afoul. J.A. 021-22 at ¶¶ 89, 90-93.

42

Deputy Garcia's search of Ms. Williams, discussed in further detail in Section II, *supra*, contradicted FCADC policy on when a cross-gender search can be performed. Contrary to the district court's holding, Deputy Garcia cannot rely on a policy with which he did not comply to demonstrate he exercised any degree of care toward Ms. Williams.

Deputy Garcia's actions prior to, during, and after his search of Ms. Williams reflect numerous violations of FCADC policy and further indicate his indifference to Ms. Williams' safety. Deputy Garcia purposefully misgendered Ms. Williams in his interactions with her prior to the search, in violation of FCADC policy which provides that inmates "shall be called by their last names without reference to gender specific identifiers such as Mr., Mrs., Miss, Ma'am, Sir or other gender specific terms used in addressing a person." J.A. 018 at ¶ 64; J.A. 021 at ¶ 91.

FCADC policy governs the proper way to perform a search of an inmate's person and PREA regulations call for searches of transgender persons by deputies that are "professional and respectful." J.A. 027 at ¶ 136 (citing 28 C.F.R. § 115.15(f)). Instead of following those policies and regulations, Deputy Garcia conducted an intentionally disrespectful and aggressive search of Ms. Williams' person that caused her both physical and psychological harm. J.A. 021-22 at ¶¶ 90-94.

43

Deputy Garcia's actions demonstrate a complete disregard for Ms. Williams' well-being that rises to the level of gross negligence. The district court erred in holding that he exercised some degree of care such that Ms. Williams could not state a claim of gross negligence against Deputy Garcia as a matter of law.

### B. Ms. Williams Pled Facts in her Amended Complaint Sufficient to State a Claim Against NP Wang for Gross Negligence.

The district court erred in finding that NP Wang's provision of any medical treatment at all to Ms. Williams amounted to an exercise of care that defeated Ms. Williams' claim of gross negligence against her as a matter of law. NP Wang acted with deliberate indifference for Ms. Williams' safety both when she failed to continue Ms. Williams' hormone treatment upon her incarceration and when she permitted a lapse in the treatment of Ms. Williams that NP Wang herself deemed necessary to later occur.

Like Deputy Garcia, NP Wang's actions departed from both FCADC policy and established standards of care for individuals with gender dysphoria. NP Wang is unable to rely on any such policy or standards as evidence of having exercised care with respect to Ms. Williams.

1. *Ms. Williams Sufficiently Stated a Claim of Gross Negligence Against NP Wang for her Failure to Continue Ms. Williams' Medically-Necessary Treatment Upon Her Incarceration.*

The court in *Gilstrap* found that allegations a defendant knew of dangers to the health of individuals to whom defendant owed a duty, coupled with the failure to take precautions to protect them from harm, were sufficient to state a claim for gross negligence. *Gilstrap,* 2019 WL 8890001 at *6. The court found the defendant's knowledge of the danger sufficient to allege "indifference to others, disregarding prudence to the level that safety of others is completely neglected." *Id*. (quoting *Wilby v. Gostel*, 578 S.E.2d 796, 801 (Va. 2003)).

In the medical context, this Court has held that merely providing *some* treatment cannot overcome allegations that treating medical professionals ignored and failed to treat a variety of symptoms, at least in demonstrating they acted with deliberate indifference for purposes of Eighth Amendment analysis. *See, e.g., Jehovah v. Clarke*, 798 F.3d 169, 181 (2015); *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (finding that the fact the plaintiff received some treatment did not mean she received treatment for a particular ailment or that the treatment was reasonable).

NP Wang's decision to deviate from the accepted WPATH Standards that address the serious medical risk accompanying a failure to treat gender dysphoria evidence her knowledge of the danger created by her failure to treat Ms. Williams,

including the risk of harm that accompanied the sudden cessation of Ms. Williams'

hormone treatment and denial of the attire she required.

Beyond the WPATH Standards, NP Wang elected not to follow FCADC

policy, which provides that "transgender or gender non-conforming inmates who

were receiving hormone treatment and therapy at the time of their incarceration

shall be referred to an appropriate medical doctor for further evaluation." J.A. 16 at

¶ 50 (citing SOP 606, Section IV.C).

FCADC policy permitted NP Wang to provide Ms. Williams with a bra

when she first asked for it on November 16, 2017. J.A. 015-16 at ¶ 44 (citing SOP

606, Section IV.B). Nevertheless, NP Wang declined to do so until Ms. Williams

pursued her request for a bra once again through the ADA Coordinator at the

facility. J.A. 019 at ¶¶ 69-71.

NP Wang knew of the standards of care applicable to individuals with

gender dysphoria and failed to take steps to avoid the necessary harm that would

arise from the sudden cessation of Ms. Williams' care. This knowledge coupled

with NP Wang's failure to act is sufficient to maintain a claim of gross negligence.

2. *Ms. Williams Sufficiently Pled a Claim of Gross Negligence Against NP Wang for the Prolonged Lapse in Treatment that Occurred Later in Her Incarceration.*

Following her receipt and review of Ms. Williams' medical records, NP

Wang failed to promptly and consistently provide the medical treatment that she

herself had deemed necessary for Ms. Williams' gender dysphoria. J.A. 024 at ¶¶ 110-114. This Court has held that a "failure to provide the level of care that a treating physician himself believes is necessary" may constitute deliberate indifference. *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990); *see also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014) (denying a motion to dismiss where defendant physician failed to enter an order necessary to provide plaintiff with promised care, resulting in a delay of treatment).

As described in further detail in Section III, *supra*, NP Wang ordered treatment for Ms. Williams but allowed for a serious, multi-week lapse in that treatment to occur later in her incarceration. J.A. 024 at ¶¶ 111-114. *See, e.g.*, *Jackson* 775 F.3d at179 (finding, at the 12(b)(6) stage, that a medical provider's ordering of treatment demonstrated his subjective belief such treatment was necessary, and that he would know subsequently failing to provide that treatment would pose an excessive risk to an inmate's health).

Even after NP Wang officially determined a bra to be clinically indicated for Ms. Williams on December 10, 2017, she took no action to requisition a bra that fit Ms. Williams at any time. J.A. 019 at ¶¶ 72-75.

NP Wang's provision of only enough medical attention to determine what treatment Ms. Williams required should not excuse her failure to provide that treatment. As such, the district court's finding that NP Wang exercised a sufficient

degree of care to overcome Ms. Williams' claim of gross negligence against her is in error.

### C. Ms. Williams Pled Facts in her Amended Complaint Sufficient to State a Claim Against Kincaid for Gross Negligence.

The district court erred in determining that Kincaid's self-described "establishment of gender classification standards directed at promoting safety of inmates and prison staff" was evidence of the existence of some degree of care toward all inmates, including Ms. Williams, thereby precluding Ms. Williams' claim of gross negligence against Kincaid. Such a finding stretches the standard of "some degree of care" beyond credulity. The existence of a standard is not evidence of the exercise of care – as the lower court found – but rather evidence of Kincaid's subjective knowledge of risk to transgender inmates' safety at the facility.

#### 1. *The Policies Kincaid Enacted Were Not Designed to Promote the Safety of Transgender Inmates.*

The policies for transgender inmates enacted by Kincaid are not only riddled with gaps and internal inconsistencies, but also bestow upon Kincaid's subordinates a degree of discretion that renders them more akin to suggestions than rules. Gender classification standards that permit or require Sheriff's Deputies to assign a gender identity to an inmate based solely on the inmate's genitalia do not, and cannot, protect an individual whose vulnerability arises from the fact that their

gender identity differs from the sex assigned to them at birth. Put plainly, these policies were insufficient to protect Ms. Williams from the harm she alleges.

Kincaid's written policy concerning the housing of transgender inmates provides, "All transgender and gender non-conforming inmates shall be classified and assigned housing based on their safety/security needs, housing availability, and genitalia (to include potential vulnerability, if assigned to general population)." SOP 606, Section IV.C. "Transgender and Gender Non-Conforming Inmates" (cited in J.A. 021 at ¶ 89). Despite acknowledging the vulnerability of transgender inmates, Kincaid's policy requires only that such inmates be asked "his or her own opinion of his or her vulnerability in the jail population of the male or female units." *Id*. The policy nevertheless dictates that "male inmates shall be classified as such if they have male genitals" and "female inmates shall be classified as such if they have female genitals." J.A. 015 at ¶ 38 (citing SOP 606, Section II.E and II.F, respectively). This last requirement nullifies the other aspects of the policy. If genitalia is, by itself, determinative, an individual's "opinion of his or her vulnerability" cannot factor into the outcome. The policy is designed to collapse in on itself.

In keeping with that policy, the decision to house Ms. Williams with the general male population was made solely based on her genitalia. J.A. 027 at ¶ 132. Sheriff's deputies placed Ms. Williams in male housing without performing an

49

assessment to determine Ms. Williams' vulnerability in the general jail population of the male unit for the purpose of ensuring Ms. Williams' safety and security. J.A. 016 at ¶ 42.

Pursuant to Kincaid's policy, the gender of an inmate's housing assignment becomes the gender of the inmate for all intents and purposes throughout the duration of their incarceration. Transgender inmates are to be "provided standard jail attire and privileges consistent with the gender of their housing assignment," are prohibited from purchasing gender-specific products from the commissary if such products conflict with the gender of their housing assignment, and can be subjected to a cross-gender search based not on their own gender but on the gender of their housing assignment. J.A. 015-16 at ¶ 44; J.A. 019 at ¶ 68; and J.A. 21 at ¶ 89 (referencing various sections of SOP 606).

Acknowledging a duty but failing to address it cannot amount to the exercise of care required by the Supreme Court of Virginia to vitiate a claim of gross negligence against a public official. Kincaid's gender classification policy is designed to eliminate the very distinction that makes a transgender person transgender: the separation between the sex assigned to a transgender individual at birth sex and that individual's gender identity. Kincaid's transgender policy cannot plausibly be credited with protecting the safety of transgender individuals when the

policy reduces individual classification to a question of genitalia alone–functionally ignoring the existence of transgender inmates.

> ### 2. Kincaid Failed to Enforce Those Policies and Procedures Which Do Serve to Protect Transgender Individuals.

Even in those instances where Kincaid's policies provided for specific protections for transgender inmates, Kincaid failed to enforce or uphold these protections, rendering their existence meaningless.

Despite a written a policy that provides "Transgender or gender non-conforming inmates shall be provided an opportunity to participate in services, programs, and all other privileges routinely provided to all inmates . . .", Sheriff's Deputies at FCADC still withheld Ms. Williams' opportunity to participate in the Workforce Program J.A. 022-23 at ¶¶ 95-106. Similarly, a policy prohibiting Sheriff's deputies from referring to inmates by a specific gender identity did not prevent Sheriff's deputies at FCADC from referring to Ms. Williams primarily as "mister," "sir," "he," or "gentleman," or prevent the widely practiced use of these terms by Sheriff's deputies to harass transgender inmates. J.A. 20 at ¶¶ 82-84.

The policies which the district court credits as promoting the safety of all inmates did not operate to protect Ms. Williams' safety or the safety of other transgender inmates. The district court erred in holding that Kincaid exercised any degree of care for Ms. Williams by enacting policies that either were, in fact, not

designed to protect transgender inmates at the facility or were not enforced such that those policies did not provide the protection Ms. Williams needed.

## **<u>CONCLUSION</u>**

The district court erred when it dismissed Ms. Williams' claim of disability discrimination under the Americans with Disabilities Act against Kincaid, improperly failed to apply relation back such that Ms. Williams' claims included those allegations which arose within two years of the filing of her original complaint, prematurely dismissed Ms. Williams' constitutional claims, and dismissed Ms. Williams' claims of gross negligence against Deputy Garcia, NP Wang, and Kincaid contrary to Virginia law. This Court should reverse the district court's findings and remand this case for further proceedings.

Dated: December 1, 2021                    Respectfully Submitted,

<span style="margin-left:3em"></span>/s/ Katherine L. Herrmann
<span style="margin-left:3em"></span>Katherine L. Herrmann
<span style="margin-left:3em"></span>THE ERLICH LAW OFFICE, PLLC
<span style="margin-left:3em"></span>2111 Wilson Blvd. Suite 700
<span style="margin-left:3em"></span>Arlington, VA 22201
<span style="margin-left:3em"></span>Tel: (703) 791-9087
<span style="margin-left:3em"></span>Fax: (703) 722-8114
<span style="margin-left:3em"></span>Email: kherrmann@erlichlawoffice.com

<span style="margin-left:3em"></span>*Attorney for Plaintiff-Appellant*

## **REQUEST FOR ORAL ARGUMENT**

Pursuant to Fed. R. App. P. 34(a)(1), Plaintiff-Appellant requests oral argument in this case.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[X] this brief or other document contains 11,512 words

[ ] this brief uses monospaced type and contains [state number of] lines


This brief or other document complies with the typeface and type style requirements because:

[X] this brief or other document has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font; or

[ ] this brief or other document has been prepared in monospaced typeface using [identify word processing program] in [identify font size and type style].


/s/ *Katherine L. Herrmann*
Katherine L. Herrmann


Party Name: Plaintiff-Appellant Kesha T. Williams


Dated: December 1, 2021

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 1, 2021, the foregoing document was

served on all parties or their counsel of record through the CM/ECF system.


<u>/s/ *Katherine L. Herrmann*</u>
Katherine L. Herrmann

*Counsel for Plaintiff-Appellant*