No. 21-2030

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

KESHA T. WILLIAMS,

Plaintiff-Appellant

v.

STACEY A. KINCAID, in her official capacity; LISHAN KASSA, MD, in her individual and official capacities; XIN WANG, NP, in her individual and official capacities; DEPUTY GARCIA, in her individual and official capacities,

Defendants-Appellees

**On Appeal from the United States District Court for the Eastern District of Virginia (Case No. 1:20-cv-01397-CMH-TCB)**

**BRIEF OF AMICI CURIAE GLBTQ LEGAL ADVOCATES & DEFENDERS, NATIONAL CENTER FOR LESBIAN RIGHTS, LAMBDA LEGAL, TRANSGENDER LEGAL DEFENSE & EDUCATION FUND, BLACK AND PINK MASSACHUSETTS, TRANSCENDING BARRIERS (ATL), NATIONAL LGBTQ TASK FORCE, THE AMERICAN CIVIL LIBERTIES UNION, THE NATIONAL CENTER FOR TRANSGENDER EQUALITY, AND TRANS PEOPLE OF COLOR COALITION IN SUPPORT OF PLAINTIFF-APPELLANT**

Shannon Minter, Esq.
NATIONAL CENTER FOR
LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco CA 94102
T: (415) 392-6257
E: sminter@nclrights.org

Jennifer Levi, Esq.
GLBTQ LEGAL ADVOCATES
& DEFENDERS
18 Tremont Street, Suite 950
Boston, MA 02108
T: (617) 388-5140
E: jlevi@glad.org

Kevin M. Barry, Esq.
QUINNIPIAC UNIVERSITY
SCHOOL OF LAW LEGAL CLINIC
275 Mount Carmel Ave.
Hamden, CT 06518
T: (203) 582-3233
E: legalclinic@quinnipiac.edu

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

GLBTQ Legal Advocates & Defenders
_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    YES    NO


2.    Does party/amicus have any parent corporations?    YES    NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    YES    NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    YES    NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)        YES    NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    YES    NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?         YES    NO
        If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____        Date: _____

Counsel for: _____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____      Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_National Center for Lesbian Rights_____
(name of party/amicus)


_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?      YES      NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                                          YES    NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES    NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                                          YES    NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?                          YES    NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____

Counsel for: _____

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

Lambda Legal
_____
(name of party/amicus)

_____

who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    YES    NO

2.    Does party/amicus have any parent corporations?    YES    NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    YES    NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                YES    NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                YES    NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?        YES    NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____    Date: _____

Counsel for: _____

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____Transgender Legal Defense & Education Fund_____
(name of party/amicus)


_____

who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES    NO


2.     Does party/amicus have any parent corporations?     YES    NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     YES    NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      YES   NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES   NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      YES   NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      YES   NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____      Date: _____

Counsel for:   Transgender Legal Defense & Education Fund

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____Black and Pink Massachusetts_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO

2.      Does party/amicus have any parent corporations?                          YES      NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                         YES      NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    YES    NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    YES    NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    YES    NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____    Date: _____

Counsel for: _____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____Transcending Barriers (ATL)_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO


2.     Does party/amicus have any parent corporations?     YES     NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     YES     NO
       If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    YES    NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)      YES    NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?                    YES    NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?      YES    NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____

Counsel for: _____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____National LGBTQ Task Force_____
(name of party/amicus)


_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES     NO


2.      Does party/amicus have any parent corporations?                              YES     NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                   YES     NO
        If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    YES   NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)      YES   NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                    YES   NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?      YES   NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____      Date: _____

Counsel for:  ___National LGBTQ Task Force_____

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

American Civil Liberties Union
_____
(name of party/amicus)

_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?     YES     NO

2.    Does party/amicus have any parent corporations?                                YES     NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                              YES     NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                    YES    NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES    NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    YES    NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?          YES    NO
        If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____

Counsel for: _____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____    Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____

(name of party/amicus)


_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    YES    NO


2.    Does party/amicus have any parent corporations?    YES    NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    YES    NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     YES    NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)     YES    NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?     YES    NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?     YES    NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____     Date: _____

Counsel for: National Center for Transgender Equality

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____      Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____Trans People of Color Coalition_____
(name of party/amicus)


_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                        YES      NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                        YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                                    YES    NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)          YES    NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                                    YES    NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?                    YES    NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____

Counsel for: _____

- 2 -

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................ ii

STATEMENT OF INTEREST OF AMICI CURIAE ..............................ix

STATEMENT OF COMPLIANCE.................................................xv

INTRODUCTION ................................................................1

ARGUMENT ....................................................................4

    I.     GID AND GENDER DYSPHORIA ARE DISTINCT
          MEDICAL CONDITIONS. ................................................4

          A.    The Medical Profession No Longer Recognizes GID as a
                Diagnosis.....................................................8

          B.    DSM-5 Removed the Diagnosis of GID and Introduced a
                New and Distinct Diagnosis of Gender Dysphoria.................10

    II.    THE ADA DOES NOT EXCLUDE GENDER DYSPHORIA.........14

          A.    The ADA Does Not Exclude Gender Dysphoria.....................16

          B.    Even if This Court Were to Disregard the Significant
                Differences Between Gender Dysphoria and GID, the
                GID Exclusion is Limited and Would Not Apply Here. ..........17

          C.    The GID Exclusion Violates the Fourteenth
                Amendment's Equal Protection Clause. ..................................20

               1.    A Broad Interpretation of the Exclusion Would
                     Trigger Heightened Scrutiny. .........................................22

               2.    A Broad Interpretation of the Exclusion Would
                     Reflect Animus and Violate the Requirement of
                     Equal Protection for that Reason as Well.......................23

CONCLUSION ..................................................................25

CERTIFICATE OF SERVICE .....................................................27

CERTIFICATE OF COMPLIANCE WITH RULES 27 AND 32.........................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. City of New York*,
   143 F. Supp. 3d 134 (S.D.N.Y. 2015) ........................................................22, 23

*Bd. of Educ. of the Highland Local Sch. Dist. v. United States
   Dep't of Educ.*,
   208 F. Supp. 3d 850 (S.D. Ohio 2016) .......................................................22, 23

*Blackwell v. United States Department of the Treasury*,
   656 F. Supp. 713 (D.D.C. 1986) ...........................................................................6

*Blatt v. Cabela's Retail, Inc.*,
   No. 5:14-CV-04822, 2017 WL 2178123
   (E.D. Pa. Nov. 16, 2015)..............................................................................17, 24

*Bostock v. Clayton Cnty., Ga.*,
   140 S. Ct. 1731 (2020)...............................................................................4, 6, 22

*Brandt v. Rutledge*,
   No. 21-cv-00450, 2021 WL 3292057 (E.D. Ark. Aug. 2, 2021) ......................21

*Christian Legal Soc. Chapter of University of California, Hastings
   Coll. of the L. v. Martinez*,
   561 U.S. 661 (2010)...........................................................................................21

*City of Cleburne, Tex. v. Cleburne Living Center*,
   473 U.S. 432 (1985)...........................................................................................24

*City of Edmonds v. Oxford House, Inc.*,
   514 U.S. 725 (1995)...........................................................................................15

*Darin B. v. McGettigan*,
   No. 0120161068, 2017 WL 1103712 (EEOC Mar. 6, 2017) ............................18

*De'Lonta v. Angelone*,
   330 F.3d 630 (4th Cir 2003) ................................................................................6

- iii -

*Doe v. Mass. Dep't of Correction*,
    No. 1:17-cv-12255-RGS, 2018 WL 2994403
    (D. Mass. June 14, 2018) ...........................................................14, 16, 18, 22, 24

*Doe v. Penn. Dep't of Corrections*,
    No. 1:20-CV-00023-SPB-RAL, 2021 WL 1583556
    (W.D. Pa. Feb. 19, 2021), *report and recommendation adopted*,
    2021 WL 1115373 (W.D. Pa. March 24, 2021) ...........................................18, 24

*Doe v. Triangle Doughnuts, LLC*,
    472 F. Supp. 3d 115 (E.D. Pa. 2020).................................................................24

*Doe v. U.S. Postal Serv.*,
    No. 84-3296, 1985 WL 9446 (D.D.C. June 12, 1985) .........................................6

*Edmo v. Corizon, Inc.*,
    949 F.3d 489 (9th Cir. 2020) ..........................................................................xi

*Edmo v. Idaho Dep't of Corr.*,
    No. 1:17-cv-00151-BLW, 2018 WL 2745898
    (D. Idaho June 7, 2018) .................................................................................17

*Evancho v. Pine-Richland Sch. Dist.*,
    237 F. Supp. 3d 267 (W.D. Pa. 2017)...........................................................22, 23

*F.V. v. Barron*,
    286 F. Supp. 3d 1131 (D. Idaho 2018) .............................................................22

*Flack v. Wis. Dept. of Health Servs.*,
    328 F. Supp. 3d 931 (W.D. Wisc. 2018) ...........................................................22

*Glenn v. Brumby*,
    663 F.3d 1312 (11th Cir. 2011) .......................................................................22

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ....................................................5, 6, 7, 9, 21, 22

*Hecox v. Little*,
    479 F. Supp. 3d 930 (D. Idaho 2020) ...............................................................22

*Iglesias v. True*,
    403 F. Supp. 3d 680 (S.D. Ill. 2019).................................................................17

*Kadel v. Folwell*,
No. 1:19CV272, 2020 WL 1169271 (M.D.N.C. Mar. 11, 2020) .......................22

*Kadel v. North Carolina State Health Plan for Teachers and State Employees*,
12 F.4th 422 (4th Cir. 2021) ........................................................5, 6, 7

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) ...............................................................21

*Kosilek v. Spencer*,
740 F.3d 733 (1st Cir. 2014).................................................................9

*Lange v. Houston Cnty.*,
499 F. Supp. 3d 1258 (M.D. Ga. 2020) ............................................19

*Lawrence v. Texas*,
539 U.S. 558 (2003)............................................................................21

*Local Union 7107 v. Clinchfield Coal Co.*,
124 F.3d 639 (4th Cir. 1997) .............................................................15

*M.A.B. v. Bd. of Educ. of Talbot Cty.*,
286 F. Supp. 3d 704 (D. Md. 2018)...............................................22, 23

*Norsworthy v. Beard*,
87 F. Supp. 3d 1104 (N.D. Cal. 2015).........................................22, 23

*O'Donnabhain v. Comm'r*,
134 T.C. 34 (T.C. 2010)........................................................................6

*Puryear v. County of Roanoke*,
214 F.3d 514 (4th Cir. 2000) .............................................................15

*Ray v. McCloud*,
507 F. Supp. 3d 925 (S.D. Ohio 2020) .............................................22

*Romer v. Evans*,
517 U.S. 620 (1996)............................................................................24

*Rosati v. Igbinoso*,
791 F.3d 1037 (9th Cir. 2015) ............................................................xi

*Sch. Bd. of Nassau Cnty., Fla. v. Arline*,
480 U.S. 273 (1987).......................................................................2, 24

*Shorter v. Barr*,
No. 4:19CV108-WS/CAS, 2020 WL 1942785 (N.D. Fla. Mar. 13,
2020), *report and recommendation adopted*, 2020 WL 1942300
(N.D. Fla. Apr. 22, 2020)....................................................................19

*Smith v. City of Salem, Ohio*,
378 F.3d 566 (6th Cir. 2004) ...........................................................6, 22

*Stockman v. Trump*,
331 F. Supp. 3d 990 (C.D. Cal. 2018) ..................................................22

*Stone v. Trump*,
280 F. Supp. 3d 747 (D. Md. 2017)..................................................22, 23

*Tay v. Dennison*,
No. 19-cv-00501-NJR, 2020 WL 2100761 (S.D. Ill. May 1, 2020) .................17

*Tcherepnin v. Knight*,
389 U.S. 332 (1967)..........................................................................15

*Tennessee v. Lane*,
541 U.S. 509 (2004)............................................................................2

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973)...........................................................................24

*Venson v. Gregson*,
No. 3:18-CV-2185-MAB, 2021 WL 673371
(S.D. Ill. Feb. 22, 2021) ......................................................................17

*Ward v. Dixie Nat. Life Ins. Co.*,
595 F.3d 164 (4th Cir. 2010) ...............................................................20

*Whitaker v. Kenosha Unified School District No. 1 Bd. of Educ.*,
858 F.3d 1034 (7th Cir. 2017) .............................................................22

*Williams v. Kincaid*,
No. 1:20-CV-1397, 2021 WL 2324162 (E.D. Va. June 7, 2021).....................14

*Yoakam v. Virginia DOC*,
   No. 3:21-cv-00031-NKM (W.D. Va. 2021) ........................................xi

*Zadvydas v. Davis*,
   533 U.S. 678 (2001).............................................................3, 20

**Statutes**

29 U.S.C. 705(20)(F)(i)...........................................................3

42 U.S.C. § 12101(5) ..............................................................2

42 U.S.C. § 12102(4)(A)..........................................................15

42 U.S.C. § 12211(b)(1) ...........................................3, 14, 15, 16, 17

**Other Authorities**

28 C.F.R. § 35.108(a)(2)(i) .......................................................15

28 C.F.R. § 35.108(b)(1)(i) .......................................................18

28 C.F.R. § 35.108(d) .............................................................15

135 Cong. Rec. S10734-02 ........................................................23

135 Cong. Rec. S10765-01 ........................................................23

American Psychiatric Association, *Diagnostic and Statistical Manual
   of Mental Disorders* (3d ed. 1980) ..........................................8, 9

American Psychiatric Association, *Diagnostic and Statistical Manual
   of Mental Disorders* (3d ed. revised 1987).................................*passim*

American Psychiatric Association, *Diagnostic and Statistical Manual
   of Mental Disorders* (4th ed. 1994) .......................................*passim*

American Psychiatric Association, *Diagnostic and Statistical Manual
   of Mental Disorders* (4th ed. text revision 2000) ........................*passim*

American Psychiatric Association, *Diagnostic and Statistical Manual
   of Mental Disorders* (5th ed. 2013) .......................................*passim*

American Psychiatric Association, *Gender Dysphoria Diagnosis*...............9, 11, 12

American Psychiatric Association, *Gender Dysphoria* (2013) .................................9

Bentz, E.K., et al, "A polymorphism of the CYP17 gene related to sex
steroid metabolism is associated with female-to-male but not male-to-
female transsexualism," 90(1): 56-59 Fertility and Sterility (2008). .................13

Dept. of Justice Statement of Interest, *Blatt v. Cabela's Retail, Inc*.,
No. 5:14-CV-04822
(E.D. Pa. Nov. 16, 2015), ECF No. 67 ....................................................5, 18, 20

Defs.' Br. in Supp. of Part'l Mot. Dismiss, *Bost v. Sam's East*,
No. 1:17-cv-01148 (M.D.N.C. Mar. 15, 2018), ECF No. 11 ............................16

Defs.' Br. in Supp. of Part'l Mot. Dismiss, *Musgrove v.
Bd. of Regents et al.*, No. 3:18-CV-00080-CDL
(M.D. Ga. Oct. 12, 2018), ECF No. 37-1 ........................................................16

Diamond, M., "Transsexuality among twins: identity concordance,
transition, rearing, and orientation," 14(1): 24-28 International
Journal of Transgenderism (2013). ....................................................................14

Drescher, Jack, et al., *Minding the body: Situating gender identity diagnoses
in the ICD-11*, International Review of Psychiatry (Dec. 2012) .......................10

Duffy, Christine M., *Gender Identity and Sexual Orientation
Discrimination in the Workplace: A Practical Guide* 16 (Christine
M. Duffy ed., 2014) ......................................................................................5, 14

Federal Rule of Appellate Procedure 27(d)(2) ........................................................28

Federal Rules of Appellate Procedure 32(a)...........................................................28

Federal Rule of Appellate Procedure 32(f)...............................................................28

Flores, Andrew R., et al*., How Many Adults Identify as Transgender
in the U.S.?*, The Williams Institute 2 (June 2016)..............................................8

Gomez-Gil, E., et al., "Familiarity of gender identity disorder in non-
twin siblings," 39(2): 265-69 Archives of Sexual Behavior (2010)...................13

Green, R., "Family co-occurrence of 'gender dysphoria': ten siblings or
parent-child pairs," 29(5): 499-50 Archives of Sexual Behavior (2000)...........13

- viii -

Guillamon, A., et al., "A review of the status of the brain structure
    research in transsexualism," 45(7):1615-48, Archives of Sexual
    Behavior (2016) ...................................................................................13

"HA60 Gender Incongruence of Adolescence or Adulthood,"
    ICD-11 For Mortality And Morbidity Statistics (May 2021)............................10

H.R. CONF. REP. No. 101-485(IV).......................................................................19

Kaufman, Randi, *Introduction to Transgender Identity and Health*,
    Fenway Guide to Lesbian, Gay, Bisexual, and Transgender Health
    (Harvey J. Makadon, et al., 2d. ed. 2008)...............................................5

Luders, E., et al., "Gender effects on cortical thickness and the
    influence of scaling," 27:314-24 Human Brain Mapping (2006)......................13

Rametti, G., et al., "White matter microstructure in female to male
    transsexuals before cross-sex hormonal treatment: A diffusion tensor
    imaging study," 45:199-204 Journal of Psychiatric Research (2011)...............13

Saraswat, Aruna, et al., *Evidence Supporting the Biologic Nature of
    Gender Identity*, 21 Endocrine Prac. (Feb. 2, 2015)..............................5

"Standards of Care for the Health of Transsexual, Transgender, and
    Gender Nonconforming People," The World Professional
    Association for Transgender Health (7th ed. 2012) ..............................7

"Statement of Interest of the United States," *Doe v. Arrisi*,
    No. 3:16-cv-08640 (D.N.J. July 17, 2017), ECF No. 49.............................18

"Statement of Interest of the United States," *Doe v. Dzurenda*,
    No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57.........................18

U.S. Const. amend. VIII ...................................................................................6

U.S. Const. amend. XIV ...................................................................................20

Zubiaurre-Elorza, et al., "Effects of cross-sex hormone treatment on
    cortical thickness in transsexual individuals," 11(5): 1248-61
    Journal of Sexual Medicine (2014)..................................................13

## STATEMENT OF INTEREST OF AMICI CURIAE

Amici curiae are GLBTQ Legal Advocates & Defenders, the National Center for Lesbian Rights, Lambda Legal, Transgender Legal Defense & Education Fund Black & Pink Massachusetts, Transcending Barriers (ATL), the National LGBTQ Task Force, the American Civil Liberties Union, and the National Center for Transgender Equality. Each of the amici is a non-profit civil rights organization. All of the amici have a strong interest in this Court finding that gender dysphoria is outside the scope of the ADA's GID exclusion as a matter of statutory interpretation or, in the alternative, that the exclusion violates the federal constitutional requirement of equal protection.

## GLTBQ Legal Advocates & Defenders

Through strategic litigation, public policy advocacy, and education, GLBTQ Legal Advocates & Defenders ("GLAD") works in New England and nationally to create a just society free of discrimination based on gender identity and expression, HIV status, and sexual orientation. GLAD has litigated widely in both state and federal courts in all areas of the law in order to protect and advance the rights of lesbians, gay men, bisexuals, transgender individuals and people living with HIV and AIDS. GLAD regularly advocates for incarcerated transgender individuals, including seeking requests for accommodation for those receiving medical treatment for gender dysphoria. GLAD most recently represented Jane Doe, a transgender

woman wrongly incarcerated in a men's prison in *Doe v. Massachusetts Department of Correction*, No. 1:17-cv-12244-RGS (D. Mass). That litigation, which included claims based on the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act, resulted in Jane Doe's transfer to a women's facility. GLAD brings experience and a deep investment in ensuring robust protections under the ADA having brought the first HIV case under the ADA decided by the United States Supreme Court. *Bragdon v. Abbott*, 524 U.S. 624 (1998) (establishing that the ADA prohibits discrimination against people living with HIV whether or not they show symptoms or have an AIDS diagnosis). GLAD has an enduring interest in ensuring that incarcerated persons receive the disability protections designed to protect them and others.

**National Center for Lesbian Rights**

The National Center for Lesbian Rights ("NCLR") is a national non-profit legal organization dedicated to protecting and advancing the civil rights of lesbian, gay, bisexual, and transgender people and their families through litigation, public policy advocacy, and public education. Since its founding in 1977, NCLR has played a leading role in securing fair and equal treatment for LGBT people and their families in cases across the country involving constitutional and civil rights. NCLR has a particular interest in promoting equal opportunity for incarcerated LGBT persons through legislation, policy, and litigation, and represents LGBT people in

civil rights cases in courts throughout the country, including its recent representation of Andree Edmo in *Edmo v. Idaho Department of Corrections*, No. 1:17-cv-00151-BLW (D. Idaho).

## Lambda Legal

Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal") is the oldest and largest national legal organization committed to achieving full recognition of the civil rights of LGBT people and everyone living with HIV through impact litigation, education, and public policy work. Lambda Legal seeks to address the particular vulnerability of LGBT people in custody and has appeared as counsel or amicus curiae in numerous federal and state court cases involving the rights of incarcerated LGBT people. *See, e.g., Rosati v. Igbinoso*, 791 F.3d 1037 (9th Cir. 2015) (per curiam) (reinstating transgender prisoner's complaint alleging that denial of gender-confirming surgery violated 8th Amendment); and *Edmo v. Corizon, Inc.*, 949 F.3d 489, 500–01 (9th Cir. 2020) (concluding that gender confirmation surgery was medically necessary for incarcerated transgender woman with gender dysphoria). Lambda Legal is counsel in *Yoakam v. Virginia DOC*, No. 3:21-cv-00031-NKM, (W.D. Va. 2021) alleging, among other claims, that gender dysphoria is a disability under the ADA and Rehabilitation Act.

**Transgender Legal Defense & Education Fund**

Transgender Legal Defense and Education Fund ("TLDEF") is a non-profit organization that advocates on behalf of transgender and non-binary people across the United States. TLDEF is committed to ensuring that law and policy permit full, lived equality for the transgender and non-binary community through impact litigation and other forms of legal advocacy, in the areas of employment, healthcare, education, government, and public accommodations. This includes ensuring that disability rights laws are applied to their fullest extent, consistent with science and the Constitution, on behalf of transgender and non-binary people, including people seeking relief from discrimination due to gender dysphoria.

**Black & Pink Massachusetts**

Black & Pink Massachusetts is a volunteer-fueled organization working for abolition of the criminal punishment system, which disproportionately impacts lesbian, gay, bisexual, transgender, queer, and intersex people, as well as those living with HIV.

**Transcending Barriers (ATL)**

Transcending Barriers (ATL) is a Black Trans-led grassroots non-profit organization that serves the transgender and gender non-conforming community in Georgia.

**The National LGBTQ Task Force**

The National LGBTQ Task Force is building a future where everyone is free to be themselves in every aspect of their lives. Today, despite all the progress made to end discrimination, millions of lesbian, gay, bisexual, transgender and queer (LGBTQ) people face barriers in every aspect of their lives: in healthcare, housing, employment, retirement, and basic human rights.

**The American Civil Liberties Union**

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with over two million members and supporters dedicated to defending the principles of liberty and equality embodied in the Constitution. As an organization that advocates on behalf of the equal rights of people with disabilities and lesbian, gay, bisexual, and transgender people, the ACLU has a strong interest in the proper interpretation and application of the ADA and the Rehabilitation Act to this dispute.

**The National Center for Transgender Equality**

The National Center for Transgender Equality ("NCTE") is a non-profit organization that advocates to change policies and society to increase understanding and acceptance of transgender people. NCTE is committed to ending discrimination and violence against transgender people in prison and beyond.

**<u>Trans People of Color Coalition</u>**

Trans People of Color Coalition ("TPOCC") exists to advance justice for all Trans People of Color. TPOCC amplifies stories, supports transgender leadership, and challenges issues of racism, transphobia, and transmisogyny.

## <u>STATEMENT OF COMPLIANCE</u>

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than amici curiae or their counsel—contributed money that was intended to fund preparing or submitting this brief.

## **INTRODUCTION**

Plaintiff Kesha T. Williams is a transgender woman diagnosed with gender dysphoria, a medical condition characterized by severe distress caused by the conflict between her female gender identity and her assigned birth sex. (Am. Compl. ¶¶ 2, 12). To alleviate her gender dysphoria, Ms. Williams underwent a medically recommended and supervised gender transition. (Am. Compl. ¶¶ 12-14). For the past fifteen years, she has been on hormone therapy that has alleviated her gender dysphoria and brought her body into conformity with her female identity. (Am. Compl. ¶¶ 14, 35).

Despite having transitioned a decade and a half ago—and despite needing to be placed in a woman's prison as part of the course of care essential to treating her gender dysphoria—Ms. Williams was wrongly incarcerated in a men's prison because she is transgender. (Am. Compl. ¶¶ 1-2, 41). Notwithstanding her repeated requests for reasonable modifications to prison policies under the ADA and Section 504 of the Rehabilitation Act ("Rehabilitation Act"), Ms. Williams' health, safety, and well-being were jeopardized by Defendants' failures to make accommodations to ensure she could receive appropriate care for her medical condition and by the discrimination she experienced. Defendants withdrew Ms. Williams' hormone therapy, forced her to shower in the presence of men, required that she be strip-searched by male officers, denied her access to female commissary items, and

deliberately and repeatedly referred to her as a man—all in direct contravention of her medical needs. (Am. Compl. ¶¶15, 161).

The ADA and the Rehabilitation Act prohibit these actions. These statutes require that the treatment of people with disabilities must be based on "reasoned and medically sound judgments,"[1] not "prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers"[2] that incorrectly presume that all human bodies function the same.[3] They require that social institutions, including prisons, provide equal access and make reasonable accommodations when entrenched policies and practices interfere with a person's equal access to those institutions.

To avoid liability for their violation of the ADA and Rehabilitation Act, Defendants seize on the laws' exclusion of "gender identity disorders not resulting

---

[1] *Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 284–85 (1987) ("The Act is carefully structured to replace such reflexive reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments . . . ."); *see Tennessee v. Lane*, 541 U.S. 509, 536 (2004) (Ginsburg, J., concurring) (highlighting that the "ADA aims both to 'guarante[e] a baseline of equal citizenship by protecting against stigma and systematic exclusion from public and private opportunities'") (citation omitted).

[2] ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(a)(2), 122 Stat. 3553.

[3] *See* 42 U.S.C. § 12101(5) ("[I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities.").

from physical impairments,"[4] and argue that it applies to the different medical condition of gender dysphoria. The district court, with little reasoning, accepted this argument. This was error.

The question raised by this case is whether the ADA prohibits an individual who faces discrimination based on gender dysphoria from bringing a claim. *Amici* argue it does not. The ADA forecloses some claims based on GID, not any based on gender dysphoria—a new and distinct diagnosis.[5] Alternatively, even if this Court were to ignore the plain language of the statute and the distinctions between gender dysphoria and GID, it must at a minimum recognize that gender dysphoria has a physiological origin and thereby falls within the ADA's safe harbor for GID "resulting from physical impairments."[6] Defendants' contrary interpretation would ignore the plain language of the statute and ascribe to Congress a poisoned purpose that violates equal protection. Under the constitutional avoidance canon, it is this Court's obligation to avoid an interpretation that renders federal law unconstitutional if there is a plausible way, consistent with the statutory language, to do so. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

---

[4] 42 U.S.C. § 12211(b)(1); 29 U.S.C. 705(20)(F)(i). The ADA's gender identity disorder ("GID") exclusion is identical to the GID exclusion in the Rehabilitation Act. Although Ms. Williams' case implicates the GID exclusion under both statutes, for simplicity, this brief refers only to the ADA's exclusion.

[5] *See* 42 U.S.C. § 12211(b)(1).

[6] *Id.*

*Amici* urge this Court to find that gender dysphoria is outside the scope of the ADA's GID exclusion as a matter of statutory interpretation or, in the alternative, find that the exclusion violates the federal constitutional requirement of equal protection.

## **ARGUMENT**

## I.    **GID AND GENDER DYSPHORIA ARE DISTINCT MEDICAL CONDITIONS.**

To understand GID and gender dysphoria, it is helpful to understand the meaning of "transgender." A transgender person is someone "who was identified as [one sex] at birth but who now identifies as a [different sex]." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1741 (2020). Typically, people designated male at birth grow up to have a psychological identity as male, and those designated female grow up to have a psychological identity as female. For a transgender person, however, one's body and psychological identity as male or female, a concept known as gender identity, do not match.[7] There is now a scientific consensus that biological factors—most notably sexual differentiation in the brain—have a role in gender identity development and that a person's gender identity is hard-wired and

---

[7] *See* Am. Psychiatric Ass'n, Diagnostic and Stat. Manual of Mental Disorders 451 (5th ed. 2013) [hereinafter "DSM-5"].

- 4 -

impervious to change.[8] *See also Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021) ("For many years, mental health practitioners attempted to convert transgender people's gender identity to conform with their sex assigned at birth, which did not alleviate dysphoria, but rather caused shame and psychological pain."); *accord Kadel v. North Carolina State Health Plan for Teachers and State Employees*, 12 F.4th 422, 427 (4th Cir. 2021) ("Just like being cisgender, being transgender is natural and is not a choice") (quoting *Grimm*, 972 F.3d at 594).

Gender dysphoria is the medical diagnosis used to describe the clinically significant distress that arises from the conflict between a transgender person's

---

[8] *See* Sec. Statement of Int. of U.S. at 3-4, *Blatt v. Cabela's Retail, Inc*., No. 5:14-CV-04822 (E.D. Pa. Nov. 16, 2015), ECF No. 67 [hereinafter DOJ *Blatt* Stat. of Int.] (compiling studies supporting "biologic etiology for transgender identity"); *see also* Aruna Saraswat, et al., *Evidence Supporting the Biologic Nature of Gender Identity*, 21 ENDOCRINE PRAC. 199, 199–202 (Feb. 2, 2015) (providing a review of data in support of a "fixed, biologic basis for gender identity" and concluding that "current data suggest a biologic etiology for transgender identity"); CHRISTINE M. DUFFY, GENDER IDENTITY AND SEXUAL ORIENTATION DISCRIMINATION IN THE WORKPLACE: A PRACTICAL GUIDE 16-77 (Christine M. Duffy ed., 2014) (discussing recent medical studies pointing to biological etiology for transgender identity); Randi Kaufman, *Introduction to Transgender Identity and Health*, FENWAY GUIDE TO LESBIAN, GAY, BISEXUAL, AND TRANSGENDER HEALTH 331, 337–38 (Harvey J. Makadon, et al., 2d. ed. 2008) ("The predominating biological theory suggests that a neurohormonal disturbance takes place in the brain during embryological development," such that "gender identity may not develop along the same lines as the genitalia").

assigned birth sex and gender identity.[9] If left medically untreated, gender dysphoria can result in debilitating depression, anxiety and, for some people, suicidality and death.[10] Federal courts, including this one, have consistently recognized gender dysphoria, and GID before that, as serious medical conditions.[11]

Gender dysphoria is highly treatable and can be cured through a recognized treatment protocol.[12] The international medical professional association focused on

---

[9] *See* DSM-5, *supra* note 7, at 451; *see also Kadel*, 12 F.4th at 427; *Grimm*, 972 F.3d at 594-95.

[10] *See* DSM-5, *supra* note 7, at 454-55; *see also Grimm*, 972 F.3d at 595.

[11] Before the ADA's passage in 1990, federal law recognized GID as an impairment covered by the ADA's precursor, Section 504 of the Rehabilitation Act of 1973. *See, e.g.*, *Doe v. U.S. Postal Serv.*, No. CIV.A. 84-3296, 1985 WL 9446, at *1-3 (D.D.C. June 12, 1985) (holding that plaintiff, a transgender woman with a "medically and psychologically established need for gender reassignment surgery," had a medical condition protected under the Rehabilitation Act); *accord Blackwell v. United States Department of the Treasury*, 656 F. Supp. 713, 715 (D.D.C. 1986), *aff'd in part, vacated in part on other grounds*, 830 F.2d 1183 (D.C. Cir. 1987).
        Federal courts have recognized both gender dysphoria and GID as serious medical conditions in a wide variety of other contexts as well. *See, e.g.*, *Bostock*, 140 S. Ct. at 1738 (acknowledging transgender employee's diagnosis of gender dysphoria and its medically recommended treatment—gender transition—in case alleging discrimination under Title VII); *Kadel*, 12 F.4th at 427; *Grimm*, 972 F.3d at 619; *O'Donnabhain v. Comm'r*, 134 T.C. 34, 62 (T.C. 2010), *acq. in by* IRS Announcement Relating to *O'Donnabhain*, 2011-47 I.R.B. 789 (IRS ACQ 2011); *id.* at 61 (collecting cases, including *De'Lonta v. Angelone,* 330 F.3d 630, 634 (4th Cir 2003), which held that GID poses a "serious medical need" for purposes of Eighth Amendment); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 568 (6th Cir. 2004) (acknowledging transgender employee's GID diagnosis and her transition to living as a woman "on a full-time basis—including at work—in accordance with international medical protocols for treating GID.").

[12] *See* "Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People," The World Professional Association for Transgender

transgender health needs, the World Professional Association For Transgender Health, Inc. ("WPATH") has established internationally accepted Standards of Care ("WPATH Standards") for the treatment of gender dysphoria.[13] As part of the WPATH Standards, individuals with gender dysphoria undergo a medically-established gender transition in order to live consistent with their gender identity.[14] The current WPATH Standards recommend an individualized approach to gender transition, consisting of a combination of hormone therapy, surgery, and/or psychotherapy.[15]

---

Health 5 (7th ed. 2012), http://admin.associationsonline.com/uploaded_files/140/files/Standards%20of%20Care,%20V7%20Full%20Book.pdf ("Gender dysphoria can in large part be alleviated through treatment") [hereinafter "WPATH Standards"]; *see also Grimm*, 972 F.3d at 595 ("Fortunately, we now have modern accepted treatment protocols for gender dysphoria.") (citing WPATH Standards). WPATH recently issued a draft of a proposed 8th edition of its Standards of Care which are due to be finalized in Spring 2022.

[13] *See* WPATH Standards, *supra* note 12, at 1; *see Grimm*, 972 F.3d at 595 ("[The WPATH Standards] represent the consensus approach of the medical and mental health community . . . and have been recognized by various courts, including this one, as the authoritative standards of care."); *accord Kadel*, 12 F.4th at 427.

[14] *See* WPATH Standards, *supra* note 12, at 9-10.

[15] WPATH Standards, *supra* note 12, at 9, 29; *see also Grimm*, 972 F.3d at 596 (discussing WPATH Standards' treatment options for gender dysphoria); *accord Kadel*, 12 F.4th at 427-28 (same).

- 7 -

The number of transgender people relative to the general population is small. According to recent estimates, there are approximately 1.4 million transgender adults living in the United States—0.6 percent of the adult population.[16]

## A.    The Medical Profession No Longer Recognizes GID as a Diagnosis.

In 1980, the American Psychiatric Association introduced the GID diagnosis in the third edition of its *Diagnostic and Statistical Manual of Mental Disorders* (DSM), where it remained until its removal from the DSM in 2013. As its name suggests, the GID diagnosis reflected the now rejected medical view that a mismatch between a person's gender identity and birth sex was itself a problem—i.e., a

---

[16] Andrew R. Flores, et al., *How Many Adults Identify as Transgender in the U.S.?*, THE WILLIAMS INSTITUTE 2 (June 2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-Identify-as-Transgender-in-the-United-States.pdf.

"disorder,"[17] "profound disturbance,"[18] and "confusion"[19] of identity—in need of

treatment.[20] As this Court explained,

> [B]eing transgender was pathologized for many years. As recently as
> the DSM-3 and DSM-4, one could receive a diagnosis of
> "transsexualism" or "gender identity disorder," *indicat[ing] that the
> clinical problem was the discordant gender identity."*

*Grimm*, 972 F.3d at 611 (emphasis added).

---

[17] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 261-66 (3d ed. 1980) (discussing "gender identity disorder") [hereinafter "DSM-III"]; Am. Psychiatric Ass'n., *Diagnostic &Statistical Manual of Mental Disorders* 71-78 (3d. ed. revised 1987) (same) [hereinafter "DSM-III-R"]; American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 532-38 (4th ed. 1994) (same) [hereinafter "DSM-IV"]; American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 576-582 (4th ed. text revision 2000) (same) [hereinafter "DSM-IV-TR"].

[18] *See* DSM-III, *supra* note 17, at 264; DSM-III-R, *supra* note 17, at 71; DSM-IV, *supra* note 17, at 536; DSM-IV-TR, *supra* note 17, at 580.

[19] *See* DSM-IV, *supra* note 17, at 536; DSM-IV-TR, *supra* note 17, at 580.

[20] *See* American Psychiatric Association, *Gender Dysphoria Diagnosis*, https://www.psychiatry.org/psychiatrists/cultural-competency/education/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis [hereinafter APA, *Gender Dysphoria Diagnosis*] (stating that the "gender identity disorder" diagnosis "pathologized identity rather than a true disorder"); American Psychiatric Association, GENDER DYSPHORIA 2, https://www.ca1.uscourts.gov/sites/ca1/files/citations/Gender%20Dysphoria%20Fact%20Sheet%202.pdf (2013) [hereinafter APA, GENDER DYSPHORIA] ("Replacing 'disorder' with 'dysphoria' in the diagnostic label is not only more appropriate and consistent with familiar clinical sexology terminology, it also removes the connotation that the patient is 'disordered.'"); *see also Kosilek v. Spencer*, 740 F.3d 733, 737 (1st Cir. 2014), *reh'g en banc granted, opinion withdrawn on other grounds* (Feb. 12, 2014) (same).

Consistent with this now-rejected view, versions of the DSM prior to 2013 listed GID under related disorders of identity, such as "Psychosexual Disorders,"[21] "Disorders Usually First Evident in Infancy, Childhood, or Adolescence,"[22] or "Sexual and Gender Identity Disorders."[23]

### B.    DSM-5 Removed the Diagnosis of GID and Introduced a New and Distinct Diagnosis of Gender Dysphoria.

In 2013, the DSM-5 removed the diagnosis of GID and created a new diagnosis, gender dysphoria.[24] Unlike the outdated diagnosis of GID, the hallmark or presenting feature of gender dysphoria is *not* a person's gender identity; rather, it is the clinically significant distress, termed dysphoria, that a person experiences as a

---

[21] DSM-III, *supra* note 17, at 261.

[22] DSM-III-R, *supra* note 17, at 74.

[23] *See* DSM-IV, *supra* note 17, at 532; DSM IV-TR, *supra* note 17, at 576.

[24] The international medical community's recognition of gender dysphoria has traced a similar path. The International Classification of Diseases (ICD), published by the World Health Organization, classified GID as a mental health condition beginning in 1975. Jack Drescher, et al., *Minding the body: Situating gender identity diagnoses in the ICD-11*, INT'L REV. PSYCHIATRY, at 570 (Dec. 2012), http://atme-ev.de/download/psychoszuICD11.pdf. The eleventh edition of the ICD, published in 2015, renamed "transsexualism"—the ICD's GID diagnosis for adolescents and adults—"gender incongruence," characterized by "a marked and persistent incongruence between an individual's experienced gender and the assigned sex, which often leads to a desire to 'transition,' in order to live and be accepted as a person of the experienced gender, through hormonal treatment, surgery or other health care services to make the individual's body align, as much as desired and to the extent possible, with the experienced gender." *HA60 Gender Incongruence of Adolescence or Adulthood*, ICD-11 For Mortality And Morbidity Statistics (May 2021), https://icd.who.int/browse11/l-m/en#/http%3a%2f%2fid.who.int%2ficd%2fentity%2f90875286.

result of the mismatch between a person's gender identity and their assigned birth sex.[25] In short, the gender dysphoria diagnosis recognizes that incongruence between a person's identity and birth sex is not the problem in need of treatment—the clinically significant distress associated with that incongruence is.[26]

The diagnostic criteria for gender dysphoria in the DSM-5 are different than those for GID. Gender dysphoria is characterized by "a marked incongruence between one's experienced/expressed gender and assigned gender," rather than a cross-gender identification *per se*.[27] The criteria for gender dysphoria, unlike GID, also include a "posttransition" specifier that applies when an "individual's gender transition is complete."[28]

---

[25] *See* DSM-5, *supra* note 7, at 452 ("The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."); *id.* at 453 (stating that, in addition to marked incongruence, "[t]here must also be evidence of distress about this incongruence").

[26] *See* APA, *Gender Dysphoria Diagnosis*, *supra* note 20 (stating that the elimination of GID and its replacement with gender dysphoria "focuse[s] the diagnosis on the gender identity-related distress that some transgender people experience (and for which they may seek psychiatric, medical, and surgical treatments) rather than on transgender individuals or identities themselves."); *see also* APA, GENDER DYSPHORIA, *supra* note 20, at 1 ("It is important to note that gender nonconformity is not in itself a mental disorder. The critical element of gender dysphoria is the presence of clinically significant distress associated with the condition.").

[27] DSM-5, *supra* note 7, at 452; *see also id.* at 814 (stating that DSM-5 "emphasiz[es] the phenomenon of 'gender incongruence' rather than cross-gender identification per se, as was the case in DSM-IV gender identity disorder").

[28] APA, *Gender Dysphoria Diagnosis*, *supra* note 20. Use of the specifier enables those cured of gender dysphoria through ongoing treatment to continue to receive

Gender dysphoria also differs from GID in other important ways. Unlike the prior versions of the DSM that paired GID with "Psychosexual" and other disorders, the DSM-5 categorizes gender dysphoria separately from other conditions in recognition of gender dysphoria's distinct place among mental health conditions.[29] In addition, the DSM-5 relies on new science supporting the physiological etiology of gender dysphoria. It includes a section entitled "Genetics and Physiology," which discusses the genetic and hormonal contributions to gender dysphoria. According to the DSM-5, the co-occurrence of gender dysphoria in families and twins and endocrine findings that show "increased androgen [i.e., 'male hormone'] levels" in transgender men point to a genetic contribution to gender dysphoria.[30]

The scientific findings upon which the DSM-5 relies are consistent with a significant body of scientific and medical research demonstrating that physical causes—most notably, an atypical influence of sex hormones on the developing fetal

---

necessary medications and other treatments. *Id.*; *see also* APA, GENDER DYSPHORIA, *supra* note 20, at 1.

[29] DSM-5, *supra* note 7, at 451; *see also* APA, GENDER DYSPHORIA, *supra* note 20, at 1 ("Gender dysphoria will have its own chapter in DSM-5 and will be separated from Sexual Dysfunctions and Paraphilic Disorders.").

[30] DSM-5, *supra* note 7, at 457 ("For individuals with gender dysphoria . . . some genetic contribution is suggested by evidence for (weak) familiality of transsexualism among nontwin siblings, increased concordance for transsexualism in monozygotic compared with dizygotic same-sex twins, and some degree of heritability of gender dysphoria."); *id.* (stating "there appear to be increased androgen levels in . . . 46,XX individuals").

brain, which takes place at a later period in pregnancy than the sexual differentiation of the genitalia—contribute to gender dysphoria.[31] For example, it has been demonstrated that transgender women, transgender men, non-transgender women, and non-transgender men have different brain composition with respect to the white matter of the brain, the cortex (central to behavior), and subcortical structures.[32] Other studies have found genetic differences between transgender individuals and non-transgender controls, with transgender men found to have a gene distribution akin to non-transgender male controls.[33] In addition, scientific studies have found a co-occurrence of gender dysphoria in families, with researchers concluding that the probability that a sibling of a transgender individual will also be transgender is five times higher than someone in the general population.[34] And in studies analyzing the

---

[31] *See infra* note 36 (discussing research supporting biological etiology of gender dysphoria).

[32] Guillamon, A., et al., "A Review of the Status of the Brain Structure Research in Transsexualism," 45(7):1615-48, Archives of Sexual Behavior (2016); Luders, E., et al., "Gender Effects on Cortical Thickness and the Influence of Scaling," 27:314-24 Human Brain Mapping (2006); Rametti, G., et al., "White Matter Microstructure in Female to Male Transsexuals before Cross-Sex Hormonal Treatment: A Diffusion Tensor Imaging Study," 45:199-204 Journal of Psychiatric Research (2011); Zubiaurre-Elorza, et al., "Effects of Cross-Sex Hormone Treatment on Cortical Thickness in Transsexual Individuals," 11(5): 1248-61 Journal of Sexual Medicine (2014).

[33] Bentz, E.K., et al, "A Polymorphism of the CYP17 Gene Related to Sex Steroid Metabolism is Associated with Female-to-Male but not Male-to-Female Transsexualism," 90(1): 56-59 Fertility and Sterility (2008).

[34] Green, R., "Family Co-Occurrence of 'Gender Dysphoria': Ten Siblings or Parent-Child Pairs," 29(5): 499-50 Archives of Sexual Behavior (2000); Gomez-Gil, E., et

incidence of gender incongruity involving identical twins, researchers have found a very high likelihood of both twins being transgender, even among twins who were reared apart.[35] As the District Court of Massachusetts has stated,

> [R]ecent studies demonstrate[e] that [gender dysphoria] diagnoses have a physical etiology, namely hormonal and genetic drivers contributing to the in utero development of dysphoria.[36]

## II.   THE ADA DOES NOT EXCLUDE GENDER DYSPHORIA.

The district court held that Ms. Williams' ADA and Rehabilitation Act claims were foreclosed by the GID exclusion because she did not "allege some physical impairment that resulted in her gender dysphoria."[37] This was error.

Ms. Williams' ADA and Rehabilitation Act claims based on gender dysphoria are not foreclosed because the ADA does not exclude *gender dysphoria*; rather, it excludes "gender identity disorders not resulting from physical impairments."[38]

---

al., "Familiarity of Gender Identity Disorder in Non-Twin Siblings," 39(2): 265-69 Archives of Sexual Behavior (2010).

[35] Diamond M., "Transsexuality Among Twins: Identity Concordance, Transition, Rearing, and Orientation," 14(1): 24-28 International Journal of Transgenderism (2013).

[36] *Doe v. Mass. Dep't of Correction,* No. 1:17-cv-12255-RGS, 2018 WL 2994403 at *6 (D. Mass. June 14, 2018); *see also* Duffy, *supra* note 8, at 16-72 to 16-74 & n.282 (citing numerous medical studies that "point in the direction of hormonal and genetic causes for the in utero development of gender dysphoria"); *see also supra* note 8 (discussing medical studies supporting biological etiology for gender identity).

[37] *Williams v. Kincaid*, No. 1:20-CV-1397, 2021 WL 2324162, at *2 (E.D. Va. June 7, 2021).

[38] 42 U.S.C. § 12211(b)(1).

Alternatively, even if this Court were to ignore the distinctions between gender dysphoria and GID, it must at a minimum recognize that the ADA nevertheless applies to Ms. Williams because gender dysphoria has a physiological origin that manifests, as Plaintiff alleged here, in the mismatch between the physical body (which can be changed or repaired through medical treatment) and one's gender identity (which is hard-wired and impervious to change). It thereby falls within the ADA's safe harbor for GID "resulting from physical impairments."[39] Either interpretation is consistent with the plain language of the statute, rules of statutory interpretation favoring the broad interpretation of remedial statutes and narrow interpretation of their exceptions,[40] and the ADA's rules of construction requiring a broad interpretation of disability.[41]

---

[39] *Id.*

[40] *See, e.g.*, *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) ("[R]emedial legislation should be construed broadly to effectuate its purposes."); *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731-32 (1995) ("[A]n exception to 'a general statement of policy' is sensibly read 'narrowly in order to preserve the primary operation of the [policy.'") (citation omitted); *Puryear v. County of Roanoke*, 214 F.3d 514, 522 (4th Cir. 2000) (construing remedial legislation broadly); *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 640 (4th Cir. 1997) (construing exception to remedial legislation narrowly).

[41] *See* 42 U.S.C. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."); 28 C.F.R. § 35.108(a)(2)(i) (same); *cf. id.* at § 35.108(d)(2)(ii), (iii)(K) (stating that "major depressive disorder" will, "as a factual matter, virtually always be found to impose a substantial limitation on a major life activity").

Further, if the GID exclusion is interpreted to apply to gender dysphoria, a conclusion with which *Amici* vehemently disagree, such an interpretation would render the statute unconstitutional by arbitrarily excluding transgender people from its protections.

### A.     The ADA Does Not Exclude Gender Dysphoria.

The ADA has no exclusion for "gender dysphoria."[42] Although the ADA does have an exclusion for "gender identity disorders not resulting from physical impairments," as discussed above, the DSM-5's gender dysphoria diagnosis differs from the GID diagnosis in all prior versions of the DSM in significant ways. Because of these differences, the ADA's GID exclusion does not apply to *gender dysphoria*, a new and distinct diagnosis.[43] A wall of case law holds likewise. *See, e.g.*, *Mass. Dep't of Correction,* 2018 WL 2994403, at \*7 (holding that plaintiff plausibly alleged that gender dysphoria "is not merely another term for 'gender identity disorder,'" and expressing agreement with the plaintiff's argument that "the decision to treat 'Gender Dysphoria' in DSM-V as a freestanding diagnosis . . . reflects an

---

[42] 42 U.S.C. § 12211(b)(1).

[43] Notably, at least two major employers, the University of Georgia and Wal-Mart, have conceded gender dysphoria's coverage under the ADA and Rehabilitation Act. *See* Defs.' Br. in Supp. of Part'l Mot. Dismiss, *Musgrove v. Bd. of Regents, et al.*, No. 3:18-CV-00080-CDL, at 2-3 (M.D. Ga. Oct. 12, 2018), ECF No. 37-1 (declining to challenge gender dysphoria's coverage under ADA and Rehabilitation Act); Defs.' Br. Supp. Part'l Mot. Dismiss, *Bost v. Sam's East*, No. 1:17-cv-01148, at \*2 (M.D.N.C. Mar. 15, 2018), ECF No. 11 (explicitly conceding that ADA does not exclude gender dysphoria).

evolving re-evaluation by the medical community of transgender issues and the recognition that GD involves far more than a person's gender identification."); *see also Venson v. Gregson*, No. 3:18-CV-2185-MAB, 2021 WL 673371, at \*2-3 & n.2 (S.D. Ill. Feb. 22, 2021) (rejecting argument that ADA excludes gender dysphoria); *Tay v. Dennison*, No. 19-cv-00501-NJR, 2020 WL 2100761, at \*3 (S.D. Ill. May 1, 2020) (same); *Iglesias v. True*, 403 F. Supp. 3d 680, 688 (S.D. Ill. 2019) (rejecting argument that "gender dysphoria falls within the [Rehabilitation Act's] exclusionary language"); *Edmo v. Idaho Dep't of Corr.*, No. 1:17-cv-00151-BLW, 2018 WL 2745898, at \*8 (D. Idaho June 7, 2018) (declining to dismiss ADA claim based on gender dysphoria)); *see also Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-04822, 2017 WL 2178123, at \*2 (E.D. Pa. Nov. 16, 2015) (same).

### B. Even if This Court Were to Disregard the Significant Differences Between Gender Dysphoria and GID, the GID Exclusion is Limited and Would Not Apply Here.

The ADA excludes "gender identity disorders *not resulting from physical impairments*."[44] Therefore, even if this Court were to disregard the significant differences between GID and gender dysphoria, the GID exclusion does not apply to gender dysphoria because it results from a physical impairment.

---

[44] 42 U.S.C. § 12211(b)(1) (emphasis added).

As discussed above, the DSM-5 and a significant body of scientific and medical research demonstrate that gender dysphoria results from an atypical interaction of sex hormones with the developing brain.[45] This atypical interaction, which results in a person being born with circulating hormones inconsistent with their gender identity, *is a physical impairment*, that is, a "physiological . . . condition . . . affecting one or more body systems," including "neurological . . . [and] endocrine" systems.[46] The United States Justice Department ("DOJ") is in accord with this view.[47] As the DOJ explains:

> [C]urrent research increasingly indicates that gender dysphoria has physiological or biological roots. . . . In light of the evolving scientific evidence suggesting that gender dysphoria may have a physical basis, along with the remedial nature of the ADA and the relevant statutory and regulatory provisions directing that the terms "disability" and "physical impairment" be read broadly, the GID Exclusion should be construed narrowly such that gender dysphoria falls outside its scope.[48]

The EEOC has similarly concluded that the GID exclusion does not apply to gender dysphoria that "results from a physical impairment,"[49] and numerous cases

---

[45] *See supra* note 36 (discussing research supporting biological etiology of gender dysphoria).

[46] 28 C.F.R. § 35.108(b)(1)(i).

[47] *See* DOJ *Blatt* Stat. of Int., *supra* note 8, at 2; *accord* Stat. of Int. of U.S. at 2-3, *Doe v. Dzurenda*, No. 3:16-CV-1934 (D. Conn. Oct. 27, 2017), ECF No. 57; Stat. of Int. of U.S. at 2-3, *Doe v. Arrisi*, No. 3:16-cv-08640 (D.N.J. July 17, 2017), ECF No. 49.

[48] DOJ *Blatt* Stat. of Int., *supra* note 8, at 3-4.

[49] *See Darin B. v. McGettigan*, No. 0120161068, 2017 WL 1103712, at *4 n.3 (EEOC Mar. 6, 2017) (stating that an individual who alleges that "gender dysphoria results from a physical impairment" states a claim under the Rehabilitation Act).

- 18 -

hold likewise. *See, e.g.*, *Mass. Dep't of Correction,* 2018 WL 2994403, at *6; *see also Doe v. Penn. Dep't of Corrections*, No. 1:20-cv-00023-SPB-RAL, 2021 WL 1583556, at *12 (W.D. Pa. Feb. 19, 2021), *report and recommendation adopted*, 2021 WL 1115373 (W.D. Pa. March 24, 2021) (citing *Mass. Dep't of Correction*, 2018 WL 2994403, at *6); *Lange v. Houston Cnty.*, 499 F. Supp. 3d 1258, 1270 (M.D. Ga. 2020); *Shorter v. Barr*, No. 4:19CV108-WS/CAS, 2020 WL 1942785, at *9 (N.D. Fla. Mar. 13, 2020), *report and recommendation adopted*, 2020 WL 1942300 (N.D. Fla. Apr. 22, 2020).

Because gender dysphoria results from a physical impairment, the GID exclusion does not apply to claims based on gender dysphoria. Such an interpretation does not render the physical impairment "safe harbor" provision superfluous. Before 2013, the DSM was silent as to the etiology of GID.[50] At the time the ADA was being debated, Congress most likely believed that some forms of GID had mental etiologies and others had physical etiologies.[51] Under the DSM-5, gender dysphoria,

---

[50] *See* DSM-III-R, *supra* note 17, at xxiii (stating that the approach taken in the DSM-III-R "is atheoretical with regard to etiology or pathophysiologic process, except with regard to disorders for which this is well established and therefore included in the definition of the disorder"); *see also* DSM-III, *supra* note 17, at 7 (same).

[51] It is possible that Congress derived the "resulting from a physical impairment" language from the DSM-III's (1980) determination that the GID diagnosis did not apply to people with a "physical intersex or genetic abnormality." DSM-III, *supra* note 17, at 263-64. The DSM-III-R—the version in effect at the time the ADA was being debated—subsequently deleted this language. *See* DSM-III-R, *supra* note 17,

like many other mental health conditions,[52] is understood to have a physical etiology—namely, genetic and hormonal drivers that contribute to the in utero development of gender incongruence and, in turn, gender dysphoria.[53]

> As the DOJ states:
>
> If our evolving understanding of GIDs has changed the scope of the Exclusion, that would reflect the ADA's own distinction between GIDs with a physical cause and those without such a cause—a distinction drawn by Congress and inherent in the language of the GID Exclusion itself.[54]

In essence, the "results from a physical impairment" language reflects *Congress's* intent to permit factual developments to change the scope of coverage of the statute and to avoid fixing in time an exclusion once scientific understanding of the condition changes.

## C.    The GID Exclusion Violates the Fourteenth Amendment's Equal Protection Clause.

Under well-settled law, courts must, where possible, construe statutes to avoid rendering them unconstitutional. *Zadvydas*, 533 U.S. at 689 ("[W]hen an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first

---

at 76; *see also* H.R. Rep. No. 101-485(IV), at 81 (May 15, 1990) (dissenting views of Rep. William E. Dannemeyer, Rep. Joe Barton, and Rep. Don Ritter) (referencing DSM-III-R).

[52] *See* DSM III-R, *supra* note 17, at xxiii (discussing mental health conditions with biological etiologies); *see also* DSM-III, *supra* note 17, at 7 (same).

[53] *See* DSM-5, *supra* note 7, at 457.

[54] DOJ *Blatt* Stat. of Int., *supra* note 8, at 5 n.3.

ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'") (citation omitted); *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 177 (4th Cir. 2010) ("[T]he doctrine of constitutional avoidance . . . is premised on the 'reasonable' notion that legislatures 'd[o] not intend [an interpretation] which raises serious constitutional doubts.'").

An interpretation of the ADA's GID exclusion that entirely removes transgender people from the law's scope cannot survive constitutional scrutiny. GID and gender dysphoria are so closely connected to transgender identity that categorically excluding these conditions would facially discriminate based on transgender status. *Cf. Christian Legal Soc. Chapter of University of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 672, 689 (2010) (holding that student group's exclusion of students based on "homosexual conduct" facially discriminated against gay students as a class); *see also Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring) (noting that "homosexual conduct . . . is closely correlated with being homosexual"). If this Court were to interpret the exclusion in this sweeping fashion, it would be subject to, and fail, heightened scrutiny because there is no legitimate reason to exclude transgender people from the law's protection, much less an important or compelling one.

### 1.    A Broad Interpretation of the Exclusion Would Trigger Heightened Scrutiny.

A construction of the ADA that precludes claims by transgender people would require heightened scrutiny. As this Court and numerous other courts have held, "transgender people constitute at least a quasi-suspect class." *Grimm*, 972 F.3d at 610; *see also, e.g.*, *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019); *Brandt v. Rutledge*, 21-cv-00450, 2021 WL 3292057, at *2 (E.D. Ark. Aug. 2, 2021), *app. filed*; *Ray v. McCloud*, 507 F. Supp. 3d 925, 937 (S.D. Ohio 2020); *Hecox v. Little*, 479 F. Supp. 3d 930, 974-75 (D. Idaho 2020); *Flack v. Wis. Dept. of Health Servs.*, 328 F. Supp. 3d 931, 953 (W.D. Wisc. 2018); *F.V. v. Barron*, 286 F. Supp. 3d 1131, 1145 (D. Idaho 2018); *M.A.B. v. Bd. of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 719 (D. Md. 2018); *Stone v. Trump*, 280 F. Supp. 3d 747, 768 (D. Md. 2017); *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 288 (W.D. Pa. 2017); *Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 873 (S.D. Ohio 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139–40 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015).

Heightened scrutiny is also warranted because policies that discriminate against transgender people also discriminate based on sex. *Grimm*, 972 F.3d at 616 ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex.") (citing *Bostock*, 140 S. Ct. at

- 22 -

1741); *see, e.g.*, *Whitaker v. Kenosha Unified School District No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir. 2017); *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011); *Smith*, 378 F.3d at 574; *Kadel v. Folwell*, No. 1:19CV272, 2020 WL 1169271, at *10 (M.D.N.C. Mar. 11, 2020); *Mass. Dep't of Corr.*, 2018 WL 2994403, at *9; *Stockman v. Trump*, 331 F. Supp. 3d 990, 1002 (C.D. Cal. 2018); *M.A.B.*, 286 F. Supp. 3d at 719; *Stone*, 280 F. Supp. 3d at 765; *Adkins*, 143 F. Supp. 3d at 139-40 (S.D.N.Y. 2015); *Bd. of Educ. of the Highland Local Sch. Dist.*, 208 F. Supp. 3d at 872-77; *Evancho*, 237 F. Supp. 3d at 288; *Norsworthy*, 87 F. Supp. 3d at 1119.

### 2.    A Broad Interpretation of the Exclusion Would Reflect Animus and Violate the Requirement of Equal Protection for that Reason as Well.

A broad construction of the exclusion would violate the requirement of equal protection because it would reflect animus toward a disfavored group. The legislative history of the GID exclusion is replete with evidence of animus, including statements that erroneously equate medical conditions associated with being transgender with moral failure.[55] As the District Court of Massachusetts stated:

---

[55] *See, e.g.*, 135 CONG. REC. S10734-02, 1989 WL 183115 (daily ed. Sep. 7, 1989) (statement of Sen. Armstrong) ("I could not imagine the [ADA] sponsors would want to provide a protected legal status to somebody who has such [mental] disorders, particularly those [that] might have a moral content."); *id.* at S10765-01, 1989 WL 183216 (statement of Sen. Helms) ("If this were a bill involving people in a wheelchair or those who have been injured in the war, that is one thing. But how

> The pairing of gender identity disorders with conduct that is criminal or viewed by society as immoral or lewd raises a serious question as to the light in which the drafters of this exclusion viewed transgender persons. . . . It is virtually impossible to square the exclusion of otherwise bona fide disabilities with the remedial purpose of the ADA, which is to redress discrimination against individuals with disabilities based on antiquated or prejudicial conceptions of how they came to their station in life.

*Doe*, 2018 WL 2994403, at **7-8.[56]

Such moral animus against transgender people fails to constitute even a legitimate governmental interest. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620, 634-35 (1996) (concluding that "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest") (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)); *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 448, 450 (1985) ("irrational prejudice" is not a legitimate interest).[57]

---

in the world did you get to the place that you did not even [ex]clude transvestites? . . . What I get out of all of this is here comes the U.S. Government telling the employer that he cannot set up any moral standards for his business. . . . [The employer] cannot say, look I feel very strongly about people who engage in sexually deviant behavior or unlawful sexual practices."); *see also id.* (statement of Sen. Rudman) ("In short, we are talking about behavior that is immoral, improper, or illegal and which individuals are engaging in of their own volition, admittedly for reasons we do not fully understand."

[56] *Accord Doe v. Pennsylvania Dep't of Corr.*, 2021 WL 1583556, at *11-12 (W.D. Pa. Feb. 19, 2021); *accord Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 134-35 (E.D. Pa. 2020); *Blatt*, 2017 WL 2178123, at *4.

[57] As the morals debate on the floor of the Senate makes clear, *see supra* note 55, Congress' exclusion of GID had nothing to do with "reasoned and medically sound

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse and remand the District

Court's judgment of dismissal of the Plaintiff's ADA and Rehabilitation Act claims.

Respectfully submitted,

GLBTQ LEGAL ADVOCATES & DEFENDERS,
NATIONAL CENTER FOR LESBIAN RIGHTS,
LAMBDA LEGAL, TRANSGENDER LEGAL
DEFENSE & EDUCATION FUND, BLACK
AND PINK MASSACHUSETTS,
TRANSCENDING BARRIERS (ATL),
NATIONAL LGBTQ TASK FORCE, THE
AMERICAN CIVIL LIBERTIES UNION, THE
NATIONAL CENTER FOR TRANSGENDER
EQUALITY, and TRANS PEOPLE OF COLOR
COALITION

By and through their attorneys,


*/s/ Shannon Minter*
Shannon Minter
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street Suite 370,
San Francisco CA 94102
Tel: (415) 392-6257
Fax: (415) 392-8442
Email: sminter@nclrights.org

*Counsel of Record for the Amici Curiae*

---

judgments" about the GID diagnosis. *See Arline*, 480 U.S. at 284–85; *see supra* note 11 (discussing courts' recognition of gender dysphoria, and GID before that, as serious medical conditions for over four decades).

*/s/ Jennifer Levi*
Jennifer Levi
GLBTQ LEGAL ADVOCATES & DEFENDERS
18 Tremont Street, STE 950
Boston, MA 02108
T: (617) 388-5140
E: jlevi@glad.org

*Brief Counsel for Amici Curiae*

*/s/ Kevin M. Barry*
Kevin M. Barry
Quinnipiac University School of Law Legal Clinic
275 Mount Carmel Ave.
Hamden, CT 06518
T: (203) 582-3233
E: kevin.barry@quinnipiac.edu

*Brief Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 8, 2021, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit through the CM/ECF system. I certify that the participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Shannon P. Minter*

Shannon P. Minter

## CERTIFICATE OF COMPLIANCE WITH RULES 27 AND 32

I hereby certify:

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2) because it contains 6,393 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the type-face requirements and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Shannon P. Minter*

Shannon P. Minter

- 28 -