**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2030**

———————

KESHA T. WILLIAMS,

　　　　　Plaintiff – Appellant,

　　v.

STACEY A. KINCAID, in her official capacity; XIN WANG, NP, in her individual and official capacities; DEPUTY GARCIA, in his individual and official capacities,

　　　　　Defendants – Appellees.

------------------------------

AMERICAN CIVIL LIBERTIES UNION; BLACK AND PINK MASSACHUSETTS; GLBTQ LEGAL ADVOCATES & DEFENDERS; LAMBDA LEGAL; NATIONAL CENTER FOR LESBIAN RIGHTS; NATIONAL CENTER FOR TRANSGENDER EQUALITY; NATIONAL LGBTQ TASK FORCE; TRANS PEOPLE OF COLOR COALITION; TRANSCENDING BARRIERS (ATL); TRANSGENDER LEGAL DEFENSE & EDUCATION FUND; DISABILITY LAW CENTER OF VIRGINIA; DISABILITY RIGHTS VERMONT,

　　　　　Amici Supporting Appellant.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:20-cv-01397-CMH-TCB)

———————

Argued:  March 11, 2022　　　　　　　　　　Decided:  August 16, 2022

———————

Before MOTZ, HARRIS, and QUATTLEBAUM, Circuit Judges.

———————

Reversed and remanded for further proceedings by published opinion. Judge Motz wrote the opinion, in which Judge Harris joined. Judge Quattlebaum wrote an opinion concurring in part and dissenting in part.

————————————

**ARGUED:** Joshua Harry Erlich, THE ERLICH LAW OFFICE, PLLC, Arlington, Virginia, for Appellant. Philip Corliss Krone, COOK CRAIG & FRANCUZENKO, PLLC, Fairfax, Virginia, for Appellees. **ON BRIEF:** Davia Craumer, Katherine L. Herrmann, THE ERLICH LAW OFFICE, PLLC, Arlington, Virginia, for Appellant. Alexander Francuzenko, COOK CRAIG & FRANCUZENKO, PLLC, Fairfax, Virginia, for Appellees. Shannon Minter, NATIONAL CENTER FOR LESBIAN RIGHTS, San Francisco, California; Jennifer Levi, GLBTQ LEGAL ADVOCATES & DEFENDERS, Boston, Massachusetts; Kevin M. Barry, QUINNPIAC UNIVERSITY SCHOOL OF LAW LEGAL CLINIC, Hamden, Connecticut, for Amici GLBTQ Legal Advocates & Defenders, National Center for Lesbian Rights, Lambda Legal, Transgender Legal Defense & Education Fund, Black and Pink Massachusetts, Transcending Barriers (ATL), National LGBTQ Task Force, The American Civil Liberties Union, The National Center for Transgender Equality, and Trans People of Color Coalition. John Cimino, Rebecca S. Herbig, Steven M. Traubert, DISABILITY LAW CENTER OF VIRGINIA, Richmond, Virginia, for Amici The disAbility Law Center of Virginia and Disability Rights Vermont.

————————————

DIANA GRIBBON MOTZ, Circuit Judge:

Kesha Williams, a transgender woman with gender dysphoria, spent six months incarcerated in the Fairfax County Adult Detention Center. Though prison deputies initially assigned her to women's housing, they quickly moved her to men's housing when they learned that she was transgender. There, she experienced delays in medical treatment for her gender dysphoria, harassment by other inmates, and persistent and intentional misgendering and harassment by prison deputies. Following her release from the detention center, Williams filed this § 1983 action against the Sheriff of Fairfax County, a prison deputy, and a prison nurse alleging violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the United States Constitution, and state common law. The district court dismissed the case, holding that the complaint failed to state grounds for relief with respect to some claims and that the statute of limitations barred others. For the reasons that follow, we disagree and so reverse and remand for further proceedings.

## I.

Because this is an appeal from a district court's grant of a motion to dismiss, we must "assume the truth of the facts as alleged in [the] complaint." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 249 (2009). We thus recount those facts.

Williams is a transgender woman whose gender identity (female) differs from the gender (male) she was assigned at birth. Prior to her incarceration, Williams changed her legal name and lived her life as a woman. Her home state of Maryland has recognized her gender as female and issued her a driver's license with that designation. Williams suffers from gender dysphoria, a "discomfort or distress that is caused by a discrepancy between

a person's gender identity and that person's sex assigned at birth." Am. Compl. ¶ 12 (quoting the World Professional Association for Transgender Health Standards of Care (7th Version 2012) ("WPATH Standards")). People suffering from gender dysphoria often benefit from medical treatment, including hormone therapy. Williams had received such medical treatment in the form of a daily pill and biweekly injections for fifteen years prior to her incarceration.

At the outset of her incarceration, prison deputies searched Williams, assigned her housing on the women's side of the prison, and gave her uniforms typically provided to female inmates, including several bras and women's underwear. Later that same day, during her preliminary medical evaluation, Williams told the prison nurse, Xin Wang, that she is transgender, suffers from gender dysphoria, and for fifteen years had received hormone medical treatment for her gender dysphoria. Williams had brought this hormone medication with her to the prison and asked Nurse Wang to retrieve it for her. Nurse Wang did not return Williams' medicine to her; instead she instructed Williams to fill out a medical release form and indicated that prison healthcare staff would follow up with her soon.

In response to Nurse Wang's further questioning, Williams explained she had not undergone transfeminine bottom surgery. Because Williams retained the genitalia with which she was born, Nurse Wang labelled Williams as "male" and changed her prison records, including her housing assignment, to reflect that label. Pursuant to the prison's policy, which provides that "[m]ale inmates shall be classified as such if they have male genitals" and "[f]emale inmates shall be classified as such if they have female genitals,"

4

prison deputies required Williams to live on the men's side of the facility.  Deputies also required her to give up the women's clothing she had previously received and to wear men's clothing.

As instructed by Nurse Wang, Williams filled out the medical release form later that same day.  But two weeks went by without Williams receiving her prescribed hormone medication for gender dysphoria.  As a result, Williams began experiencing significant mental and emotional distress.  She requested a visit from a nurse, who directed her to fill out another medical release form.  Williams did so.  Nurse Wang received Williams' medical records on December 4, 2018, but did not approve the medication or re-initiate hormone treatment until on or about December 10.  Subsequently, Nurse Wang failed to provide Williams with her approved and scheduled hormone treatment on two separate occasions.

While Williams was housed on the men's side of the prison, prison deputies repeatedly harassed her regarding her sex and gender identity.  Deputies ignored her requests that they refer to her as a woman.  Instead, they referred to her as "mister," "sir," "he," or "gentleman."  Williams' requests for some accommodations — to shower privately and for body searches to be conducted by a female deputy — were denied.  One deputy threatened to place her in solitary confinement if she resisted a search by a male deputy.  Male inmates also harassed Williams, causing her to fear for her safety throughout her incarceration in male housing.

In January 2019, during a "shakedown" search of Williams' housing unit, Williams again requested that a female deputy conduct the body search.  Despite the presence and

availability of a female deputy, deputies ignored her request.  Instead, a male deputy, Deputy Garcia, who knew Williams to be a woman but referred to her as a man, told her: "Sir, you are a male and I need to search you."  He then subjected her to a "highly aggressive" search that resulted in bruising to her breast and caused her "pain for several days."  Afterward, he "mocked Ms. Williams and made light of his actions in searching her person."

Williams' incarceration ended in May 2019.  Thereafter, she brought this § 1983 action, asserting violations of the ADA, 42 U.S.C. §§ 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq.*, the U.S. Constitution, and state law.  Williams filed her original complaint on November 16, 2020.  That complaint named as defendants Stacey A. Kincaid, Sheriff of Fairfax County; nine "Custody Does"; and fifteen "Health Care Does."  After limited discovery into the identities of prison employees, she filed an amended complaint two months later against only Sheriff Kincaid, Nurse Wang, and Deputy Garcia ("Defendants").

Defendants moved to dismiss the Amended Complaint.  Sheriff Kincaid contended that the ADA and Rehabilitation Act afforded Williams no basis for relief because "gender dysphoria is not a 'disability' under the ADA."  Kincaid Mem. in Support of Mot. to Dismiss at 8.  Rather, according to Sheriff Kincaid, "it is an identity disorder not resulting from physical impairments."  *Id.*  The district court adopted this argument and dismissed the ADA and Rehabilitation Act claims against Sheriff Kincaid.  The court also dismissed the claims against Nurse Wang and Deputy Garcia, holding that most were barred by the statute of limitations and that the acts alleged to have taken place within the limitations

period were insufficient to state claims against those defendants.  Finally, the court held that the gross negligence claims against Sheriff Kincaid and Deputy Garcia failed because they had exhibited "some degree of care for inmates such as" Williams.

Williams timely noted this appeal.

## II.

We first address Williams' claims against Sheriff Kincaid under the ADA and the Rehabilitation Act,[1] reviewing de novo the district court's dismissal of those claims under Rule 12(b)(6).  *Gerner v. County of Chesterfield*, 674 F.3d 264, 266 (4th Cir. 2012).  In reviewing a 12(b)(6) motion, we must "draw all reasonable inferences in favor of the plaintiff."  *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).  To survive such a motion, a complaint must contain facts that, if true, "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high."  *Owens v. Baltimore City State's Att'ys Office*, 767 F.3d 379, 403 (4th Cir. 2014).

Among its protections, the ADA prohibits public entities from discriminating against, or excluding from participation in the benefits of services, programs, and activities, any qualified individual with a disability.  42 U.S.C. § 12132.  The ADA defines the term

---

[1] Neither party asserts that the ADA and the Rehabilitation Act require different analyses.  This is so because the two statutes provide identical protection with respect to the matters at issue in this case.  Thus, as in *National Federation of the Blind v. Lamone*, "plaintiffs' ADA and Rehabilitation Act claims rise and fall together," and so "for simplicity our opinion combines them and principally analyzes the ADA claim."  813 F.3d 494, 502 n.4 (4th Cir. 2016).

"disability" broadly to include "a physical or mental impairment that substantially limits one or more major life activities of such individual." *Id.* § 12102(1)(A). Sheriff Kincaid does not dispute that gender dysphoria falls within that definition.

Instead, the Sheriff relies on the ADA's exclusions. The statute excludes from the broad definition of "disability" — and thus from the statute's protections — "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders not resulting from physical impairments*, [and] other sexual behavior disorders," as well as "compulsive gambling, kleptomania, . . . pyromania; or . . . psychoactive substance use disorders resulting from current illegal use of drugs." *Id.* § 12211(b) (emphasis added). Sheriff Kincaid argues, and the district court held, that the exclusion for "gender identity disorders not resulting from physical impairments" applied to Williams' gender dysphoria and barred her ADA claim. Whether this is so constitutes a question of first impression for the federal appellate courts.

In addressing this question, we of course must follow Congress' direction. After a series of Supreme Court decisions narrowing the ADA, Congress responded in 2008 by instructing courts in an amendment to the ADA that the definition of "disability" "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the [ADA's] terms." *Id.* § 12102(4)(A). In doing so, "Congress expressly directed courts to construe the amended [ADA] as broadly as possible." *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 332 (4th Cir. 2014). Moreover, because the 2008 amendments to the ADA were "intended to make it 'easier for people with disabilities to obtain protection under the ADA,'" *Jacobs v. N.C. Admin. Off. of the Cts.*,

8

780 F.3d 562, 572 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.1(c)(4)), courts must construe the ADA's exclusions narrowly. *See Alexander v. Carrington Mortgage Servs., LLC*, 23 F.4th 370, 374 (4th Cir. 2022).

Williams poses two challenges to the district court's holding that she suffers from a "gender identity disorder[] not resulting from physical impairments." First, she contends that gender dysphoria categorically is *not* a "gender identity disorder[]." Second, Williams argues that even if her gender dysphoria is a "gender identity disorder[]," it results from a physical basis that places it outside the scope of the exclusion from ADA protection. Appellant Br. at 32. We consider each of these arguments in turn.

### A.

We begin with Williams' first contention: that gender dysphoria categorically is not a "gender identity disorder[]," and so the exclusion from ADA protection of "gender identity disorders" does not affect ADA coverage for gender dysphoria. The text of the ADA does not define the term "gender identity disorders" and does not mention gender dysphoria at all. Thus, although the ADA specifically lists a number of exclusions from the definition of "disability," that list does not include gender dysphoria. To determine whether "gender identity disorders" includes gender dysphoria, we must look to the meaning of the ADA's "terms at the time of its enactment." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). That examination reveals that in 1990, "the time of the statute's adoption," "gender identity disorders" did not include gender dysphoria. *Id.*

In fact, in 1990, the medical community did not acknowledge gender dysphoria either as an independent diagnosis or as a subset of any other condition. But it did

recognize a class of other disorders that it characterized as "gender identity disorders." According to the then-current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM), "[t]he essential feature" of a "gender identity disorder" was "an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity." Am. Psych. Ass'n, Diagnostic and Statistical Manual 71 (3d ed., rev. 1987) (DSM-III-R); *see Hall v. Florida*, 572 U.S. 701, 704 (2014) (describing the DSM as "one of the basic texts used by psychiatrists and other experts"). We have recently recognized precisely this point: that a diagnosis of "gender identity disorder . . . indicat[ed] that the clinical problem was the discordant gender identity." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020) (internal citation omitted), *cert. denied*, 141 S. Ct. 2878 (2021). In other words, in 1990, the gender identity disorder diagnosis marked being transgender as a mental illness. *Id.*

Crucially, advances in medical understanding led the American Psychiatric Association (APA) in 2013 to remove "gender identity disorders" from the most recent DSM (5th ed. 2013), the DSM-5.[2] At the same time as the APA removed "gender identity

---

[2] Sheriff Kincaid claims we may not consider the DSM-5 because Williams did not refer to it in her complaint. But the Supreme Court has recognized the DSM as a "basic text[] used by psychiatrists and other experts." *Hall v. Florida*, 572 U.S. 701, 704 (2014). Notably, it is a source often referred to as authoritative by courts. *See, e.g.*, *Grimm*, 972 F.3d at 595 (relying on the DSM-5's diagnostic criteria for gender dysphoria). We also note that in her complaint, Williams quotes the definition of gender dysphoria provided by the WPATH Standards, which itself refers health professionals to the DSM-5's diagnostic criteria. Like a dictionary, the DSM-5 represents a useful source as to the meaning of a statutory term. Courts do not require plaintiffs to attach dictionaries to their complaints in order for courts to consider them. *See, e.g.*, *Bostock*, 140 S. Ct. at 1740. We decline to do so for the DSM-5.

10

disorder" from the DSM-5, the APA added the diagnosis of "gender dysphoria," which did not exist as a diagnosis in 1990.

The very fact of revision suggests a meaningful difference, and the contrast between the definitions of the two terms — gender identity disorder and gender dysphoria — confirms that these revisions are not just semantic. Indeed, the definition of gender dysphoria differs dramatically from that of the now-rejected diagnosis of "gender identity disorder." Rather than focusing exclusively on a person's gender identity, the DSM-5 defines "gender dysphoria" as the "*clinically significant distress*" felt by some of those who experience "an incongruence between their gender identity and their assigned sex."[3] DSM-5 at 451–53 (emphasis added); *see* Br. of Amici Curae, The disAbility Law Center, et al. in Supp. of Appellant at 9. And the DSM-5 explains that the discomfort or distress caused by gender dysphoria may result in intense anxiety, depression, suicidal ideation, and even suicide. DSM-5 at 454–55. In short, "being trans alone cannot sustain a diagnosis of gender dysphoria under the DSM-[5], as it could for a diagnosis of gender identity disorder under [earlier versions of the DSM]." Ali Szemanski, Note, *Why Trans Rights Are Disability Rights: The Promises and Perils of Seeking Gender Dysphoria Coverage Under the Americans with Disabilities Act*, 43 Harv. J. L. & Gender 137, 147 (2020). For

---

[3] The WPATH Standards similarly define "gender dysphoria" as "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)." WPATH Standards at 2; *see also Grimm*, 972 F.3d at 595 (describing the WPATH Standards as "represent[ing] the consensus approach of the medical and mental health community . . . [and] recognized by various courts, including this one, as the authoritative standards of care").

11

if a transgender person does not experience "*clinically significant* distress," she could not be diagnosed as having gender dysphoria under the DSM-5. *See* DSM-5 at 453 (emphasis added).

Reflecting this shift in medical understanding, we and other courts have thus explained that a diagnosis of gender dysphoria, unlike that of "gender identity disorder[]," concerns itself primarily with *distress* and other disabling symptoms, rather than simply being transgender. In *Grimm*, we further explained that "left untreated, gender dysphoria can cause, among other things, depression, substance use, self-mutilation, other self-harm, and suicide." 972 F.3d at 595. Similarly, the Ninth Circuit has pointed out that "[f]ailure to follow an appropriate treatment plan [for gender dysphoria] can expose transgender individuals to a serious risk of psychological and physical harm." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 771 (9th Cir. 2019).

Not only are "gender identity disorder" and gender dysphoria characterized by different symptoms; they also affect different populations. As Williams acknowledges in her complaint, "gender dysphoria" is "a disability suffered by many (but certainly not all) transgender people." Am. Compl. ¶ 2; *see also* Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. Rev. 507, 516 (2016) ("For many transgender people, the incongruence between gender identity and assigned sex does not interfere with their lives; they are completely comfortable living just the way they are."); DSM-5 at 451 ("[N]ot all individuals will experience distress as a result of such [gender] incongruence."). But "[f]or a subset of transgender people . . . the

incongruence results in gender dysphoria — i.e., a feeling of stress and discomfort with one's assigned sex." Barry et al., *A Bare Desire to Harm*, at 516.[4]

In sum, the APA's removal of the "gender identity disorder" diagnosis and the addition of the "gender dysphoria" diagnosis to the DSM-5 reflected a significant shift in medical understanding. The obsolete diagnosis focused solely on cross-gender identification; the modern one on clinically significant distress. The DSM-5 itself emphasizes this distinction, explaining that the gender dysphoria diagnosis "focuses on dysphoria as the clinical problem, not identity per se." DSM-5 at 451. Put simply, while the older DSM pathologized the very existence of transgender people, the recent DSM-5's diagnosis of gender dysphoria takes as a given that being transgender is not a disability and affirms that a transgender person's medical needs are just as deserving of treatment and protection as anyone else's.

---

[4] Sheriff Kincaid offers little in the way of a response to Williams' argument that gender dysphoria does not constitute a "gender identity disorder." Arguably, her "passing shot" amounts to waiver. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). But even if not waived, any argument that can be gleaned from the Sheriff's brief on this question is totally unpersuasive. The Sheriff relies on a page-and-a-half press release, which she asserts the APA released alongside the DSM-5, and which characterizes gender dysphoria as "a revision of DSM-IV's criteria for gender identity disorder." Appellee Br. at 18 (quoting Gender Dysphoria, Am. Psych. Ass'n (2013), *available at* https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Gender-Dysphoria.pdf). Our colleague in the dissent similarly relies heavily on that excerpted quotation. But this language seems to us an innocuous generalization; it is far from a statement that "gender identity disorder" and gender dysphoria are identical. Rather, the press release makes the same crucial point as Williams does, i.e.: "It is important to note that gender nonconformity is not in itself a mental disorder. The critical element of gender dysphoria is the presence of clinically significant distress." *Id.* at 1. Even if there were some inconsistency between the press release and the DSM-5, we rely on the latter, as it is the DSM itself that represents the consensus and authoritative view of "psychiatrists and other experts." *Hall*, 572 U.S. at 704.

Thus, the ADA excludes from its protection anything falling within the plain meaning of "gender identity disorders," as that term was understood "at the time of its enactment." *Bostock*, 140 S. Ct. at 1738. But nothing in the ADA, then or now, compels the conclusion that gender dysphoria constitutes a "gender identity disorder" excluded from ADA protection. For these reasons, we agree with Williams that, as a matter of statutory construction, gender dysphoria is not a gender identity disorder.[5]

And even putting aside our legal conclusion, at this early stage in the litigation, a dismissal of Williams' ADA claims would misunderstand the generosity with which complaints are to be reviewed. *See Bd. of Trs. v. Four-C-Aire, Inc.*, 929 F.3d 135, 152 (4th Cir. 2019) ("When considering the sufficiency of a complaint's allegations under a Rule 12(b)(6) motion, courts must construe the complaint 'liberally so as to do substantial justice.'" (quoting *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017))). The difference between "gender identity disorders" and gender dysphoria, as revealed by the DSM and the WPATH Standards, would be more than enough support to "nudge [Williams'] claims" that gender dysphoria falls entirely outside of § 12211(b)'s exclusion

---

[5] The dissent insists that Williams' gender dysphoria must constitute a "gender identity disorder" because, as defined by the now-outdated DSM-III-R, a diagnosis of gender identity disorder required evidence of "[p]ersistent discomfort and [a] sense of inappropriateness about one's assigned sex." DSM-III-R at 76. The dissent reasons that this sense of "[p]ersistent discomfort" sounds like the distress that defines a diagnosis of gender dysphoria under the DSM-5. But this contention simply misses the point. Even if there are similarities between the now-obsolete definition of gender identity disorder and the DSM-5's definition of gender dysphoria, the diagnosis of gender identity disorder referred to in § 12211(b) *no longer exists*. As we have explained, the differences between these two diagnoses are not merely semantic or the result of "linguistic drift." Equating the two is like equating the now-obsolete diagnosis of hysteria with the modern diagnosis of general anxiety disorder simply because they share a common diagnostic criterium.

14

for "gender identity disorders" "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.[6]

Moreover, given Congress' express instruction that courts construe the ADA in favor of maximum protection for those with disabilities, we could not adopt an unnecessarily restrictive reading of the ADA. To so hold would be for a court to take it upon itself to rewrite the statute in two impermissible ways: by penciling a new condition into the list of exclusions, and by erasing Congress' command to construe the ADA as broadly as the text permits. We cannot add to the ADA's list of exclusions when Congress has not chosen to do so itself.

B.

Williams also contends that even if gender dysphoria and "gender identity disorder[]" were not categorically distinct, as we have held, her gender dysphoria nevertheless falls within the ADA's safe harbor for "gender identity disorders . . . *resulting from physical impairments*." Thus, Williams maintains that we must reverse the district

---

[6] Although no circuit court has answered the precise question before us, we note that this conclusion accords with a growing number of district courts that have addressed this question. *See, e.g.*, *Venson v. Gregson*, No. 3:18-cv-2185, 2021 WL 673371 (S.D. Ill. Feb. 22, 2021); *Iglesias v. True*, 403 F. Supp. 3d 680 (S.D. Ill. 2019); *Doe v. Mass. Dep't of Corr.*, 2018 WL 2994403 (D. Mass. 2018); *Edmo v. Idaho Dep't of Corr.*, No. 1:17-cv-00151, 2018 WL 2745898 (D. Idaho June 7, 2018); *Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-04822, 2017 WL 2178123 (E.D. Pa. May 18, 2017).

court's dismissal of her ADA claims for an additional and independent reason — because her gender dysphoria has a "known physical basis." Br. of Appellant at 36.

In response, Sheriff Kincaid does *not* argue that gender dysphoria *never* results from a physical impairment; she concedes that it sometimes may. *See* Br. of Appellees at 15 ("[T]he question *is not* whether gender dysphoria could possibly be the result of the physical impairment . . . ." (emphasis added)); *id.* at 19 (noting that the DSM "indicates that gender dysphoria can result from a disorder of sex development, which would equate to resulting from physical impairment"). Rather, Sheriff Kincaid contends that Williams failed to explicitly *plead* that her gender dysphoria was the result of a physical impairment. Appellee Br. at 15. The district court (apparently assuming that gender dysphoria is a "gender identity disorder") based its dismissal of the ADA claim on this rationale alone.

In determining the correctness of this legal conclusion, we are once again guided by Congress' mandate that we must construe the definition of "disability" as broadly as the text of the ADA permits. 42 U.S.C. § 12102(4)(A). Though the statute itself does not define the phrase "physical impairments," the Equal Employment Opportunity Commission (EEOC) has promulgated regulations defining the term expansively as "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological . . . and endocrine." 28 C.F.R. § 35.108(b)(1)(i). And we must defer to the EEOC's reasonable interpretations of ambiguous terms in the ADA. *See Summers*, 740 F.3d at 331–32.

In light of the broad scope of the ADA and the implementing regulations, we conclude that Williams has alleged sufficient facts to render plausible the inference that

her gender dysphoria "result[s] from physical impairments." 42 U.S.C. § 12211(b)(1). Williams alleges that the medical treatment for *her* gender dysphoria "consisted primarily of a hormone therapy, which she used to effectively manage and alleviate the gender dysphoria she experienced," and that she had received this medical treatment for fifteen years. Am. Compl. ¶ 14. Thus, contrary to the dissent's assertion, Williams does not merely allege that gender dysphoria may require physical treatment such as hormone therapy; she maintains that her gender dysphoria requires it. Indeed, she invokes her need for hormone treatment in her complaint upwards of ten times. She explains that hormone treatment enables "feminization or masculinization of the body." *Id.* ¶ 29. And she alleges that without it, when the prison failed to provide this treatment, she experienced, inter alia, "emotional, psychological, and *physical* distress." *Id.* ¶ 123 (emphasis added).

These allegations suffice to raise "the reasonable inference" that Williams' gender dysphoria results from a physical impairment. *Iqbal*, 556 U.S. at 678. In particular, the need for hormone therapy may well indicate that her gender dysphoria has some physical basis. *See Grimm*, 972 F.3d at 596 (describing "hormone therapy" as a "physical transition treatment[]"). That Williams did not "specifically allege that her gender dysphoria is rooted in some physical component" by using those particular words does not render implausible the inference that her gender dysphoria has a physical basis. *Doe v. Pa. Dep't of Corr.*, No. 1:20-cv-00023, 2021 WL 1583556, at *11–12 (W.D. Pa. Feb. 19, 2021) (relying on plaintiff's argument "that the DSM-[5] provides evidence of a physical source"

17

to conclude she plausibly alleged her gender dysphoria falls "outside of the statutory exclusion").

Indeed, in addition to the allegations regarding her hormone treatment, Williams points to medical and scientific research identifying possible physical bases of gender dysphoria.[7]  The Department of Justice has agreed that this emerging research renders the inference that gender dysphoria has a physical basis sufficiently plausible to survive a motion to dismiss.  *See, e.g.*, Statement of Interest of the United States of America at 1–2, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-4822 (E.D. Pa. Nov. 16, 2015) ("In light of the evolving scientific evidence suggesting that gender dysphoria may have a physical basis, along with the remedial nature of the ADA and the relevant statutory and regulatory provisions directing that the term 'disability' and 'physical impairment' be read broadly,

---

[7] For example, as Williams notes, recent medical research suggests "that [gender dysphoria] diagnoses have a physical etiology, namely, hormonal and genetic drivers contributing to the in utero development of dysphoria."  *Mass. Dep't of Corr.*, 2018 WL 2994403, at *6; *see also* Ferdinand Boucher & Tudor Chinnah, *Gender Dysphoria: A Review Investigating the Relationship Between Genetic Influences and Brain Development*, 11 Adolescent Health, Med. & Therapeutics 89, 97 (2020) (conducting a literature review and concluding "that the causal mechanism of [gender dysphoria] is unknown, but the importance of biological influences via genes and hormones is clear"); Madeleine Foreman et al., *Genetic Link Between Gender Dysphoria and Sex Hormone Signaling*, 104 J. Clin. Endocrinology & Metabolism 390, 394 (2019) ("[T]he results of our study of transgender women support the hypothesis that gender dysphoria has a polygenic basis, involving interactions among multiple genes and polymorphisms that may alter the sexual differentiation of the brain *in utero*, contributing to the development of gender dysphoria in transgender women.").

18

the [Gender Identity Disorder] Exclusion should be construed narrowly such that gender dysphoria falls outside its scope.").

Sheriff Kincaid's contrary argument boils down to asserting that Williams should have inserted the words "from a physical basis" into her complaint. In fact, at oral argument, Sheriff Kincaid's counsel conceded that if Williams "pled that [gender dysphoria] was the result of a physical impairment, then . . . [the ADA claim] can get beyond the pleading stage, and then it could still be an issue for proof." Oral Argument at 32:01–32:20. But a plaintiff need not plead any "specific words" to defeat a motion to dismiss. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (internal citation omitted). The Sheriff's contention to the contrary would return us to "the hypertechnical, code-pleading regime of a prior era," eliding Rule 8's straightforward focus on the plausibility of a claim. *Iqbal*, 556 U.S. at 678.

Our approach today "acknowledges that courts typically lack sufficient expertise in physiology, etiology, psychiatry, and other potentially relevant disciplines to determine the cause or causes of gender dysphoria." *Pa. Dep't of Corr.*, 2021 WL 1583556, at *9. Especially at this early stage, to dismiss a case based on such "*unknowns*" would be wholly "premature and speculative." *Bd. of Trs.*, 929 F.3d at 152; *see also id.* (noting that courts must construe complaints "liberally so as to do substantial justice"). Williams' complaint, as it stands, permits the plausible inference that her condition "result[ed] from a physical impairment." 42 U.S.C. § 12211(b). Her allegations need not include either those precise

19

words or a scientific analysis explaining the precise biomechanical processes by which her condition arose.

## C.

If there were any doubt that § 12211(b) does not foreclose Williams' ADA claim on a motion to dismiss, we would interpret that statute to permit that claim to proceed to avoid a serious constitutional question. When a statute "raises 'a serious doubt' as to its constitutionality," we must "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

As Williams points out, many transgender people experience gender dysphoria, Am. Compl. ¶ 9, and both gender dysphoria and "gender identity disorder" (as it existed in 1990) are very "closely connected to transgender identity." Br. of Amici GLBTQ Legal Advocs. & Defs. et al. in Supp. of Appellee 21; *see also Grimm*, 973 F.3d at 596. Given that correlation, we have little trouble concluding that a law excluding from ADA protection *both* "gender identity disorders" *and* gender dysphoria would discriminate against transgender people as a class, implicating the Equal Protection Clause of the Fourteenth Amendment. *Cf. Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 689 (2010) (declining to distinguish between conduct and status when the two are closely correlated).

In part because of the long history of discrimination against transgender people, we have held that intermediate scrutiny applies to laws that discriminate against them. *See Grimm*, 972 F.3d at 610 ("[T]ransgender people constitute at least a quasi-suspect class.");

*see also Karnoski v. Trump*, 926 F.3d 1180, 1200–02 (9th Cir. 2019).   Thus, such laws will "fail unless they are substantially related to a sufficiently important governmental interest." *Grimm*, 972 F.3d at 608 (cleaned up).  And "[t]o survive intermediate scrutiny, the state must provide an 'exceedingly persuasive justification'" for the law. *Id.* (quoting *United States v. Virginia*, 518 U.S. 515, 534 (1996) (*VMI*)).

One need not look too closely to find evidence of discriminatory animus toward transgender people in the enactment of § 12211(b).   *See generally* Kevin M. Barry, *Disabilityqueer: Federal Disability Rights Protection for Transgender People*, 16 Yale Human Rts. & Dev. J. 1 (2014) (detailing how moral opprobrium led to adoption of amendment excluding "gender identity disorders").  To begin with, the provision lists "gender identity disorders" alongside pedophilia, exhibitionism, and voyeurism.  This grouping implicitly "brands all [transgender people] as [equivalent to] criminals, thereby making it more difficult for [them] to be treated in the same manner as everyone else." *Lawrence v. Texas*, 539 U.S. 558, 581 (2003) (O'Connor, J., concurring in the judgment).

The legislative history of the ADA reflects the moral judgment implicit in that list.  For example, Senator Jesse Helms, a leading force behind the exclusion of gender identity disorders from the ADA, stated:  "If this were a bill involving people in a wheelchair or those who have been injured in the war, that is one thing.  But how in the world did you get to the place that you did not even [ex]clude transvestites?"  Barry, *Disabilityqueer*, at 14 (quoting Helms).   Another legislator advocating this exclusion, Senator William Armstrong, "could not imagine the sponsors would want to provide a protected legal status to somebody who has such disorders, particularly those [that] might have a moral content

to them or which in the opinion of some people have a moral content." *Id.* at 13; *see also, e.g.*, 135 Cong. Rec. S10765-01 (daily ed. Sep. 6, 1989) ("In short, we are talking about behavior that is immoral, improper, or illegal and which individuals are engaging in of their own volition, admittedly for reasons we do not fully understand."). In the words of Professor Barry, who has outlined much of this legislative history, "[w]ith the passage of [the Armstrong-Helms] amendment, the ADA became, in effect, a moral code: 'disability' coverage applies to those we pity, not those we despise." *Id.* at 25.

Moreover, this is not the first time that courts have confronted a law that "withdraws from [one group], but no others, specific legal protection from the injuries caused by discrimination." *Romer v. Evans*, 517 U.S. 620, 627 (1996). In fact, by carving a safe harbor for discrimination out of broad antidiscrimination protections, § 12211(b) bears a striking resemblance to the Colorado law at issue in *Romer*, which repealed municipal antidiscrimination ordinances "to the extent they prohibit discrimination on the basis of 'homosexual, lesbian or bisexual orientation, conduct practices, or relationships.'" *Id*. at 624. In *Romer*, the Court held that "laws of the kind now before us raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.* at 634. And indeed, we have previously recognized the ADA's exclusion of "gender identity disorders" *itself* as evidence of such discriminatory animus. *See Grimm*, 972 F.3d at 611.

In light of the "basic promise of equality . . . that animates the ADA," we see no legitimate reason why Congress would intend to exclude from the ADA's protections transgender people who suffer from gender dysphoria. *Nat'l Fed. of the Blind*, 813 F.3d at

22

510.  The only reason we can glean from the text and legislative record is "a bare . . . desire to harm a politically unpopular group[, which] cannot constitute a legitimate governmental interest." *Romer*, 517 U.S. at 634.  And Sheriff Kincaid falls "far short of establishing [an] 'exceedingly persuasive justification'" for the exclusion — in fact, she has not even attempted to offer one.  *VMI*, 518 U.S. at 546 (internal citation omitted).

Because "a construction of the statute . . . by which [this constitutional] question may be avoided" is readily available, *Zadvydas*, 533 U.S. at 689, we reject a reading of § 12211(b) that would exclude gender dysphoria from the ADA's protections.  As explained above, Williams' complaint amply supports *two* inferences that allow us to stop short of deciding this case on constitutional grounds:  first, that gender dysphoria does not constitute a "gender identity disorder[]," and second, that Williams' gender dysphoria "result[s] from a physical impairment."  42 U.S.C. § 12211(b).[8]

For all of these reasons, we reverse the district court's dismissal of Williams' ADA claims.

---

[8] In response to our discussion of constitutional avoidance, our colleague in the dissent notes that "the constitutionality of § 12211(b) is not even properly before us."  True enough.  But neither this Court nor the Supreme Court has ever held that a plaintiff must bring a separate constitutional claim in order for us to rely on constitutional avoidance as a canon of statutory construction.  That is so because constitutional avoidance "is not a method of adjudicating constitutional questions by other means" but rather a tool that "allows courts to *avoid* the decision of constitutional questions" by "choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts."  *Clark v. Martinez*, 543 U.S. 371, 381 (2005).

III.

We now turn to Williams' remaining claims. Before reaching the merits of those claims, we must address a threshold statute of limitations question that pertains only to some of Williams' claims.[9] Williams filed her Original Complaint on November 16, 2020, within the two-year statute of limitations that the parties agree applies to all her claims. *See* Va. Code Ann. § 8.01-243(A). But she failed to name Nurse Wang and Deputy Garcia as defendants until she filed her Amended Complaint on February 12, 2021. If February 12 is the relevant filing date for the claims against those two defendants, many of the facts alleged against them fall outside of the two-year limitations period.

Williams contends that the Amended Complaint "relates back" to the Original Complaint, such that the filing date for the Original Complaint applies to *all* her claims. "The relation back of an amendment is governed by Rule 15(c) and presents a question of law which this Court reviews de novo." *Robinson v. Clipse*, 602 F.3d 605, 607 (4th Cir. 2010). Under Rule 15(c), an amendment to a pleading that replaces or renames a party "relates back" to the original pleading when: (1) the amendment arose out of the same "conduct, transaction, or occurrence" as the original pleading; (2) "within the period set out in Rule 4(m) for serving the summons and complaint," the new party receives notice of the action such that it will not be prejudiced; and (3) the new party "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(B)–(C).

---

[9] Williams named Sheriff Kincaid in the Original Complaint, and so the statute of limitations issue does not apply to the claims against the Sheriff.

A.

1.

In rejecting Williams' relation-back argument, the district court relied only on Rule 15(c)'s second requirement:  that the new party receive notice within the period set out in Rule 4(m).  *See* Fed. R. Civ. P. 15(c)(1)(C)(i).  The court explained that because Williams received an extension of time in which to serve the Amended Complaint, she did not serve Nurse Wang and Deputy Garcia until *after* the requisite 90-day period had elapsed.  *See* Fed. R. Civ. P. 4(m).  As a result, the district court found that Williams had not provided timely notice to those Defendants.

The district court erred when it concluded that the time period set out in Rule 4(m) does not incorporate court-approved extensions.  To be sure, Rule 4(m) requires a plaintiff to serve her complaint no more than 90 days after filing it.  However, we clarified in *Robinson* that "Rule 15(c)'s notice period incorporates any extension" by a court of that 90-day deadline.  602 F.3d at 608 (citing Fed. R. Civ. P. 15, advisory comm. notes (1991 Amendment)).  The district court granted Williams such an extension, and Williams served Wang and Garcia before the adjusted deadline.  Thus, contrary to the district court's conclusion, Williams acted well within the bounds of Rule 15(c).

Even if that were not so, the Supreme Court has unequivocally "reject[ed the] suggestion that Rule 15(c) requires a plaintiff to . . . file and serve an amended complaint within the Rule 4(m) period." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 554 n.5 (2010).  This is so because Rule 15(c) requires only "notice of the action," and notice under Rule 15 "need not be formal." *Id.* (quoting Fed. R. Civ. P. 15(c) advisory comm. notes

25

(1966 amendment)).  Williams provided several alternatives to formal notice.  For example, she explains (without contradiction) that within the 90-day period, her counsel informed counsel for Wang and Garcia that they would be named in the Amended Complaint. Williams also explains (again without contradiction) that counsel for Nurse Wang and Deputy Garcia received an electronic copy of the Amended Complaint within the 90-day period.  *See* Appellant Br. at 19–22.  Both of these satisfy Rule 15(c)'s notice requirement. *See generally Goodman v. Praxair, Inc.*, 494 F.3d 458, 473–74 (4th Cir. 2007) (en banc) (imputing Rule 15(c)(3) notice to new defendant because new defendant's attorneys were aware of the action, "eliminat[ing] any worry that [the new defendant] was caught by surprise when the complaint was amended").

In any event, Nurse Wang and Deputy Garcia waived this argument.  They have never responded to Williams' notice arguments, either before the district court or before us.  They therefore concede that they had proper notice.  *See Mironescu v. Costner*, 480 F.3d 664, 677 n.15 (4th Cir. 2007) (noting that appellees may waive issues by not briefing them).

2.

Instead of asserting that they lacked notice, Wang and Garcia's only argument on appeal is that naming a "Doe" defendant does not constitute a "mistake" under Rule 15(c)(1)(C)(ii).  They invoke the decisions of several of our sister circuits in support of this contention.  *See, e.g., Herrera v. Cleveland*, 8 F.4th 493, 497 (7th Cir. 2021); *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 471 (5th Cir. 2019); *Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019).

26

Though this Court has yet to squarely address this question, we have said that Rule 15(c)'s "emphasis on notice, rather than on the type of 'mistake' that has occurred, saves the courts . . . from an unguided and therefore undisciplined sifting of reasons for an amendment." *Goodman, Inc.*, 494 F.3d at 473; *see also Robinson*, 602 F.3d at 609–10 ("In *Goodman v. Praxair, Inc.*, this Court rejected formalism in evaluating 'mistake' under Rule 15(c)."); *Rumble v. 2nd Ave Value Stores*, 442 F. Supp. 3d 909, 917 (E.D. Va. 2020) ("By instructing courts to focus on notice and prejudice, *Goodman* rejected the notion that a John Doe substitution can never qualify as a mistake that permits relation back under Rule 15(c)."); Meg Tomlinson, Note, Krupski *and Relation Back for Claims Against John Doe Defendants*, 86 Fordham L. Rev. 2071, 2090–92 (2019) (discussing Fourth Circuit precedent and concluding that, in line with those decisions, plaintiffs should be permitted to rename Doe defendants under Rule 15(c)).

Even if we now wished to reject the focus on notice set forth in *Goodman* (and we see no reason why we could or should do so), Wang and Garcia never made this argument before the district court. To the contrary, in their motions to dismiss, they *conceded* that the "Relation Back doctrine" *does* "appl[y] to re-naming John Does in amended complaints when the John Doe defendant receives *notice* before the expiration of the service provided under Federal Rule of Civil Procedure [] 4(m)." Garcia Mem. in Support of Mot. to Dismiss at 5; *see also* Wang Mem. in Support of Mot. to Dismiss at 9 (same).

Wang and Garcia may not backtrack now. We have long held that "[a]bsent exceptional circumstances . . . we do not consider issues raised for the first time on appeal." *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 242 (4th Cir. 2009) (quoting *Volvo*

*Const. Equip. N. Am. v. CLM Equip. Co.*, 386 F.3d 581, 603 (4th Cir. 2004)). Wang and Garcia have not contended, either in their brief or at oral argument, that such exceptional circumstances exist here. And nothing in the record hints at a reason sufficient to clear this "high[] bar." *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020). Thus, we decline to consider their brand-new argument that naming a Doe defendant does not constitute a "mistake."

Accordingly, we reverse the district court's determination that the statute of limitations bars certain claims against Nurse Wang and Deputy Garcia and remand those claims for consideration on the merits in the first instance.[10]

## B.

Having considered the statute of limitations question, we turn to the claims that the district court disposed of fully on the merits — Williams' assertions of gross negligence against Sheriff Kincaid and Deputy Garcia.

In Virginia, "[g]ross negligence is 'a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person.'" *Commonwealth v. Giddens*, 816 S.E.2d 290, 294 (Va. 2018)

---

[10] The district court partially addressed the Eighth Amendment and state law claims against Nurse Wang based only on the facts that occurred within two years of the filing of the Amended Complaint. "Mindful that we are a court of review, not of first view," *United States v. Buster*, 26 F.4th 627, 636 n.3 (4th Cir. 2022) (citation and alteration omitted), we remand those partially-addressed claims, along with the Fourteenth Amendment claim against Deputy Garcia that the district court never addressed on the merits, so that the district court may consider them together in full. *Cf. Martineau v. Wier*, 934 F.3d 385, 396 (4th Cir. 2019) ("[w]hether [a] sequence of events is evidence of" wrongdoing "is for the district court to determine, after consideration of all relevant facts and circumstances").

(quoting *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004)). "'It is a heedless and palpable violation of legal duty respecting the rights of others' which amounts to the 'absence of slight diligence, or the want of even scant care.'" *Chapman v. City of Va. Beach*, 475 S.E.2d 798, 800–01 (Va. 1996) (quoting *Town of Big Stone Gap v. Johnson*, 35 S.E.2d 71, 73 (Va. 1945)). Because merely inadequate care is insufficient to make out a claim of gross negligence, such a claim "must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016). Finally, "[o]rdinarily, the question whether gross negligence has been established is a matter of fact to be decided by a jury." *Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (Va. 1987). A court should rule on gross negligence only when "reasonable minds could not differ." *Id.*

The district court dismissed the gross negligence claims against Sheriff Kincaid and Deputy Garcia for failure to state a claim because it found that the complaint showed that both exercised "some degree of care." For the most part, in doing so, the court erred.

### 1.

We begin with Williams' gross negligence claim against Sheriff Kincaid. That claim is based on two different sets of facts.

The first centers on Sheriff Kincaid's supervision of her deputies. Williams contends that Sheriff Kincaid acted with gross negligence because under the Sherriff's supervision, her deputies misgendered and harassed Williams and prevented Williams from participating in the prison's Workforce Program. But Williams alleges only that Sheriff Kincaid "failed to *appropriately* supervise, review, and ensure the provision of

*adequate* care and treatment to Ms. Williams by custody and medical staff." Am Compl. ¶ 169 (emphasis added). Taking these allegations as true, as we must at this stage, Williams suggests that Sheriff Kincaid did supervise her deputies but that she did so inadequately. Mere inadequacy, however, is insufficient to allege gross negligence under Virginia law. *See Elliot*, 791 S.E.2d at 732. Williams thus has not alleged a claim of gross negligence against Sheriff Kincaid based on inadequate supervision of her deputies.

The second set of facts rests on the Sheriff's maintenance of a policy "wherein transgender inmates are housed based on their genitalia," which caused Williams to be housed with men and face a risk of real harm. Analysis of this claim requires a close look at the relevant prison policy provisions included in the complaint. Williams acknowledges that the prison policy announces that "[a]ll transgender and gender non-conforming inmates shall be classified and assigned housing based on their safety/security needs, housing availability, and genitalia (to include potential vulnerability, if assigned to general population)." Appellant's Br. at 49. This provision appears to mandate a multifactor balancing test, allowing the prison to determine on a case-by-case basis where to house transgender inmates.

If this were the sole provision of the prison policy relating to housing transgender inmates, we could not hold that the policy evinces gross negligence. But as Williams further alleges, Sheriff Kincaid's policy also contains two other provisions that appear to limit or override this one. Those provisions state that "male inmates shall be classified as such if they have male genitals" and "female inmates shall be classified as such if they have female genitals." Am. Compl. ¶ 38.

30

Williams asserts that these provisions force prison officials to house transgender inmates based *solely* on their genitalia, even if doing so would obviously put an inmate at risk of serious harm. Under this reading, prison officials thus *cannot* rely on "safety/security needs," "housing availability," or "potential vulnerability" to determine where to house a transgender inmate. And another provision of the policy mandates that transgender inmates be "provided standard jail attire and privileges consistent with the gender of their housing assignment." Am. Compl. ¶ 44. Thus, Williams asserts, in compliance with these policy provisions, solely because of her genitalia, prison deputies placed her on the men's side of the prison and required her to wear men's clothing, exposing her to harassment and physical injury.

In considering whether Sheriff Kincaid had acted with gross negligence, the district court concluded that she "enacted standards relating to gender classification directed at promoting safety of inmates and prison staff." The district court can only have been referring to the provision of the policy that addresses the "safety/security needs" of transgender inmates. But that provision cannot be read without reference to the other provisions quoted above, which seem to override it. And even if there is another way to reconcile these competing provisions that does not require deputies to house inmates based solely on their genitalia, at this early stage, we must construe the complaint — and thus the prison policy — in Williams' favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

Reading these provisions together in the way Williams reasonably suggests, the prison policy contravenes federal law. Specifically, federal regulations enacted under the Prison Rape Elimination Act require prisons, when "deciding whether to assign a

transgender or intersex inmate to a facility for male or female inmates," to "consider on a *case-by-case* basis whether placement would ensure the inmate's health and safety, and whether the placement would present management or security problems." 28 C.F.R. § 115.42(c) (emphasis added).  The binary approach of Sheriff Kincaid's policy flouts the case-by-case analysis federal law requires.

Moreover, far from exhibiting a degree of care, a policy that houses transgender inmates based solely on their genitalia puts transgender inmates at *further* risk of harm. The safety risks of housing transgender women in men's prisons are by now well-recognized.  *See, e.g.*, *Powell v. Schriver*, 175 F.3d 107, 115 (2d Cir. 1999); *Tay v. Dennison*, 457 F. Supp. 3d 657, 682 (S.D. Ill. 2020); *Doe v. District of Columbia*, 215 F. Supp. 3d 62, 76 (D.D.C. 2016); Valerie Jenness et al., *Violence in California Correctional Facilities: An Empirical Examination of Sexual Assault* 2, U.C. Irvine Ctr. For Ev.-Based Corrections (2007), *available at* https://cpb-us-e2.wpmucdn.com/sites.uci.edu/dist/0/1149/files/2013/06/BulletinVol2Issue2.pdf (estimating that *fifty-nine percent* of transgender inmates in men's prisons are sexually assaulted, compared to about four percent of the general prison population).  Under the prison's policy, when viewed in the light most favorable to Williams, a transgender woman who has not undergone transfeminine bottom surgery will invariably be housed with men. And because other inmates will likely view such an inmate's genitalia as not "matching" her female gender identity, the inmate's genitalia will make it more obvious to the other inmates that she is transgender and thereby increase the risk that she will suffer violence.

32

We recognize that "the standard for gross negligence in Virginia is one of indifference, not inadequacy." *Elliott*, 791 S.E.2d at 732 (alteration omitted). But maintaining a prison policy that violates federal law and that puts vulnerable inmates at an obvious risk of harm, as Williams has plausibly alleged, could allow a reasonable jury to conclude that Sheriff Kincaid crossed the line from inadequacy to indifference. *See Frazier*, 362 S.E.2d at 691 (holding that gross negligence should "[o]rdinarily . . . be decided by a jury"). Sheriff Kincaid is of course free to advance a contrary interpretation of the prison's policy at summary judgment or trial and the district court might well find that the facts fall short of gross negligence at those points. But "at this stage of the proceedings, in which we must grant all reasonable inferences in [Williams'] favor," we must accept her plausible interpretation of the prison policy. *Ray v. Roane*, 948 F.3d 222, 230 (4th Cir. 2020). Accordingly, we reverse the district court's dismissal of the gross negligence claim against Sheriff Kincaid.[11]

### 2.

Finally, we consider the gross negligence claim against Deputy Garcia. The district court dismissed this claim as barred by the statute of limitations. But it nevertheless went

---

[11] The dissent suggests that because Sheriff Kincaid maintained a policy that houses transgender inmates based solely on their genitalia, she must have "exercised at least some care." Of course, simply maintaining *any* kind of policy cannot alone establish the exercise of care. Otherwise, a prison could exercise care by establishing and following a policy stating that "Inmates must be assigned housing that affords them the least safety possible." The *substance* of the policy thus matters a great deal. And contrary to the dissent's suggestion, a policy that houses transgender inmates based solely on their genitalia is not merely "not optimal." As we have explained, housing transgender inmates based solely on their genitalia *affirmatively subjects them to increased risks of harm.*

on to consider this claim on the merits. We therefore address that claim on the merits as well.

Williams alleges Deputy Garcia treated her with gross negligence when he searched her, "purposefully misgender[ed] her," and bruised her breast. Am. Compl. ¶ 145. Deputy Garcia claims, and the district court found, that he followed prison policy and therefore exercised "some degree of care" towards Williams. But the only provision of the prison's policy on which Garcia relies states that "*if there is uncertainty* by a deputy as to a classified inmate's gender: . . . If the inmate is housed with the male population, the inmate shall be searched by male staff only." (emphasis added).

The difficulty with Deputy Garcia's reliance on this provision is that Williams alleges that Deputy Garcia *knew* her to be a woman, and therefore had no "uncertainty" when he searched her. Williams further alleges that Deputy Garcia caused her physical harm during this search. Thus, the district court was mistaken when, in the face of these allegations, it granted Deputy Garcia's motion to dismiss her claims on the ground that "Defendant Garcia's search of Plaintiff complied with the Sheriff's Office policies relating to gender classification, which are directed at promoting the safety of inmates and prison staff."

Taking the allegations in the complaint as true, as we must, Deputy Garcia did not attempt to comply with the prison's policy on body searches and thus cannot be said to have exhibited any degree of care toward Williams. *See Amisi v. Riverside Reg'l Jail Auth.*, 555 F. Supp. 3d 244, 261 (E.D. Va. Aug. 16, 2021) (allowing gross negligence claim to proceed where jail officials conducted "a highly invasive strip search" without "legal

authority"). Rather, Williams alleges that Garcia's search lacked a clear basis in the prison's policy and was both aggressive and "highly invasive," bruising her breast and causing pain that lasted several days. *Id.* Such facts, if proven, would suffice to show "a complete neglect of [Williams'] safety." *Giddens*, 816 S.E.2d at 294. Accordingly, we must reverse the district court's dismissal of Williams' gross negligence claim against Deputy Garcia.

## IV.

In sum, we hold that Williams has plausibly alleged that gender dysphoria does not fall within the ADA's exclusion for "gender identity disorders not resulting from physical impairments." In addition, we hold that Williams' Amended Complaint relates back to her Original Complaint and that she has stated claims of gross negligence against Sheriff Kincaid and Deputy Garcia. For the foregoing reasons, we reverse the dismissal of these claims and remand to the district court for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

QUATTLEBAUM, Circuit Judge concurring in part and dissenting in part:

In 1990, Congress passed the Americans with Disabilities Act ("ADA"). 42 U.S.C. §§ 12101–12213. It provides sweeping protections for citizens with disabilities. But in doing so, Congress also limited what disabilities the ADA covers. The ADA expressly excluded from "the term 'disability'" any "gender identity disorders not resulting from physical impairments." 42 U.S.C. § 12211(b)(1).

Williams alleges she suffers from "gender dysphoria." She defines gender dysphoria as discomfort or distress caused by a discrepancy between one's gender identity and the sex assigned at birth. But as alleged by Williams, gender dysphoria is a "gender identity disorder" as that phrase was understood at the time Congress passed the ADA. And since "gender identity disorders not resulting from physical impairments" are excluded from the ADA, the district court appropriately dismissed Williams' ADA claim.

In challenging the district court's decision, Williams argues that gender dysphoria is not a gender identity disorder at all. Instead, she claims the phrase gender identity disorders applies broadly to all those who identify with a gender different from their gender at birth. In contrast, according to Williams, gender dysphoria refers more narrowly only to those who experience discomfort and distress from such incongruence. In support of this position, Williams relies on recent publications from certain psychiatric organizations. As Williams notes, some organizations have removed the phrase gender identity disorder from their publications altogether and clarified that distress and discomfort from identifying with a different gender from the gender assigned at birth constitutes gender dysphoria, not a gender identity disorder. But even if Williams is correct about such changes in

36

understanding, linguistic drift cannot alter the meaning of words in the ADA when it was enacted. And at that time, the meaning of gender identity disorders included gender dysphoria as alleged by Williams.

My view here is not in any way a value judgment on Williams, those with gender dysphoria or the broader transgender community. Likewise, I express no view here on the proper policy decisions concerning gender dysphoria or transgender issues. Those issues are outside my job description. Instead, I offer a legal judgment—nothing more, nothing less. Under basic principles of statutory construction, Williams' ADA claim should be dismissed.

I also agree with the district court that Williams' allegations of gross negligence against Sheriff Kincaid fail to plausibly state a claim. That claim is based on the prison's policy of classifying prisoners into housing based on their genitalia. But under Virginia law, the applicable state law for this claim, gross negligence requires the complete absence of care. One might question whether a better classification method exists. But the prison's policy, and the other policies that flow from it, reflect at least some care. Thus, as a matter of law, Sheriff Kincaid was not grossly negligent.

Accordingly, I respectfully dissent to those portions of the majority's opinion.[1]

## I.

The majority holds that Williams' alleged gender dysphoria is a disability covered by the ADA. I disagree and would affirm the district court's dismissal of the ADA claim.

According to Williams, the district court erred in two ways. First, Williams argues that gender dysphoria is not a gender identity disorder and, as a result, is not excluded from coverage under § 12211(b)(1). Alternatively, Williams argues that even if gender dysphoria is a gender identity disorder, it resulted from a physical impairment, meaning § 12211(b)(1)'s exclusion does not apply.

## A.

### 1.

To evaluate Williams' first argument, I begin with the text of the ADA. Under 42 U.S.C. § 12111, the ADA specifically excludes certain conditions from the definition of "disability," including:

> (1) transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders not resulting from physical impairments*, or other sexual behavior disorders;

---

[1] I concur in the majority's decision concerning the district court's dismissal on statute of limitations grounds. Thus, I concur in remanding the Eighth Amendment deliberate indifference claim against Wang, the Fourteenth Amendment Equal Protection claim against Garcia and the gross negligence claim against Wang. I also agree with the majority that the district court erred in concluding that Garcia followed the prison's policies and, therefore, could not have committed gross negligence as a matter of law. Thus, I join with the majority in remanding that claim as well. And because the district court granted Sheriff Kincaid's motion for summary judgment as to the gross negligence claim based on the theory of respondeat superior as to Garcia's conduct, I would likewise vacate and remand that portion of the order as it relates to Sheriff Kincaid. Since I concur with the majority on those issues, I do not discuss them below.

42 U.S.C. § 12211(b)(1) (emphasis added). So, we must decide whether gender dysphoria, which Williams alleges to be "discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)," *see* J.A. 11, is a gender identity disorder under the ADA.

The ADA does not define "gender identity disorders." Nor has that phrase been interpreted by the Supreme Court, our court or any of our sister circuits. Thus, in deciding the question we face today, we must look to the meaning of gender identity disorders at the time the statute was written. *See Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021); *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018); *Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014). Congress passed the ADA in 1990. So we ask how gender identity disorders would have been understood at that time.

Williams relies on the American Psychiatric Association's ("APA") Diagnostic and Statistical Manual of Mental Disorders ("DSM").[2] The DSM is a publication for the classification of mental disorders that is periodically revised. In 1990, the DSM was in its third, revised, edition. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (3d. ed., rev. 1987) ("DSM-III-R"). The DSM-III-R provided that "[t]he essential feature of [gender identity] disorders . . . is an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity." DSM-III-R at 71. But importantly, it added that, even in mild cases of gender identity disorder,

---

[2] I will assume, without deciding, that the DSM is authoritative for purposes of my analysis.

"discomfort and a sense of the inappropriateness about the assigned sex are experienced." *Id*. In fact, the first "diagnostic criteria" for gender identity disorder under the DSM-III-R is "persistent or recurrent discomfort and a sense of inappropriateness about one's assigned sex." *Id*. at 77.

What Williams alleges she experiences as a person with gender dysphoria—"discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics)"—falls precisely under the DSM-III-R's description of, and diagnostic criteria for, gender identity disorders. In other words, when the ADA was signed into law, gender identity disorder was understood to include what Williams alleges to be gender dysphoria. Thus, Williams' ADA claim must fail.

2.

Williams' position and the majority's conclusion, however, is that gender dysphoria is a new, different diagnosis not encompassed by the phrase gender identity disorders. In advancing this argument, Williams relies on the fifth edition of the DSM. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5"). The DSM-5 removed the diagnosis of gender identity disorder and added gender dysphoria. DSM-5 at 451. Specifically, the DSM-5 states that "[g]ender dysphoria is a new diagnostic class in DSM-5 and reflects a change in conceptualization of the disorder's defining features by emphasizing the phenomenon of 'gender incongruence' rather than cross-gender identification per se, as was the case in [] gender identity disorder." *Id.* at 814. Williams alleges this view is also reflected in the seventh edition of the World

40

Professional Association for Transgender Health Standards of Care ("WPATH Standards"), which was published in 2012. In adopting Williams' position, the majority relies on these publications as well.

Based on these publications, Williams argues gender identity disorder means "gender nonconformity," whereas gender dysphoria is "a clinical diagnosis that recognizes being transgender is not a medical condition—rather, the medical condition is the distress caused by having a gender identity that differs from one's birth sex." Opening Br. 34.[3] In short, Williams argues, and the majority agrees, that the "distress" that comes from being transgender is what differentiates someone with gender dysphoria from someone with a gender identity disorder. Thus, according to Williams and the majority, gender dysphoria is not a gender identity disorder and is thus not excluded from the ADA.

But in attempting to distinguish between gender identity disorder and gender dysphoria, both Williams and the majority ignore the actual language of the DSM-III-R. That publication, which was in place in 1990, provides that, even in mild cases, gender

---

[3] Besides citing to the DSM-III-R and the DSM-5, the majority states that "'being trans alone cannot sustain a diagnosis of gender dysphoria under the DSM-[5], as it could for a diagnosis of gender identity disorder under [earlier versions of the DSM].'" Maj. Op. 11 (quoting Ali Szemanski, Note, *Why Trans Rights Are Disability Rights: The Promises and Perils of Seeking Gender Dysphoria Coverage Under the Americans With Disabilities Act*, 43 Harv. J. L. & Gender 137, 147 (2020)). This quote from a law student's note, however, is not supported by a citation and it does not match with the language of the DSM-III-R and the DSM-5. Likewise, the majority's statement that "if a transgender person does not experience '*clinically significant distress*,' she could not be diagnosed as having gender dysphoria under the DSM-5," Maj. Op.12, does not match the publication's text. While not pertinent the issues we face today, the DSM-5 provides that gender dysphoria "is associated with clinically significant distress *or* impairment in social, occupational, or other forms of functioning." DSM-5 at 453 (emphasis added).

identity disorders involve "discomfort and a sense of the inappropriateness about the assigned sex." DSM-III-R at 71. It even lists such distress as the first diagnostic criteria for gender identity disorder. *Id*. at 73, 77. This language makes clear that Williams' argument is incorrect. Gender identity disorders, as understood in 1990, included distress and discomfort from identifying as a gender different from the gender assigned at birth.

In reaching this conclusion, I accept as true Williams' allegation that she suffers from gender dysphoria. And I accept as true Williams' allegation that gender dysphoria involves discomfort or distress caused by a discrepancy between one's gender identity and the sex assigned at birth. But accepting those allegations as true does not require me to turn a blind eye to the plain language of the authorities on which Williams relies. Nor does it permit Williams, like Humpty Dumpty, to "use a word" and declare "'it means just what I choose it to mean.'" Lewis Carroll, *Through the Looking-Glass, And What Alice Found There* 124 (1872). After all, we are not in Wonderland.

In fact, the DSM-III-R was no outlier on this issue. From 1990 to today, gender identity disorder has been understood to include distress and discomfort from identifying as a gender different from the gender assigned at birth. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 532–33 (4th ed. 1994) (requiring, for a gender identity disorder diagnosis, "evidence of a strong and persistent cross-gender identification, which is the desire to be, or the insistence that one is, of the other sex," and "evidence of persistent discomfort about one's assigned sex or a sense of inappropriateness in the gender role of that sex"); *Gender Identity Disorder*, McGraw-Hill Concise Dictionary of Modern Medicine (2002) (describing gender identity disorder as "[a] clinical

condition in which a person has a persistent desire to be of the opposite phenotypic sex—cross-gender identification, and experiences discomfort about his/her assigned sex; this desire may take the form of simple 'cross-dressing', or may be of such intensity to compel the person to seek sexual reassignment"); *Gender Identity Disorder*, Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health (7th ed. 2003) (defining gender identity disorder as "a disturbance of gender identification in which the affected person has an overwhelming desire to change their anatomical sex or insists that they are of the opposite sex, with persistent discomfort about their assigned sex or about filling its usual gender role"); *Gender Identity Disorder (GID)*, Concise Medical Dictionary 300–01 (Oxford University Press, 8th ed. 2010) (emphasizing gender identity disorder requires "significant distress" over an incongruence between a person's gender assigned at birth and the gender a person identifies with).[4] Whether we focus on when Congress passed the ADA or look beyond to today, the distinction Williams attempts to draw between gender identity disorder and gender dysphoria fails.

---

[4] Interestingly, gender identity disorder and gender dysphoria are often cross-referenced or referred to as synonyms. *See e.g.*, The Harry Benjamin International Gender Dysphoria Association, *Standards of Care for Gender Identity Disorders* 2 (6th ed. 2001) (saved as an ECF attachment) (referring to gender identity disorder and gender dysphoria as synonyms); Karl Bryant, *gender dysphoria*, Britannica (Nov. 18, 2019) (saved as an ECF attachment) (providing that gender dysphoria is also known as gender identity disorder); *GID*, Oxford English Dictionary (saved as an ECF attachment) (defining gender identity disorder as a "persistent dissatisfaction with or distress relating to one's anatomic sex," and including "gender dysphoria" as a synonym); *Gender Identity Disorder*, Oxford Dictionaries (saved as an ECF attachment) (defining gender identity disorder as an "[o]lder term for gender dysphoria"); J.E. Schmidt, *Gender Dysphoria Syndrome*, Attorneys' Dictionary of Medicine, Volume 3 (2021) (ebook) (providing that "gender dysphoria syndrome" is the "[s]ame as *gender identity disorder*").

My conclusion is bolstered by the text of § 12211(b)(1). Significantly, Congress excluded gender identity disorders not resulting from a physical impairment. The plural use of the term should not be overlooked. This language indicates that Congress considered this class to include more than one diagnosis. Consistent with this, the DSM-III-R specified certain gender identity disorders. DSM-III-R at 71–78. But it also contains a category of "Gender Identity Disorder Not Otherwise Specified." *Id*. at 77–78. Thus, whether gender dysphoria is new diagnosis or a replacement for gender identity disorder is not the point. Section 12211(b)(1)'s exclusion of gender identity disorders, as that phrase was understood at the time, included an alleged disability involving discomfort or distress caused by a discrepancy between one's gender identity and the sex assigned at birth.

In sum, the foundation of Williams' position—that in 1990, gender identity disorder referred to individuals with cross-gender identification generally and not those that experience distress and discomfort from that identification—is belied by the actual language of the DSM-III-R. And it is further undermined by consistent references to gender identity disorder and gender dysphoria in dictionaries and medical publications from 1990 to present. Finally, it is inconsistent with the text of § 12211(b)(1).

What is more, there is evidence that the DSM-5's change from gender identity disorder to gender dysphoria primarily involved nomenclature. In fact, the APA said as much. In its preview of the upcoming changes to the DSM-5, the APA stated that:

> In the upcoming fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), people whose gender at birth is contrary to one they identify with will be diagnosed with gender dysphoria. This diagnosis is a revision of DSM-IV's criteria for gender identity disorder and is intended

44

to better characterize the experiences of affected children, adolescents, and adults.

*Gender Dysphoria*, Am. Psychiatric Ass'n (2013), https://www.psychiatry.org/File%20 Library/Psychiatrists/Practice/DSM/APA_DSM-5-Gender-Dysphoria.pdf. The fact that the DSM-5 diagnoses "people whose gender at birth is contrary to one they identify with" as having gender dysphoria is telling. Recall that Williams describes gender identity disorder as "gender nonconformity" generally, as opposed to the stress and discomfort that come from gender identification. *See* Opening Br. 34.

But the APA not only previewed the upcoming change; it gave the reasons for it. The APA stated that "[i]t replace[d] the diagnostic name 'gender identity disorder' with 'gender dysphoria'" with the "aim[] to avoid stigma" from characterizing the condition as a disorder. *Gender Dysphoria*, Am. Psychiatric Ass'n, *supra*. It added "[w]hile diagnostic terms facilitate clinical care and access to insurance coverage that supports mental health, these terms can also have a stigmatizing effect." *Id.*

Reducing stigmas and preserving insurance coverage may be good reasons to change the name of the diagnosis from gender identity disorder to gender dysphoria. And there may be other reasons for the change. But the meaning of gender identity disorders was fixed at the time the ADA was enacted. Evolution as to the meanings of words and phrases, even if that occurred here, does not modify the statute's terms. The Constitution places the responsibility to amend or not amend statutes on the legislature—not on us and certainly not on the APA or the WPATH. *See Fedorenko v. United States*, 449 U.S. 490,

513 n.35 (1981) ("It is not the function of the courts to amend statues under the guise of 'statutory interpretation.'").

This principle represents the line of demarcation between my reasoning and that of my good colleagues in the majority. To them, it does matter that gender dysphoria as alleged by Williams fell within gender identity disorders as that phrase was understood in 1990. In fact, they insist reliance on this reality "misses the point." Maj. Op. 14, n. 5. The important point, according to the majority, is that the diagnosis of gender identity disorders as referenced in § 12211(b) "no longer exists." *Id*. But whether or not in 2013 the APA removed gender identity disorders from the DSM-5, § 12211(b) still excludes gender identity disorders from the ADA just as it did in 1990. Once again, our focus must be on what gender identity disorders meant in 1990, not what the APA did in 2013. Otherwise, we give organizations like the APA to power to effectively modify statutes passed by Congress and signed into law by the President. That cannot be right.

Judicially modifying the meaning of a statute because of society's changing attitudes not only invades the province reserved for the legislature; it turns a statute into a moving target. Who gets to decide whether society's attitudes have sufficiently changed? How much do they have to change? How do we ever really know what the law means?

3.

The majority relies on the 2008 amendments to the ADA in which Congress specified that the term "disability" "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A). But those amendments do not persuade me. Even in cases in

46

which a statute is "entitled liberal construction and application in order properly to effectuate the Congressional intent," that "salutary policy does not justify ignoring plain words of limitation." *Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 107 (1944). Thus, no matter "[h]owever inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment. . . . Specific terms prevail over the general in the same or another statute which otherwise might be controlling.'" *Id.* (quoting *Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932)); *see also Townsend v. Little*, 109 U.S. 504, 512 (1883) (noting that when "general and specific provisions" are "in apparent contradiction, whether in the same or different statutes," the specific will "qualify . . . the general"); *S.C. Dep't of Health & Envtl. Control v. Commerce & Indus. Ins. Co.*, 372 F.3d 245, 258 (4th Cir. 2004) ("Pursuant to elementary principles of statutory construction, unless the legislature has indicated that it intends otherwise, a specific statutory provision controls a more general one."). As described above, § 12211(b)(1) excludes Williams' ADA claim. Thus, the ADA's general instruction for liberal construction does not override the specific exclusions.

In fact, the 2008 amendments bolster my view. While Congress modified parts of the ADA, it left intact the provision that placed gender identity disorders outside the scope of the ADA. That means the understanding of that phrase from 1990 should continue to guide our analysis.

4.

Williams also argues on appeal that if the exclusion in § 12211(b) covers gender dysphoria, this "raises a serious question about the constitutionality of the exclusion and its disparate treatment of transgender individuals in violation of Equal Protection." Opening Br. 32. More specifically, Williams asserts that "[a] reading of the exclusion that interprets 'gender identity disorder' not as a medical condition distinct from gender dysphoria, but instead as a category of transgender-related health conditions, would render the classification facially discriminatory." Opening Br. 38–39.

The majority does not adopt this view as a substantive constitutional challenge. However, it uses the same reasoning under the doctrine of constitutional avoidance. And in evaluating § 12211(b) under the Equal Protection Clause, the majority concludes that Sheriff Kincaid did not provide a sufficient justification for the exclusion.

But before the constitutional avoidance canon may be employed, a statute first must be ambiguous. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) ("The canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found susceptible of more than one construction. In the absence of more than one plausible construction, the canon simply has no application.'" (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005))). Here, § 12211(b)(1)'s exclusion of gender identity disorders is not ambiguous. It plainly included the gender dysphoria Williams alleges entitles her to ADA benefits. So constitutional avoidance does not help Williams.

48

Besides, the constitutionality of § 12211(b) is not even properly before us. First, Williams did not plead that constitutional issue or raise it before the district court. She initially asserted an equal protection claim against Sheriff Kincaid and Garcia for housing her in the male area of the prison, subjecting her to searches by male guards, misgendering her, preventing her from showering privately and delaying her entry into the workforce program. However, Williams voluntarily dismissed this claim as to Sheriff Kincaid. And even to the extent the claim remains as to Garcia, it is different from the alleged constitutional infirmity Williams asserts on appeal.

Second, any equal protection analysis requires not only consideration of whether the ADA's exclusions are discriminatory but also of the government's interests in § 12211(b)(1) and the relationship of the exclusions to those interests. *See United States v. Virginia*, 518 U.S. 515, 533 (1996). Recognizing this, the majority concludes Congress had no "legitimate reason" for the exclusions. Maj. Op. 22. It adds Sheriff Kincaid "has not even attempted to offer one." *Id*. But Williams did not even raise this equal protection issue before the district court. So, there has been no record developed on whether the exclusions are discriminatory, the government's interests in the exclusions or the relationship of the exclusions to those governmental interests. And for that reason, it is hardly surprising that Sheriff Kincaid did not offer a full justification for the exclusions, instead pointing out that Williams raised the issue for the first time on appeal and arguing that, under a plain error review, the exclusions are not discriminatory in the first place. In my view, even if framed as a constitutional avoidance analysis, we should not wade into this issue on our own when it was never presented to the district court. *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 87 n.3

49

(4th Cir. 2013) ("Plaintiffs had the opportunity to raise these arguments in the district court and in the original briefing in this case but did not do so; thus the arguments are waived.").[5]

5.

In reviewing a dismissal under Rule 12(b)(6) de novo, we must of course accept the allegations of a complaint as true. But that does not require us to accept the mischaracterizations of words or phrases in a statute. No amount of lingual gymnastics can change the fact that Williams' alleged disability falls comfortably with the meaning of the phrase "gender identity disorders" as used in 42 U.S.C. § 12211(b).

B.

Determining that Williams suffers from a gender identity disorder under § 12211(b) does not end our inquiry. Even if gender dysphoria as alleged by Williams is a gender identity disorder, it is not excluded from the ADA if it results from a physical impairment. Williams argues, and the majority agrees, that the amended complaint plausibly alleges

---

[5] By pointing out that the constitutional issues raised by the majority are not properly before us, I take no position—at this time—on the merits of those issues. The majority points to the remarks of two senators, but the ADA passed by a vote of 76 to 8. Then in 2008, the ADA was amended by unanimous consent without any change to the text of § 12211(b). It seems clear, therefore that when addressing the merits, the remarks of two senators, regardless of what one thinks of those remarks, should not be considered. *See N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 307 (4th Cir. 2020) (finding that the district court's conclusion that a law's legislative history supported a finding of discriminatory intent "impermissibly stemmed from the comments of a few individual legislators").

that the distress and discomfort she experiences from identifying with a different gender than the one assigned at birth results from a physical impairment. According to Williams and the majority, the allegations about taking hormone therapy plausibly pleads the existence of a physical impairment.

But a review of the amended complaint indicates otherwise. The amended complaint does not identify any part of Williams' body that is impaired or how or why it became impaired. Williams does not even allege a physical impairment generally.

And I disagree with the majority's conclusion that the allegations in the amended complaint about hormone therapy are enough. Williams' allegation that "[a]n individual with gender dysphoria *may* require feminization or masculinization of the body through hormone therapy and/or surgery to alleviate and effectively treat the condition" does not imply the existence of a pre-existing physical impairment.[6] J.A. 14 (emphasis added). At most, it implies hormone therapy and/or surgery may be—not that it always is—helpful to treat the condition. But § 12211(b)(1) requires that a person's gender identity disorder *result* from a physical impairment. That means the physical impairment must come first.

---

[6] And this does not change merely because Williams cites to the DSM-5 in the briefs to this Court. True, the DSM-5 refers to some emerging research about possible associations of gender dysphoria and certain genetic characteristics. But ignoring the fact that Williams made no reference to the DSM-5 before the district court and ignoring the fact that there is no requirement in the statute to look to the DSM-5 for answers, the DSM-5 does not state that gender dysphoria always results from a physical impairment. In fact, the DSM-5 concedes that "current evidence is insufficient" to make some of these determinations as to genetic and physiological associations. DSM-5 at 457. And perhaps more to the point, Williams alleges no genetic or other physiological impairment.

Williams' arguments all ignore the sequence compelled by the statute. Stated differently, Williams and the majority get things backwards.

The only physical condition Williams alleges the hormone therapy addresses is the distress and discomfort that comes from the fact that Williams was assigned male at birth but identifies as female. So what Williams really seems to be arguing is that for transgender individuals experiencing stress and discomfort about their gender incongruity, the physical impairment is that those individuals were assigned a gender at birth (and have the accompanying physical characteristics) different from the gender with which they identify. But that cannot be an impairment for purposes of § 12211(b) because it would read "not resulting from physical impairments" out of the statute. Anyone with a gender identity disorder, or gender dysphoria for that matter, under the respective DSMs, was born with physical characteristics that differ from the gender with which they identify. *See* DSM-5 at 453 (providing that a diagnosis of "gender dysphoria" requires that there be "evidence of distress about this incongruence" between the gender a person is assigned and their experienced or expressed gender); DSM-III-R at 71 (providing that a person with a "gender identity disorder" experiences "discomfort and a sense of inappropriateness about [their] assigned sex"). If having the physical characteristics of a gender different from the gender with which they identify is a physical impairment under § 12211(b)(1), then all gender identity disorders *must* result from physical impairments since, by definition, gender identity disorders involve such gender incongruence. Under that interpretation, "not resulting from physical impairments" would have no effect violating the "duty to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167,

174 (2001) (internal punctuation omitted); *see also United States v. Simms*, 914 F.3d 229, 241 (4th Cir. 2019) (concluding the court should not adopt a reading of a statute "that renders part of the statute superfluous over one that gives effect to its 'every clause and word'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))).[7]

To meet the Rule 8 standard and survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "To contain sufficient factual matter to make a claim plausible, the factual content must 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019) (citing *Iqbal*, 556 U.S. at 678). Because Williams' amended complaint contains insufficient allegations about a physical impairment, Williams' ADA claim is not plausible on its face.

## II.

Last, I consider Williams' gross negligence claim against Sheriff Kincaid. Williams' gross negligence allegations stem from the Detention Center's policy of classifying inmates based on their genitalia. Sheriff Kincaid is responsible, by law, for operating the prison. That responsibility includes enacting policies to protect the inmates

---

[7] The language of § 12211(b)(1) makes clear that Congress contemplated that some gender identity disorders result from physical impairments and others do not. Indeed, the DSM-III-R confirms this. It noted that "Gender Identity Disorder of Childhood" may "rarely" be associated with "[p]hysical abnormalities of the sex organs." DSM-III-R at 73; *see also id.* at 74 ("In the rare cases in which physical intersexuality or a genetic abnormality is present, such a condition should be noted.").

and the prison employees, including for transgender inmates. In carrying out this responsibility, Sheriff Kincaid enacted a policy to classify inmates into housing based on their genitalia. Williams has male genitalia. As a result, Williams was housed with male prisoners, provided male underwear and searched as needed by male guards.

Virginia law imposes a strict standard for gross negligence. A party who exercises "some degree of care" cannot be liable for gross negligence. *Elliot v. Carter*, 791 S.E.2d 730, 732 (Va. 2016). Said differently, parties can only be liable for gross negligence in Virginia if they exhibit no care at all.

Even accepting the allegations in the amended complaint as true, Williams has not plausibly pled a claim for gross negligence. Williams alleged that Sheriff Kincaid created, implemented and carried out the prison policies related to the safety of inmates and employees at the prison based on classifying prisoners according to their genitalia. By doing so, Sheriff Kincaid exercised at least some care. Williams may not agree with those policies, and perhaps the policies employed were not optimal. But the allegations in the amended complaint concerning their creation and implementation preclude a claim for gross negligence.

To explain, Williams would have preferred to be housed with females, given female underwear and searched by female guards. Maybe classifying an inmate based on their gender identity is a better policy. But under that system, female prison staff would have to search inmates with male genitalia and female inmates would have to live and shower with inmates with male genitalia. Those realities create a separate set of concerns and safety

54

issues. And Sheriff Kincaid's responsibilities extend not just to transgender inmates but to all inmates and prison employees.[8]

The point of this is not to say what is the best approach. The point is to illustrate that, in delineating policies, Sheriff Kincaid faced a difficult situation. There are pros and cons for every possible approach. Sheriff Kincaid tried to address that situation with a classification policy based on genitalia. And that effort, even if arguably imperfect, represents some care and, thus, as a matter of law, forecloses Williams' gross negligence claim.

Whether Williams or this Court agrees with Sheriff Kincaid's policies, the Sheriff exhibited at least some care in implementing the polices and carrying them out. Sheriff Kincaid cannot be said to have exhibited a total lack of care. For that reason, the district court's decision should be affirmed.[9]

---

[8] The majority rightly concludes that creating a policy would not, under Virginia law, automatically immunize a party from a gross negligence claim. But the policies about which Williams complains, on their face, exhibit some care.

[9] The majority also suggests that Sheriff Kincaid was grossly negligent because the prison policy contravenes federal law by not using a case-by-case analysis in facility assignment. Maj. Op. 31–32. Williams briefly references the Prison Rape Elimination Act's prohibition against cross-gender searches in challenging the district court's dismissal of the equal protection claim and the claims against Garcia. But this also is not properly before us. Williams never raised the "case-by-case" analysis provision cited by the majority. Nor does Williams raise the federal statue at all with respect to the gross negligence claims against Sheriff Kincaid. Thus, this issue is not properly before us. *Liberty Univ., Inc.*, 733 F.3d at 87 n.3 ("Plaintiffs had the opportunity to raise these arguments in the district court and in the original briefing in this case but did not do so; thus the arguments are waived."). For that reason, I will not address substantive problems with a claim that violating the Act plausibly alleges gross negligence.

III.

For the foregoing reasons, I would affirm the dismissal of Williams' ADA claim and gross negligence claim as to Sheriff Kincaid.