RECORD NO. 21-2030

In The

# United States Court of Appeals
### For The Fourth Circuit

## KESHA T. WILLIAMS,

*Plaintiff – Appellant,*

**v.**

## STACEY A. KINCAID, in her official capacity;
## XIN WANG, NP, in her individual and official capacities;
## DEPUTY GARCIA, in his individual and official capacities,

*Defendants – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA**

---

**APPELLEES' PETITION FOR REHEARING *EN BANC***

---

Alexander Francuzenko
Philip C. Krone
COOK CRAIG & FRANCUZENKO, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, Virginia  22030
(703) 865-7480

*Counsel for Appellees*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA  23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# **Table of Contents**

**Page**

Table of Authorities ................................................................... ii

I.    Statement of Purpose ....................................................... 1

II.   Background .................................................................... 1

III.  Argument ....................................................................... 2

       A.    The Panel decision that gender dysphoria does not fall within the ADA's exclusion provision conflicts with U.S. Supreme Court and Fourth Circuit precedent for statutory construction ............ 2

       B.    The Panel decision that gender dysphoria results from a physical impairment conflicts with U.S. Supreme Court and Fourth Circuit precedent for statutory construction .............................. 8

IV.   Conclusion ................................................................... 10

Certificate of Compliance

Certificate of Filing and Service

## **Table of Authorities**

**Page(s)**

## **Cases**

*Bostock v. Clayton Cnty., Georgia,*
    140 S. Ct. 1731 (2020)..........................................................................3

*Clark v. Martinez,*
    543 U.S. 371 (2005)............................................................................5

*Duncan v. Walker,*
    533 U.S. 167 (2001).......................................................................6, 9

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,*
    541 U.S. 246 (2004)............................................................................3

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018).........................................................................5

*Moore Ice Cream Co. v. Rose,*
    289 U.S. 373 (1933)............................................................................6

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,*
    469 U.S. 189 (1985)............................................................................3

*Perrin v. United States,*
    444 U.S. 37 (1979).............................................................................2

*Smith v. United States,*
    508 U.S. 223 (1993)............................................................................2

*United States v. Locke,*
    471 U.S. 84 (1985).............................................................................6

*United States v. Menasche,*
    348 U.S. 528 (1955)............................................................................6

*United States v. Simms*,
    914 F.3d 229 (4th Cir. 2019) ....................................................................6, 9

**Statutes**

29 U.S.C. §§ 701 *et seq*. .............................................................................1

42 U.S.C. § 12101 ........................................................................................1

42 U.S.C. § 12211 ........................................................................................5

42 U.S.C. § 12211(b) ............................................................................1, 2, 5

42 U.S.C. § 12211(b)(1) ...............................................................................2

**Regulation**

28 C.F.R. § 35.108(b)(1)(i) ...........................................................................9

**Other Authorities**

Am. Psych. Ass'n, Diagnostic and Statistical Manual 71 (3d ed., rev. 1987)...........4

*Gender Dysphoria*, Am. Psychiatric Ass'n (2013),
https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/AP
A_DSM-5-Gender-Dysphoria.pdf ...............................................................4

## I.      <u>Statement of Purpose</u>

The Panel decision that the Americans with Disability Act exclusion, 42 U.S.C. § 12211(b), does not include the diagnosis of gender dysphoria conflicts with U.S. Supreme Court decisions involving statutory construction and constitutional avoidance.  The dissenting opinion by Judge Quattlebaum sets forth the proper analysis and holding as to whether gender dysphoria is excluded under § 12211(b). The Panel decision also involves a question of exceptional importance as it is the first federal appellate court decision to interpret the Americans with Disability Act exclusion, 42 U.S.C. § 12211(b), to not include the diagnosis of gender dysphoria. In addition, the Panel decision is of exceptional importance as it renders a medical determination without the benefit of medical experts.

## II.     <u>Background</u>

This case involves Kesha Williams suffers from gender dysphoria.  She is a transgender woman whose gender identity (female) is different from the gender assigned to her at birth (male).  Ms. Williams' allegations stem from her six-month incarceration at the Fairfax County Adult Detention Center.  The claims that are of particular importance as it relates to this petition are Ms. Williams' claims against Appellee, Stacey A. Kincaid, Sheriff for Fairfax County, for a failure to accommodate in violation the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq* (the "ADA") and the Rehabilitation Act, 29 U.S.C. §§ 701 *et seq*.

III.  **Argument**

The Panel decision declaring that gender dysphoria falls outside of the ADA's exclusions, § 12211(b)(1), is the first federal appellate court decision on this issue. The decision, however, does not comport with the rules of statutory construction. Consequently, the decision is of exceptional importance as it re-writes federal law and sets forth a sweeping medical determination, as a matter of law, that individuals suffer from gender dysphoria because of a physical impairment, without the benefit of medical experts.

> **A.    The Panel decision that gender dysphoria does not fall within the ADA's exclusion provision conflicts with U.S. Supreme Court and Fourth Circuit precedent for statutory construction.**

The ADA excludes from its definition of "disability" "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders not resulting from physical impairments*, [and] other sexual behavior disorders," as well as "compulsive gambling, kleptomania, . . . pyromania; or . . . psychoactive substance use disorders resulting from current illegal use of drugs." 42 U.S.C. § 12211(b) (emphasis added).  The ADA does not define "gender identity disorders not resulting from a physical impairment."  "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."  *Smith v. United States*, 508 U.S. 223, 228 (1993) (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979) (words not defined in statute should be given ordinary or common

meaning)). "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (quoting *Park 'N Fly*, *Inc. v. Dollar Park & Fly*, *Inc.*, 469 U.S. 189, 194 (1985)).

"Because the law's ordinary meaning at the time of enactment usually governs, we must be sensitive to the possibility a statutory term that means one thing today or in one context might have meant something else at the time of its adoption or might mean something different in another context. And we must be attuned to the possibility that a statutory phrase ordinarily bears a different meaning than the terms do when viewed individually or literally." *Bostock v. Clayton Cnty.*, *Georgia*, 140 S. Ct. 1731, 1750 (2020). In *Bostock*, the Supreme Court stated that courts

> interpret[] a statute in accord with the ordinary public meaning of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, *update*, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.

*Bostock v. Clayton Cnty.*, *Georgia*, 140 S. Ct. 1731, 1738 (2020) (emphasis added). With this in mind, the Panel's reliance on comparing the diagnoses of gender dysphoria and gender identity disorders in third and fifth editions of the Diagnostic

and Statistical Manual of Mental Disorders (the "DSM") is flawed and improperly updates the exclusion provision of the ADA.

As none of the exclusion's terms are defined, the Panel decision looked to the DSM-III-R, the DSM edition that existed at the time the ADA was enacted, to define "gender identity disorders." In turn, the Panel decision applies the DSM-III-R's diagnosis as the definition of "gender identity disorder."

The DSM-III-R provided that "[t]he essential feature of [gender identity] disorders . . . is an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity." Am. Psych. Ass'n, Diagnostic and Statistical Manual 71 (3d ed., rev. 1987) (DSM-III-R). The diagnostic criteria for gender identity disorder included "persistent or recurrent discomfort and a sense of inappropriateness about one's assigned sex." *Id*. at 77.

In 2013, when the American Psychiatric Association (the "APA") changed from gender identity disorder to gender dysphoria, it stated

> In the upcoming fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5), people whose gender at birth is contrary to the one they identify with will be diagnosed with gender dysphoria. This *diagnosis is a revision of DSM-IV's criteria for gender identity disorder* and is intended to better characterize the experiences of affected children, adolescents, and adults.

*Gender Dysphoria*, Am. Psychiatric Ass'n (2013), https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Gender-Dysphoria.pdf. (emphasis added). "The DSM-5 defines 'gender

dysphoria' as the '*clinically significant distress*' felt by some of those who experience "an incongruence between their gender identity and their assigned sex." (Dkt. No. 68, p. 11) (emphasis original) (quoting DSM-V at 451–53). Gender dysphoria "focuses on dysphoria as the clinical problem, not identity per se" DSM-5 at 451.

Gender identity cannot be removed from gender dysphoria. While the diagnosis and treatment has evolved to focus on the clinical problem, that problem still involves, at its base, an incongruence with gender identity. As a result, gender dysphoria falls within the gender identity disorders as that phrase was understood when the ADA was enacted. The Panel decision allows the APA to re-write the ADA and, thereby, improperly updates the exclusion provision under § 12211(b).[1]

The flaw in the Panel's statutory construction is further illustrated by the fact that not all the terms in § 12211 are in the DSM-III-R diagnoses. Specifically, the DSM-III-R does not have a diagnosis for "transvestism," "sexual behavior

---

[1] Additionally, the Panel decision reasons that "[b]ecause 'a construction of the statute . . . by which [this constitutional] question may be avoided' is readily available . . . we reject a reading of § 12211(b) that would exclude gender dysphoria from the ADA's protections. (Dkt. No. 68, p. 23). "The canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found susceptible of more than one construction. In the absence of more than one plausible construction, the canon simply has no application.'" *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005))). The Panel does not suggest that the exclusion provision as a whole is ambiguous or that the "gender identity disorders" is ambiguous.

disorders," "compulsive gambling," or "psychoactive substance use disorders." Under this reasoning, at the time the ADA was enacted, the exclusion included four meaningless terms, violating the "duty to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal punctuation omitted); *see also United States v. Simms*, 914 F.3d 229, 241 (4th Cir. 2019) (concluding the court should not adopt a reading of a statute "that renders part of the statute superfluous over one that gives effect to its 'every clause and word'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))).

Again, if the DSM is used as the dictionary to define these terms, the DSM-V, does not contain diagnoses for "transvestism," "transsexualism," "pedophilia," "exhibitionism," "voyeurism." "sexual behavior disorders," "compulsive gambling," "psychoactive substance use disorders," or "gender identity disorders." Thus, under the Panel decision, currently nine out of the eleven terms that were excluded have been written out of the ADA, not by Congress, but by the APA. *See United States v. Locke*, 471 U.S. 84, 96 (1985) (the Supreme Court has cautioned that it "cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question") (quoting *Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933) (Cardozo, J.)).

Under the presumption that Congress intended those terms to have meaning, the more appropriate reading would be a physical or mental impairment that

substantially limits one or more major life activities of an individual that is connected to "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders not resulting from physical impairments*, [and] other sexual behavior disorders, . . . compulsive gambling, kleptomania, . . . pyromania; or . . . psychoactive substance use disorders resulting from current illegal use of drugs" is excluded from the ADA's definition of disability. Under such a reading, whatever the medical condition associated with these terms would be excluded.

Consequently, gender dysphoria falls under the gender identity disorder umbrella. First, while the term disorder carries a stigma and changing terminology is important for eliminating stigmas, promoting acceptance, and promoting treatment, gender dysphoria is, nonetheless, still a diagnosis contained in the DSM, which is a manual for mental *disorders*. Second, the gender dysphoria chapter indicates "that current term[, gender dysphoria,] is more descriptive than the previous DSM-IV term *gender identity disorder*." *Id.* "More descriptive" does not equate to entirely separate unrelated condition. The evolution of the condition does not amend the language of the statute and supplant Congress' authority.

Finally, "gender dysphoria refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." DSM-5 at 451. Thus, gender dysphoria involves one's experienced or expressed gender, or in other words it involves gender identity. *See id.* ("[g]ender

7

identity is a category of social identity and refers to an individual's identification as male, female, or, occasionally, some category other than male or female").

The Panel's decision (1) is of exceptional importance because it is the first appellate court to address this issue and (2) is in direct opposition with Supreme Court and other Fourth Circuit caselaw on statutory construction. Therefore, the Petition for Rehearing *En Banc* must be granted.

**B.      The Panel decision that gender dysphoria results from a physical impairment conflicts with U.S. Supreme Court and Fourth Circuit precedent for statutory construction.**

While the ADA does not indicate whether the phrase "gender identity disorders resulting from a physical impairment" is one distinct term, or a distinct term ("gender identity disorders") with a qualification ("resulting from a physical impairment"), neither the parties nor the Panel naturally read "gender identity disorders not resulting from a physical impairment" as one distinct term. Instead, the phrase was naturally read as a distinct term ("gender identity disorders") with a qualification ("resulting from a physical impairment"). The Panel decision applied the Equal Employment Opportunity Commission's definition for physical impairment means "[a]ny physiological disorder or condition . . . affecting one or

more body systems, such as neurological . . . and endocrine." 28 C.F.R.
§ 35.108(b)(1)(i).[2]

The Panel decision applied to this definition, noting that

> Williams alleges that the medical treatment for *her* gender dysphoria
> consisted primarily of a hormone therapy, which she used to effectively
> manage and alleviate the gender dysphoria she experienced," and that
> she had received this medical treatment for fifteen years. Am. Compl.
> ¶ 14. Thus, contrary to the dissent's assertion, Williams does not merely
> allege that gender dysphoria may require physical treatment such as
> hormone therapy; she maintains that her gender dysphoria requires it.

(Dkt. No. 68, p. 17). Upon these allegations, without a developed record, the Panel

decision determined that gender dysphoria is a "gender identity disorder resulting

from a physical impairment." The problem, however, is the allegations describe the

symptoms or manifestations of gender dysphoria. In other words, the Panel is saying

gender dysphoria results from the symptoms of gender dysphoria. This backward

construction makes "resulting from a physical impairment" meaningless.

In order to give effect to the statutory language "resulting from a physical

impairment," there would need to be separate physical impairment causing the

gender dysphoria. *See Duncan*, 533 U.S. at 174; *Simms*, 914 F.3d at 241 (4th Cir.

2019). There was none pled in this case. Not only is the reasoning flawed, but it is

---

[2] The Panel through its opinion substitutes the statutory language, "physical
impairment," with "physical basis." Physical basis is not the same as physical
impairment. "Basis" means "the underlying support or foundation for an idea,
argument, or process." Whereas to be impaired means to be "weakened or
damaged."

of exceptional importance because the determination strikes against the purpose (eliminating stigmas) of adding the revised diagnosis of gender dysphoria by ultimately, rendering gender dysphoria as a physical impairment.[3]

The Panel's decision (1) is of exceptional importance because it is the first appellate court to address this issue and sets forth a sweeping medical determination as a matter of law and (2) is in direct opposition with Supreme Court and other Fourth Circuit caselaw on statutory construction.   Therefore, the Petition for Rehearing *En Banc* must be granted.

## IV.   <u>Conclusion</u>

Based on the foregoing, and the reasoning set forth in Judge Quattlebaum's dissent, Appellee, Stacey A. Kincaid, urges this court to grant her Petition for Rehearing *En Banc*.

<div style="margin-left:auto">

/s/ Alexander Francuzenko
Alexander Francuzenko
Philip C. Krone
COOK CRAIG & FRANCUZENKO, PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, Virginia  22030
(703) 865-7480
*Counsel for Appellees*

</div>

---

[3] For example, before the Panel's decision that renders a gender dysphoria a physical impairment, the National LGBTQ Task Force already expressed concern with the diagnosis and its desire for gender dysphoria to be removed from the DSM entirely. *See (In)Validating Transgender Identities: Progress and Trouble in the DSM-5*, LGBTQ Task Force, Kayley Whalen, https://www.thetaskforce.org/invalidating-transgender-identities-progress-and-trouble-in-the-dsm-5/, (last accessed Aug. 30, 2022).

## **Certificate of Compliance**

1.  This petition complies with type-volume limits because, excluding the parts
    of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure
    statement, table of contents, table of citations, statement regarding oral
    argument, signature block, certificates of counsel, addendum, attachments):

    [ X ] this petition contains [2,349] words.

    [    ] this petition uses a monospaced type and contains [*state the number of*]
    lines of text.

2.  This petition complies with the typeface and type style requirements
    because:

    [ X ] this petition has been prepared in a proportionally spaced typeface
    using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

    [    ] this petition has been prepared in a monospaced typeface using [*state
    name and version of word processing program*] with [*state number of
    characters per inch and name of type style*].

Dated: August 30, 2022                    /s/ Alexander Francuzenko
                                          *Counsel for Appellees*

## **Certificate of Filing and Service**

I hereby certify that on this 30th day of August, 2022, I caused this Petition for Rehearing *En Banc* to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Alexander Francuzenko
*Counsel for Appellees*